**Annex 3**

**Defense of the ECB dated 28 March 2019**

Date of acceptance        :              02/04/2019



ОБЩ СЪД НА ЕВРОПЕЙСКИЯ СЪЮЗ
TRIBUNAL GENERAL DE LA UNIÓN EUROPEA
TRIBUNÁL EVROPSKÉ UNIE
DEN EUROPÆISKE UNIONS RET
GERICHT DER EUROPÄISCHEN UNION
EUROOPA LIIDU ÜLDKOHUS
ΓΕΝΙΚΟ ΔΙΚΑΣΤΗΡΙΟ ΤΗΣ ΕΥΡΩΠΑΪΚΗΣ ΕΝΩΣΗΣ
GENERAL COURT OF THE EUROPEAN UNION
TRIBUNAL DE L'UNION EUROPÉENNE
CÚIRT GHINEARÁLTA AN AONTAIS EORPAIGH
OPĆI SUD EUROPSKE UNIJE
TRIBUNALE DELL'UNIONE EUROPEA

EIROPAS SAVIENĪBAS VISPĀRĒJĀ TIESA
EUROPOS SĄJUNGOS BENDRASIS TEISMAS
AZ EURÓPAI UNIÓ TÖRVÉNYSZÉKE
IL-QORTI ĠENERALI TAL-UNJONI EWROPEA
GERECHT VAN DE EUROPESE UNIE
SĄD UNII EUROPEJSKIEJ
TRIBUNAL GERAL DA UNIÃO EUROPEIA
TRIBUNALUL UNIUNII EUROPENE
VŠEOBECNÝ SÚD EURÓPSKEJ ÚNIE
SPLOŠNO SODIŠČE EVROPSKE UNIJE
EUROOPAN UNIONIN YLEINEN TUOMIOISTUIN
EUROPEISKA UNIONENS TRIBUNAL

**E-CURIA**                                                Luxembourg, 01/04/2019
- 883110 -                                                              T-27/19-13

Mr Okko Hendrik Behrends
Mr Lars Feddern
Mr Marc Kirchner
DLA Piper UK LLP
Westhafenplatz 1
60327 Frankfurt am Main
DEUTSCHLAND

**Case T-27/19**

### Pilatus Bank plc and Pilatus Holding ltd.
### v
### European Central Bank

The Registrar of the General Court encloses a copy of the following document(s):

| Document(s) | Author(s) | Register number(s) |
|---|---|---|
| Defence | European Central Bank | 882907 |

The applicant may, if it deems it necessary, lodge a reply. The purpose of a reply is not to repeat the applicant's pleas in law and arguments, but to respond to new matters raised in the defence.

The following time-limit, which includes the extension on account of distance, has been fixed for the next step to be taken in the proceedings:

| Document(s) to be lodged | Party/Parties concerned | Time-limit – dd/mm/yyyy |
|---|---|---|
| Reply | Pilatus Bank plc and Pilatus Holding ltd. | 13/05/2019 |

- 2 -

All procedural documents must be lodged only in electronic format via the e-Curia application.

E. Artemiou
Administrator

Date of acceptance        :                02/04/2019



| | | |
|---|---|---|
| Published ID | : | T-27/19 |
| Document number | : | 11 |
| Register number | : | 882907 |
| Date of lodgment | : | 28/03/2019 |
| Date of entry in the register | : | 29/03/2019 |
| Type of document | : | Defence |

| | | |
|---|---|---|
| | : | Document |
| e-Curia lodgment reference | : | DT105699 |
| File number | : | 1 |
| Person lodging document | : | Puidokas Markas (R351121) |
| | | BCE |



**EUROPEAN CENTRAL BANK**

Frankfurt am Main, 28 March 2019

## TO THE PRESIDENT AND THE MEMBERS OF THE
## GENERAL COURT OF THE EUROPEAN UNION

Registry
Rue du Fort Niedergrünewald
2925 Luxembourg
LUXEMBOURG
Per e-Curia

### DEFENCE

lodged by the **European Central Bank**, Sonnemannstrasse 20, 60314 Frankfurt am Main, Germany, represented by Alexander Karpf, Emilie Yoo and Markas Puidokas, members of the ECB's Directorate General Legal Services, acting as Agents, on whom service may be effected via e-Curia and, failing that, by email LegalAdviceTeam@ecb.europa.eu or, if necessary, at Sonnemannstrasse 20, 60314 Frankfurt am Main, Germany

in **Case T-27/19**

**Pilatus Bank plc,**
Whitehall Mansions, Level 2,
Ta'Xbiex Wharf, Ta'Xbiex XBX 1026,
Malta

– **Applicant 1** –

and

**Pilatus Holding Ltd.,**
Whitehall Mansions, Level 2,
Ta'Xbiex Wharf, Ta'Xbiex XBX 1026,
Malta

– **Applicant 2** –

against

**the European Central Bank**
Sonnemannstrasse 20
60314 Frankfurt am Main
Germany

– **Defendant** –

| | | |
|---|---|---|
| **I.** | **INTRODUCTION** | **5** |
| **II.** | **LEGAL FRAMEWORK** | **8** |
| **1.** | **The ECB's tasks in respect of significant and less significant credit institutions** | **8** |
| **2.** | **The ECB's task to authorise and to withdraw authorisations** | **9** |
| **3.** | **The Contested Decision** | **11** |
| **III.** | **RELEVANT FACTS AND PROCEDURE** | **11** |
| **IV.** | **THE APPLICATION IS PARTLY INADMISSIBLE** | **13** |
| **V.** | **THE APPLICATION IS UNFOUNDED** | **16** |
| **4.** | **First plea: the ECB did not fail to assume its responsibility pursuant to Article 14(5) of the SSM Regulation** | **16** |
| | a) The MFSA's measures of 21 and 22 March 2018 do not constitute a withdrawal of an authorisation | 17 |
| | b) The ECB could not have assumed the direct supervision of Pilatus Bank as the conditions for direct supervision were not met | 18 |
| **5.** | **Second plea: There was a ground for the Contested Decision** | **19** |
| | a) The Contested Decision is based on a breach of legal requirements | 19 |
| | b) The suitability of a shareholder may be assessed based on allegations alone | 20 |
| | c) Whether the allegations concern acts that are legal or not under Union law is irrelevant | 22 |
| | d) The Guidelines are also relevant in cases of a withdrawal of authorisation | 23 |
| **6.** | **Third plea: The Applicants failed to demonstrate that the ECB did not exercise its discretion appropriately** | **24** |
| **7.** | **Fourth plea: The ECB assessed the relevant facts impartially and objectively** | **25** |
| **8.** | **Fifth plea: the ECB did not violate the principle of proportionality** | **26** |
| **9.** | **Sixth plea: the ECB did not violate the principle of nemo auditor** | **29** |
| **10.** | **Seventh plea: the Contested Decision is compatible with the presumption of innocence during criminal proceedings** | **30** |
| **11.** | **Eighth plea: the ECB did not violate the principle of equal treatment and non-discrimination** | **31** |
| **12.** | **Ninth plea: the ECB did not violate Article 19 of the SSM Regulation and did not misuse its powers** | **31** |

**13. Tenth plea: the ECB did not violate the Applicants' rights of defence and to
be heard**                                                                    **32**

**14. Eleventh plea: the ECB did not fail to provide an adequately reasoned
decision**                                                                    **33**

**VI. ORDERS SOUGHT**                                                         **33**

**TABLE OF ANNEXES**                                                          **35**

## I.   INTRODUCTION

1.   Applicant 1 (also referred to as 'Pilatus Bank') used to be a less significant credit institution in Malta, subject to direct prudential supervision by the Malta Financial Services Authority (MFSA), pursuant to Article 6(4) of Council Regulation (EU) No 1024/2013[1] (the 'SSM Regulation'). Applicant 2 is the direct majority shareholder of Pilatus Bank (together with Pilatus Bank, the 'Applicants').

2.   The European Central Bank (ECB), being exclusively competent for the withdrawal of authorisation in relation to all credit institutions established in the participating Member States, withdrew the authorisation of Pilatus Bank by the decision of 2 November 2018 (the 'Contested Decision')[2].

3.   On 15 January 2019, the Applicants lodged an application (the 'Application') for the annulment of the Contested Decision.

4.   The ECB submits that the Application is inadmissible in so far as it is lodged on behalf of Applicant 2 because Applicant 2 does not have an interest in bringing proceedings, or standing, distinct from that of Pilatus Bank.

5.   The Applicants submit eleven pleas in law as follows:

–   *First plea*: the ECB violated Pilatus Bank's right, pursuant to Article 41(1) of the Charter of Fundamental Rights of the European Union (the 'Charter'), to have its affairs handled impartially, fairly and within a reasonable time by allowing the MFSA to implement a *de facto* withdrawal of an authorisation without any due process and by not assuming direct responsibilities over Pilatus Bank.

–   *Second plea*: the Contested Decision is based on the erroneous assumption that a ground for the withdrawal of authorisation exists. In particular, the Contested Decision relies on a mere press release which expresses allegations; the allegations relate to charges which are not illegal under EU law; and the charges are unrelated to Pilatus Bank.

–   *Third plea*: the Contested Decision fails to take into account the discretionary nature of the withdrawal of an authorisation since it is based on the point of view of a person who asks whether the withdrawal of an authorisation may be justified and who wishes to withdraw the authorisation.

---

1   Council Regulation (EU) No 1024/2013 of 15 October 2013 conferring specific tasks on the European Central Bank concerning policies relating to the prudential supervision of credit institutions (OJ L 287, 29.10.2013, p. 63).

2   Annexed hereto as **B.1**.

− *Fourth plea*: the ECB failed to assess the relevant facts impartially and objectively. The Contested Decision is based on conclusions of the MFSA which in turn are based on allegations of the United States (US) law enforcement authorities. Furthermore, the ECB failed to assess the reputational effects on Pilatus Bank of the indictment of Mr Ali Sadr Hashemi Nejad ('Mr Sadr') and to distinguish this effect from the impact of the measures of the MFSA and the impact of the ECB's public statements and leaks to the media.

− *Fifth plea*: the ECB breached the principle of proportionality. The proportionality assessment contains references to the problematic financial condition of Pilatus Bank which were unsubstantiated and unsupported by evidence. In addition, none of the less intrusive measures were considered in an appropriate manner.

− *Sixth plea*: the ECB breached the principle of nemo auditor. The main difficulties of Pilatus Bank are due to the actions of the MFSA as well as the failure of the ECB to intervene despite its dominant role in prudential supervision pursuant to the SSM Regulation. Accordingly, the ECB cannot rely on the consequences of its own misconduct and failure to perform its role properly as a basis for the Contested Decision.

− *Seventh plea*: the Contested Decision is based on erroneous considerations as to the presumption of innocence. The ECB did not consider any concrete facts and merely referred to the existence of charges in abstract. Further, the ECB cannot base its decision on allegations but disregard another extremely important element of the US criminal law system, namely the presumption of innocence.

− *Eighth plea*: the Contested Decision violates the principle of equal treatment and is discriminatory as no bank owned by a Maltese citizen (or any bank owned by a citizen of the same country) would have been treated in this manner.

− *Ninth plea*: the ECB did not act independently when adopting the Contested Decision and misused its powers.

− *Tenth plea*: Pilatus Bank's rights of defence and its right to be heard have been violated because Pilatus Bank was systematically deprived of its legal representation.

− *Eleventh plea*: the ECB did not adequately reason the Contested Decision as it is extremely superficial and vague.

6.   Based on the relevant legal framework and the facts of the case (see sections II and III), the ECB will demonstrate in more detail that in relation to Applicant 2 the Application must be dismissed as inadmissible (see section IV) and further

that the Applicants' pleas must be rejected as unfounded in their entirety (see section V).

7.   The ECB will show in particular that:

−   First, the ECB did not breach Pilatus Bank's rights pursuant to Article 41(1) of the Charter as the ECB  did not fail to assume its responsibilities under the SSM Regulation. Further, the MFSA's measures do not amount to a *de facto* withdrawal of authorisation of a credit institution.

−   Second, the Contested Decision is based on a breach of legal requirements, as the assessment of the suitability of a shareholder may be based on allegations from credible sources and not necessarily on final convictions. Further, these allegations are relevant for assessing the suitability of the shareholder Mr Sadr even if the criminal charges do not constitute offences under Union law. Whether the alleged acts would be regarded as legal under Union law is irrelevant.

−   Third, the ECB did not fail to exercise its discretion appropriately in adopting the Contested Decision. The Applicants do not provide any arguments to support their plea.

−   Fourth, the ECB assessed the relevant facts impartially and objectively. In particular, the ECB did not rely on the MFSA's conclusions but adopted the Contested Decision based on a draft proposal of the MFSA in accordance with the applicable law. Moreover, the assessment of Mr Sadr's suitability may be based on criminal allegations. Finally, the ECB considered the reputational damage incurred by Pilatus Bank when assessing the necessity for the withdrawal of the authorisation.

−   Fifth, the ECB did not violate the principle of proportionality. In particular, the Applicants fail to provide any evidence to support their claims that the proportionality considerations in the Contested Decision were flawed.

−   Sixth, the ECB did not violate the principle of nemo auditor as the ECB was not under any obligation to assume the direct supervision of Pilatus Bank. Further, the Applicants do not provide any evidence for their claim that Pilatus Bank's reputation was damaged as a result of public statements and leaks from within the MFSA or the ECB.

−   Seventh, the Contested Decision is compatible with the presumption of innocence as the ECB's assessment under the Contested Decision sought to determine whether there were any circumstances which cast serious doubts on the reliability and suitability of the shareholder in Pilatus Bank and not to establish whether a criminal offence had been committed.

– Eighth, the ECB did not violate the principle of equal treatment and non-discrimination. The Applicants do not provide any arguments to explain how the principles of equal treatment and discrimination were violated.

– Ninth, the ECB acted independently when adopting the Contested Decision and did not misuse its powers. The Applicants do not provide any arguments to support their plea.

– Tenth, the ECB did not violate Pilatus Bank's rights of defence and its right to be heard. Pilatus Bank was invited to provide comments on the draft of the Contested Decision. Further, the Applicants' claims in relation to legal representation at issue in Case T-687/18 R are irrelevant because the procedure under dispute in that case did not concern the supervisory procedure which led to the adoption of the Contested Decision.

– Eleventh, the Contested Decision is adequately reasoned as it contains the material facts and legal reasons on which it is based.

## II.   LEGAL FRAMEWORK

8.   The following section presents the legal framework relevant for this case. In particular, the ECB will set out its tasks in respect of significant and less significant credit institutions (1.); its task to authorise credit institutions and to withdraw authorisations of credit institutions (2.); and the Contested Decision itself (3.).

### 1.   The ECB's tasks in respect of significant and less significant credit institutions

9.   Within the framework of Article 6 of the SSM Regulation, the ECB is exclusively competent, for prudential supervisory purposes, to carry out the tasks listed in Article 4(1) of that Regulation in relation to all credit institutions established in the participating Member States.

10.   Article 6 of the SSM Regulation establishes the cooperation and the distribution of responsibilities between the ECB and national competent authorities (NCAs) in the supervision of credit institutions.

11.   According to Article 6(4) of the SSM Regulation, the ECB has the responsibilities set out in Article 6(5) of that Regulation and the NCAs have the responsibilities set out in Article 6(6) of that Regulation for the supervision of 'less significant' credit institutions in relation to the tasks defined in Article 4 of that Regulation, except for the task to authorise credit institutions and to withdraw authorisations (Article 4(1)(a) of the SSM Regulation) and the task to assess notifications of the acquisition and disposal of qualifying holdings in credit institutions (Article 4(1)(c) of the SSM Regulation).

12. In accordance with Article 6(5) of the SSM Regulation, the ECB shall exercise oversight over the functioning of the system. When necessary to ensure consistent application of high supervisory standards, the ECB may at any time, on its own initiative after consulting with NCAs or upon request by an NCA, decide to exercise directly itself all the relevant powers for one or more less significant credit institutions[3].

13. In accordance with Article 6(6) of the SSM Regulation, the NCAs shall carry out and be responsible for the tasks referred to in points (b), (d) to (g) and (i) of Article 4(1) of that Regulation and adopting all relevant supervisory decisions with regard to less significant credit institutions.

14. It follows from the above that the ECB carries out prudential supervision and is responsible for significant credit institutions as well as to authorise and withdraw authorisations of credit institutions and to assess notifications of the acquisition and disposal of qualifying holdings in respect of all credit institutions. In addition, the ECB exercises oversight over the functioning of the system.

15. The NCAs carry out prudential supervision and are responsible for, and adopt, all relevant supervisory decisions in relation to less significant credit institutions. The prudential supervision by NCAs in relation to less significant credit institutions excludes the tasks to authorise and withdraw authorisations of credit institutions and to assess notifications of the acquisition and disposal of qualifying holdings in respect of all credit institutions.

## 2. The ECB's task to authorise and to withdraw authorisations

16. The supervisory tasks conferred upon the ECB, include, amongst others, to authorise credit institutions and to withdraw authorisations of credit institutions pursuant to Article 4(1)(a) of the SSM Regulation. As mentioned above, this task is performed by the ECB in relation to all credit institutions in a participating Member State, irrespective of their significance.

17. Pursuant to Article 14(5) of the SSM Regulation, the ECB may withdraw the authorisation in the cases set out in relevant Union law on its own initiative, following consultations with the NCA of the participating Member State where the credit institution is established, or on a proposal from such NCA.

18. Where the NCA which has proposed the authorisation considers that the authorisation must be withdrawn in accordance with the relevant national law, it shall submit a proposal to the ECB to that end. In that case, the ECB shall take a decision on the proposed withdrawal taking full account of the justification for withdrawal put forward by the NCA.

---

3   Article 6(5)(b) of the SSM Regulation.

19. Article 18 of Directive 2013/36/EU of the European Parliament and of the Council[4] (the 'CRD IV') establishes the conditions under which competent authorities may withdraw the authorisation granted to a credit institution. Amongst other reasons, in accordance with Article 18(c) of the CRD IV, competent authorities may withdraw the authorisation where a credit institution no longer fulfils the conditions under which an authorisation was granted. This provision has been implemented in Malta by means of Article 9(2)(c) of the Banking Act[5]. Article 9(2)(c) of the Banking Act provides that, amongst other reasons, the competent authority may only restrict or withdraw the licence issued to a credit institution where such a credit institution no longer fulfils the conditions under which the licence was issued.

20. Article 14(2) of the CRD IV provides that the competent authorities shall refuse authorisation to commence the activity of a credit institution if, taking into account the need to ensure the sound and prudent management of a credit institution, they are not satisfied as to the suitability of the shareholders or members, in particular where the criteria set out in Article 23(1) of the CRD IV are not met. This provision has been implemented in Malta by means of Article 7(1)(d) of the Banking Act. Article 7(1)(d) of the Banking Act provides that a licence cannot be granted unless the competent authority is satisfied that the shareholders or members whether direct or indirect, that have qualifying holdings, controllers and all individuals who will effectively direct the business of the credit institution are 'suitable persons to ensure its sound and prudent management'. Qualifying holding means a direct or indirect holding in an undertaking which represents 10 % or more of the capital or of the voting rights or which makes it possible to exercise a significant influence over the management of that undertaking[6]. The competent authority shall be satisfied of the suitability of the shareholders or members, in particular, where the criteria set out in Article 13A(9) of the Banking Act are met[7].

21. Article 23(1) of the CRD IV establishes the criteria for assessing the suitability of a proposed acquirer and the financial soundness of a proposed acquisition. In addition to other criteria, Article 23(1)(a) of the CRD IV requires competent authorities to assess the reputation of a proposed acquirer. This provision has been implemented in Malta by means of Article 13A(9) of the Banking Act.

---

4   Directive 2013/36/EU of the European Parliament and of the Council of 26 June 2013 on access to the activity of credit institutions and the prudential supervision of credit institutions and investment firms, amending Directive 2002/87/EC and repealing Directives 2006/48/EC and 2006/49/EC (OJ L 176, 27.6.2013, p. 338).

5   Banking Act – Chapter 371 of the Laws of Malta.

6   Article 2 of the Banking Act which refers to Article 4(1)(36) of Regulation (EU) No 575/2013 of the European Parliament and of the Council of 26 June 2013 on prudential requirements for credit institutions and investment firms and amending Regulation (EU) No 648/2012 (OJ L 176, 27.6.2013, p. 1).

7   Article 7(1)(d) of the Banking Act.

### 3.    The Contested Decision

22.  By the Contested Decision, the ECB withdrew the authorisation of Pilatus Bank.

23.  In the Contested Decision, the ECB explains that the authorisation of Pilatus Bank has been withdrawn because of its failure to meet the conditions for authorisation as set out in Articles 9(2)(c) and 7(1)(d) of the Banking Act.

24.  In this context, the ECB assessed that a holder of a qualifying holding and controller of Pilatus Bank, Mr Sadr, no longer satisfied the reputation requirement as provided for under the applicable legal framework. More specifically, Mr Sadr was arrested in the United States on a six-count indictment. According to the indictment, Mr Sadr is charged with one count of conspiracy to defraud the United States, one count of conspiracy to violate the International Emergency Economic Powers Act, one count of bank fraud, one count of conspiracy to commit bank fraud, one count of money laundering, and one count of conspiracy to commit money laundering.

25.  The Contested Decision concluded that the withdrawal of the authorisation of Pilatus Bank was suitable, necessary and reasonable to end the non-compliance with the legal requirements and to protect the interests of depositors and the stability of the national banking sector as a whole.

26.  While the sale to a third party or a group of third parties was identified as an alternative to the withdrawal of authorisation the ECB concluded that this measure did not have a realistic chance of succeeding. This was based on the ECB's assessment that there was no material franchise value to Pilatus Bank.

27.  Concluding that no alternative measures to a withdrawal of the authorisation were feasible to restore the compliance of Pilatus Bank with the legal requirements, the ECB decided to withdraw Pilatus Bank's authorisation.

## III.    RELEVANT FACTS AND PROCEDURE

28.  Pilatus Bank used to be a credit institution established in Malta and a less significant credit institution directly supervised by the MFSA. The ECB, having the exclusive task of authorising and withdrawing authorisation in relation to all credit institutions established in participating Member States, was competent to perform those tasks in relation to Pilatus Bank.

29.  According to a press release published by the US Department of Justice, on 19 March 2018, Mr Sadr, who is the ultimate shareholder of Pilatus Bank holding indirectly 100% of the capital and voting rights in the latter, was arrested in the United States on a six-count indictment for his alleged participation in a scheme in which more than USD 115 million in payments for a Venezuelan housing

complex were illegally funnelled through the US financial system for the benefit of Iranian individuals and entities[8].

30.   The indictment was subject to intense national and international media attention resulting in negative press reports on Pilatus Bank, severely tarnishing its reputation, in particular taking into account the allegations of the US prosecutor with respect to the illicit origin of (part of) the funds invested in the capital of Pilatus Bank[9].

31.   In particular, during the week of 20 March 2018 when Mr Sadr was indicted, Pilatus Bank received requests to withdraw a total of EUR 51.4 million worth of deposits.[10] The total amount of deposits requested to be withdrawn represented around 40% of the total amount of deposits on the balance sheet of Pilatus Bank at 28 May 2018.

32.   On 21 March 2018, to mitigate the negative effects on Pilatus Bank stemming from the indictment of Mr Sadr, the MFSA acted immediately by, inter alia, ordering his removal, with immediate effect, from the position of director of Pilatus Bank and any executive roles held therein as well as by directing Mr Sadr to suspend the exercise of his voting rights and to refrain from exercising the legal and judicial representation of Pilatus Bank[11].

33.   Moreover, on 21 and 22 March 2018, respectively, the MFSA imposed a full moratorium[12] on Pilatus Bank and appointed Mr Lawrence Connell as a Competent Person[13] to take charge of Pilatus Bank's assets for the purpose of safeguarding the interests of depositors and to assume control of its business.

34.   On 29 June 2018, the ECB received a proposal from the MFSA to withdraw Pilatus Bank's authorisation. On 2 August 2018, the MFSA submitted to the

---

8    See press release published by the US Department of Justice, https://www.justice.gov/usao-sdny/pr/iranian-national-arrested-scheme-evade-us-economic-sanctions-illicitly-sending-more-115.

9    According to the submissions of the United States Attorney for the Southern District of New York, quoted by numerous local and international press reports, Mr Sadr's equity in Pilatus Bank 'constitutes criminal proceeds directly linked to the Venezuela project — [Mr Sadr] used money from the project (CHF 1 million and EUR 8 million) to establish and capitalize Pilatus Bank in 2013'. See Case 1:18-cr-00224-ALC Document 29 Filed 05/24/18 accessible at: http://www.independent.com.mt/file.aspx?f=168992.

10   At the end of April 2018 the total amount of deposits requested to be withdrawn further increased to EUR 53.9 million.

11   Directive of the MFSA of 21 March 2018 as regards removal and suspension of voting rights, annexed hereto as Annex **B.2**.

12   Directive of the MFSA of 22 March 2018 as regards the moratorium, annexed hereto as Annex **B.3**.

13   Directive of the MFSA dated 22 March 2018 as regards the appointment of the competent person, annexed hereto as **Annex B.4**.

ECB a revised proposal to withdraw the authorisation after considering additional information it received from Pilatus Bank on 18 July 2018.

35. By letter of 31 August 2018, the ECB invited Pilatus Bank to provide comments on the draft decision withdrawing the authorisation within five working days from the date of receipt of that letter.

36. On 6 September 2018, Pilatus Bank, represented by its legal counsel, requested an extension of the hearing period to 14 days as well as access to the file in this procedure.

37. Taking into account the request submitted by Pilatus Bank's legal counsel, the hearing period was extended initially until 17 and subsequently until 21 September 2018.

38. On 21 September 2018, Pilatus Bank's legal counsel commented on the draft withdrawal decision, expressing the opposition of the management and shareholders of Pilatus Bank to the proposed draft decision withdrawing its authorisation as a credit institution. Therefore, the ECB considered that no material new facts had emerged since Pilatus Bank was notified of the draft decision.

39. In response to the request by the members of the European Parliament to investigate a possible breach or non-application of Union law by the Maltese competent authorities in relation to Pilatus Bank, the European Banking Authority (EBA) opened a preliminary enquiry in relation to the Maltese Financial Intelligence Analysis Unit and another in relation to the MFSA.

40. On 24 September 2018 the EBA informed the members of the European Parliament that in light of the significant supervisory actions taken by the MFSA in relation to Pilatus Bank, the EBA decided to close the case without opening a breach of Union law investigation[14]. In addition, the EBA noted that the recommendation by the MFSA to the ECB to withdraw the authorisation of Pilatus Bank because of the indictment of Mr Sadr and the liquidity situation of Pilatus Bank was an appropriate step to comply with Article 14(2) of the CRD IV.

41. On 2 November 2018, the ECB adopted the Contested Decision and notified this decision to Pilatus Bank.

## IV.   THE APPLICATION IS PARTLY INADMISSIBLE

42. The ECB submits that the Application is inadmissible in so far as it is lodged on behalf of Applicant 2 because Applicant 2 has not demonstrated that it

---

14   Letter of the EBA Chairperson of 24 September 2018 to the Members of the European Parliament, annexed hereto as **Annex B.5**.

possesses a personal and separate interest in the annulment of the Contested Decision and that the Contested Decision is of direct and individual concern to it.

43. As established by case-law, a shareholder applicant must show that it has a legal interest in bringing proceedings separate from that possessed by an undertaking which it partly controls and which is concerned by a European Union measure. Otherwise, in order to defend its interests in relation to that measure, its only remedy lies in the exercise of its rights as a member of the undertaking which itself has a right of action[15].

44. That finding is based in particular on the fact that the possibility for shareholders to determine the management and policy of the undertaking in which they own shares, and the interests it must safeguard, precludes a finding that there is a risk of that undertaking adopting procedural decisions contrary to their interests[16].

45. To establish that there is a personal interest, it is the applicant that must prove that it has an interest in bringing proceedings. In particular, the applicant must be able to demonstrate a personal interest in the annulment of the contested decision[17].

46. While the Application makes a general claim that as a shareholder Applicant 2 is able to challenge the Contested Decision, the Application fails to demonstrate that Applicant 2 indeed has a personal interest in the annulment of the withdrawal of Pilatus Bank's authorisation separate from Pilatus Bank's or that Applicant 2 is precluded from exercising its rights as a shareholder of Pilatus Bank.

---

15   Judgment of 12 November 2015 in *HSH Investment Holdings* v *Commission*, T-499/12, ECLI:EU:T:2015:840, paragraph 31 (citing judgment of 20 June 2000, *Euromin* v *Council*, T-597/97, ECLI:EU:T:2000:157, paragraph 50; order of 27 March 2012, *European Goldfields* v *Commission*, T-261/11, ECLI:EU:T:2012:157, paragraph 21; order of 15 May 2013, *Post Invest Europe* v *Commission*, T-413/12, ECLI:EU:T:2013:246, paragraph 24; and judgment of 17 July 2014, *Westfälisch-Lippischer Sparkassen- und Giroverband* v *Commission*, T-457/09, ECLI:EU:T:2014:683, paragraph 112); see also judgment of 24 March 2011 in *Freistaat Sachsen and Land Sachsen-Anhalt* v *Commission*, T-443/08 and T-455/08, ECLI:EU:T:2011:117, paragraph 62.

16   Order of 15 May 2013, Post Invest Europe v Commission, T-413/12, not published, EU:T:2013:246, paragraph 29.

17   Judgment of 12 November 2015 in *HSH Investment Holdings* v *Commission*, T-499/12, ECLI:EU:T:2015:840, paragraph 25 (citing order of 31 July 1989, *S.* v *Commission*, C-206/89 R, ECLI:EU:C:1989:333, paragraph 8, and judgment of 14 April 2005, *Sniace* v *Commission*, T-141/03, ECLI:EU:T:2005:129, paragraph 31); see also judgment of 24 March 2011, *Freistaat Sachsen and Land Sachsen-Anhalt* v *Commission*, T-443/08 and T-455/08, ECLI:EU:T:2011:117, paragraph 62 (citing the order of 29 April 1999, *Unione Provinciale degli Agricoltori di Firenze and Others* v *Commission*, T-78/98, ECLI:EU:T:1999:87, paragraph 30).

47. In particular, as a result of the appointment of the Competent Person by the MFSA in respect of Pilatus Bank, Applicant 2 is not in fact prevented from exercising its rights as a shareholder. In particular, the powers of Pilatus Bank's management bodies have not been completely transferred to the Competent Person.

48. It must be noted in this context, that on 5 November 2018, the Court of Appeal in Malta delivered a final-instance judgment[18] in a similar case on whether, among other things, the directors of a bank were still empowered to request in the bank's name the revocation of a number of supervisory decisions made by the MFSA despite the appointment of a competent person. The Maltese Court of Appeal ruled that the directors of the said bank had not been completely divested of all their powers, as claimed by the MFSA, but rather that the legal and judicial representation that is due to the competent person was limited to the particular circumstances referred to in the national law on the basis of which the competent authority was appointed, notably matters concerning the assets and exercising control of the business. It is noted in this context that the Competent Person for Pilatus Bank was also appointed on the same legal basis as the competent person in the case considered by the Maltese Court of Appeal.

49. In the present case, the fact that the powers of Pilatus Bank's management bodies have not been completely transferred to the Competent Person is evidenced by the present Application. The Application is also brought on behalf of Pilatus Bank based on a power of attorney signed by the directors. Accordingly, Applicant 2 is able to exercise its rights as a shareholder in order to get Pilatus Bank to bring an action.

50. Further, under the fourth paragraph of Article 263 of the Treaty, a natural or legal person may institute proceedings against a decision addressed to another person only if that decision is of direct and individual concern to the former.

51. The Application falls short of demonstrating that the Contested Decision is of direct and individual concern to Applicant 2.

52. In particular, persons other than those to whom a decision is addressed may claim to be individually concerned only if that decision affects them by reason of certain attributes which are peculiar to them or by reason of circumstances in which they are differentiated from all other persons and by virtue of those

---

18   Court of Appeal (Inferior Judgment), Appeal number 6/2017, Heikki Niemelä, Mika Lehto both in their capacity as directors of Nemea Bank plc; Nemea Plc (C 45025); Nevestor SA (890.311.134); and Nemea Bank plc (C 45026) (appellees) versus The Malta Financial Services Authority (appellant). Attached hereto as **annex B.6**.

factors distinguishes them individually just as in the case of the person addressed.[19]

53. In the present case, the situation of Applicant 2 cannot be compared with the situation where a group of persons are individually concerned by a measure not addressed to them. In those cases the relevant measure, despite not being addressed to the concerned persons, was able to alter their rights, acquired prior to the adoption of the measure[20]. This is not the case of Applicant 2. The Contested Decision does not affect Applicant 2's right of property over Pilatus Bank's shares or other substantial rights connected to this property. The fact that the number of shareholders in Pilatus Bank is limited is not sufficient. Indeed case law has held individual concern to be absent even where there was, in fact, only one person affected by the contested decision, where that person was affected only by virtue of its objective capacity in the same manner as any other person who is, or might be in the future, in the same situation[21].

54. Further, the ECB maintains that Applicant 2 is not directly concerned by the Contested Decision because its rights have not been substantially affected within the meaning of the case law. In the present case, the only person which can be said to be directly concerned is Pilatus Bank. This is because the Contested Decision withdrew Pilatus Bank's authorisation as a credit institution and thus had legal effects only for Pilatus Bank (by removing its ability to operate as a credit institution). Applicant 2 did not have a banking licence and was thus not affected by the withdrawal of an authorisation.

55. For the reasons set out above, the Application lodged on behalf of Applicant 2 is inadmissible.

## V.   THE APPLICATION IS UNFOUNDED

56. In light of the legal and factual background set out above, the ECB submits that the Application must be dismissed. All eleven pleas are unfounded.

### 4.   First plea: the ECB did not fail to assume its responsibility pursuant to Article 14(5) of the SSM Regulation

57. In its first plea, the Applicants allege that the ECB violated Pilatus Bank's rights pursuant to Article 41(1) of the Charter to have its affairs handled impartially, fairly and within a reasonable time by the competent institution of the Union, i.e.

---

19   Commission v Aktionsgemeinschaft Recht und Eigentum, C-78/03 P, EU:C:2005:761, paragraph 33.

20   *Commission* v *Infront WM*, C-125/06 P, ECLI:EU:C:2008:159, paragraphs 74-75; *Piraiki-Patraiki* v *Commission*, C-11/82 P, ECLI:EU:C:1985:18, paragraph 19; *Alfred Toepfer and Getreide-Import Gesellschaft* v *Commission*, Joined cases 106 and 107-63, ECLI:EU:C:1965:65, on p. 411 of the English special edition of the Court reports.

21   *Spijker Kwasten BV* v *Commission*, C-231/82, ECLI:EU:C:1983:220, paragraphs 8-10.

the ECB. The ECB understands that the Applicants' claim is based on the argument that the ECB allowed the MFSA to implement a *de facto* licence withdrawal without any due process on 21 and 22 March 2018 and that the ECB did not assume direct responsibilities over Pilatus Bank pursuant to Article 14(5) of the SSM Regulation.

58. The ECB will demonstrate that the Applicants' first plea is unfounded. First, the measures taken by the MFSA on 21 and 22 March 2018 do not constitute a withdrawal of a banking authorisation (see a) below). Secondly, the ECB was not under any obligation to assume direct supervision of Pilatus bank (see b) below).

   **a)  The MFSA's measures of 21 and 22 March 2018 do not constitute a withdrawal of an authorisation**

59. First of all, the ECB notes that the Application does not explain why the MFSA's decisions of 21 and 22 March 2018, i.e. a moratorium and the appointment of a competent person, constitute a (de facto) withdrawal of a banking authorisation and why the Contested Decision cannot constitute a genuine decision by the ECB but is essentially a mere confirmation of a fait accompli created by the MFSA.

60. The moratorium and the appointment of a competent person clearly constitute different supervisory measures from the withdrawal of authorisation, and are issued on a separate and independent legal basis. Also, as specified in the MFSA's directives of 21 and 22 March 2018, the MFSA's measures were of a temporary nature.

61. Therefore, the MFSA's measures cannot constitute the withdrawal of the authorisation pursuant to Article 18 of the CRD IV. The withdrawal of the authorisation, which is an exclusive task of the ECB in relation to all credit institutions, is in particular of a permanent nature and implies the prohibition of an undertaking from carrying out the business of taking deposits or other repayable funds from the public.

62. While the imposition of the moratorium signals financial difficulties of a credit institution it does not automatically lead to the withdrawal of an authorisation. The moratorium may well be lifted and a credit institution may be allowed to continue its business. It is a temporary measure aimed to address any immediate negative effects on a credit institution.

63. Accordingly, the measures adopted by the MFSA on 21 and 22 March 2018 in relation to Pilatus Bank neither constitute a (de facto) withdrawal of a banking authorisation nor render the Contested Decision a mere 'confirmatory' act as the Applicants claim. Consequently, any alleged breaches in the context of the MFSA's measures cannot render the Contested Decision unlawful.

### b)  The ECB could not have assumed the direct supervision of Pilatus Bank as the conditions for direct supervision were not met

64.  Further, contrary to the claims of the Applicants, the ECB submits that the MFSA was the competent authority to take the measures of 21 and 22 March 2018 in accordance with the applicable legal framework and, in addition, the ECB could not have assumed direct supervision in respect of Pilatus Bank as the conditions to do so were not met.

65.  As a less significant credit institution, Pilatus Bank was directly supervised by the MFSA as the competent NCA pursuant to Articles 4(1) and 6(4) and 6(6) of the SSM Regulation. In particular, Article 6(6) of the SSM Regulation specifies that the NCAs shall carry out and be responsible for the supervisory tasks, as specified in Article 4(1) of the SSM Regulation, and adopt all relevant supervisory decisions with regard to less significant credit institutions, except for the tasks regarding the granting and withdrawal of authorisation and the assessment of qualifying holdings for which the ECB is responsible for all credit institutions.

66.  In respect of less significant credit institutions, the ECB exercises oversight over the functioning of the system[22]. When necessary to ensure the consistent application of high supervisory standards, the ECB may at any time, on its own initiative after consulting with NCAs or upon a request by an NCA, decide to exercise directly itself all the relevant powers for one or more less significant credit institutions[23].

67.  In the present case, the ECB was not in a position to assume the direct supervision of Pilatus Bank since the conditions to do so were not met. In particular, there was no necessity to ensure consistent application of high supervisory standards as the MFSA carried out appropriate supervision of Pilatus Bank.

68.  Even if the conditions for the use of this power were met, the SSM Regulation establishes a discretionary power of the ECB to take over direct supervision of a less significant credit institution. The discretionary nature of this power does not imply any obligation on the ECB to assume the direct supervision of a less significant credit institution.

69.  Consequently, the ECB submits that the MFSA's measures of 21 and 22 March 2018 did not amount to the *de facto* withdrawal of authorisation of Pilatus Bank. Moreover, the ECB was not competent to prohibit the MFSA from adopting supervisory measures in relation to Pilatus Bank. Finally, the ECB was not in a

---

22   Article 6(5)(c) of the SSM Regulation.

23   Pursuant to Article 6(5)(b) of the SSM Regulation.

position to assume direct supervision of Pilatus Bank since the conditions for the use of this power were not met. Accordingly, the ECB did not breach Pilatus Bank's rights pursuant to Article 41(1) of the Charter. In any event, the Applicants do not provide any substantiated reasoning for this claim.

**5.    Second plea: There was a ground for the Contested Decision**

70.    By their second plea, the Applicants argue that the Contested Decision is based on the erroneous assumption that a ground for the withdrawal of an authorisation exists. The Applicants support their plea with the following arguments:

–    the Contested Decision relies on a mere press release by the US authorities which expresses only allegations;

–    the allegations relate to charges of violations of US sanctions against Iran and that the relevant conduct charged is not illegal from a European law perspective; and

–    the charges against Mr Sadr are unrelated to Pilatus Bank, even predating the existence of the bank.

Furthermore, the Applicants argue that the Joint Guidelines on the prudential assessment of acquisitions and increases of qualifying holdings in the financial sector[24] (the 'Guidelines') referred to by the ECB in the Contested Decision do not apply to the withdrawal of an authorisation. Rather, the Guidelines are intended to be applied solely for decisions on the acquisition of a qualifying holding.

71.    The Applicants' second plea is unfounded. First, the ECB will demonstrate that the Contested Decision is based on a breach of legal requirements, which justifies the withdrawal of a banking authorisation (see point a) ). Second, the assessment of the reputation may be based on allegations only and not necessarily on final convictions (see point b) ). Third, it is of no relevance whether the alleged conduct of Mr Sadr is also regarded as illegal under Union law (see point c) ). Finally, Mr Sadr is the sole ultimate shareholder of Pilatus Bank and therefore the allegations affecting his reputation are related to Pilatus Bank and its authorisation. Moreover, the Guidelines apply also in cases concerning the withdrawal of an authorisation of a credit institution (see point d)).

**a)    The Contested Decision is based on a breach of legal requirements**

---

24    Joint Guidelines on the prudential assessment of acquisitions and increases of qualifying holdings in the financial sector (JC/GL/2016/01).

72. Article 18(c) of the CRD IV[25] provides that grounds for the withdrawal of a banking authorisation exist where the credit institution no longer fulfils the conditions under which an authorisation was granted.

73. Pursuant to Article 14(2) of the CRD IV[26], an authorisation cannot be granted unless the competent authority is satisfied that the shareholders or members whether direct or indirect, that have qualifying holdings, controllers and all individuals who will effectively direct the business of the credit institution are 'suitable persons to ensure its sound and prudent management'.

74. The criteria on which the suitability of shareholders with a qualifying holding is assessed are set out Article 23(1) of the CRD IV[27]. These criteria include, inter alia, the reputation of the person holding a qualifying holding within the meaning of the legal framework[28].

75. It follows that the non-compliance of a qualifying shareholder with the suitability criteria set out in Article 23(1) of the CRD IV, transposed in Malta by means of Article 13A(9) of the Banking Act, including the reputation criterion, also constitutes a ground for the withdrawal of authorisation when this becomes apparent after the initial grant of the authorisation and outside the context of a qualifying holding assessment within the meaning of Article 22 of the CRD IV.

76. Since the ECB concluded in the Contested Decision that the sole ultimate shareholder Mr Sadr was no longer suitable within the meaning of Article 7(1)(d) of the Banking Act and therefore Pilatus Bank no longer fulfilled the conditions under which its authorisation was granted (Article 9(2)(c) of the Banking Act), the Contested Decision was based on a breach of legal requirements justifying the withdrawal of an authorisation.

b) **The suitability of a shareholder may be assessed based on allegations alone**

77. The ECB assessed Mr Sadr's suitability, taking into account the presumption of innocence during criminal proceedings, as well as the impact his suitability had on Pilatus Bank. While the charges against Mr Sadr in the United States constitute allegations, the indictment was nevertheless assessed as relevant and raising serious doubts with respect to Mr Sadr's integrity in his capacity as the sole ultimate shareholder of Pilatus Bank.

78. According to the Guidelines, integrity is not called into question only in the case of final convictions; any information from credible and reliable sources should

---

25   Transposed into national law by Article 9(2)(c) of the Banking Act of Malta.
26   Transposed into national law by Article 7(1)(d) of the Banking Act of Malta.
27   Transposed into national law by Article 13A(9) of the Banking Act of Malta.
28   Article 13A(9)(a) of the Banking Act of Malta transposing Article 23(1)(a) of the CRD IV.

be taken into account[29]. Pending criminal proceedings may thus have an impact on the reputation of the person concerned (and consequently on the credit institution). Although it is for national prosecutors to commence criminal proceedings, the very fact that an individual is – or has been – subject to such proceedings is relevant to the assessment of suitability. Competent authorities should not consider that the absence of a criminal conviction or prosecution, administrative and enforcement action constitutes in and of itself sufficient evidence of a proposed acquirer's integrity, in particular where allegations of criminal conduct persist[30].

79. As set out in the Contested Decision, the assessment of the ECB is in line with the principle of presumption of innocence during criminal proceedings, which is protected and recognised under Maltese as well as Union law.

80. This follows from the different purposes pursued by prudential supervision as opposed to criminal law. Prudential supervision is not concerned with imposing punishment on natural persons, but with ensuring the stability and soundness of credit institutions. It takes a forward-looking perspective in order to manage and mitigate risks arising from financial activities. In establishing the legal framework, the Union legislative bodies were aware that financial markets are, to a larger degree than other sectors, dependent on the trust and confidence of the general public in the way financial market actors run their business, since a loss of such confidence can rapidly lead to a loss of funding and thereby result in the failure of such an actor. Consequently, their primary concern was not whether a qualifying shareholder of a credit institution has, objectively and by the standards of criminal law, committed a criminal offence, but with the public perception of the shareholder. This is evidenced by the use of the word 'reputation' in Article 23(1)(a) of the CRD IV and not a different word that would reflect criminal law standards[31].

81. As a consequence, circumstances which cast serious doubt on the reliability and suitability of a shareholder can be of relevance from a prudential perspective even if they fall short of a criminal conviction; this is true in particular if, as was the case here, these circumstances had an impact on the reputation of Pilatus Bank to such an extent that they led to detrimental market sentiment. This detrimental market sentiment was evidenced not only by significant withdrawal requests[32] submitted by the depositors of Pilatus Bank

---

29  See paragraph 10.13 of the Guidelines.

30  See paragraph 10.14 of the Guidelines.

31  Other language versions of the CRD IV confirm this interpretation by also using words which focus on the public perception of a shareholder, as opposed to standards of criminal law; see, for instance, German *Leumund*, French *honorabilité*, Italian *onorabilità*, Spanish *reputación*.

32  Specifically, during the week of 20 March 2018 when Mr Sadr was indicted, Pilatus Bank received withdrawal requests for a total of EUR 51.4 million worth of deposits. The amount of

subsequent to the initiation of criminal proceedings against Mr Sadr, but also in the termination of a majority of correspondent banking relationships.

82. These differences between the objectives of prudential supervision and criminal law mean that it is compatible with the presumption of innocence for the ECB to draw proportionate supervisory conclusions from the criminal proceedings against Mr Sadr, and from the effect these proceedings had on the reputation of Mr Sadr and consequently on the prudential situation of Pilatus Bank. This does not entail a claim or pronouncement by the ECB that Mr Sadr is guilty of a criminal offence or a prejudgment of the assessment of the case by the competent criminal authorities, as this is not part of the ECB's competence.

83. Accordingly, the ECB submits that the assessment of the suitability of the sole ultimate shareholder and controller of Pilatus Bank, Mr Sadr, may be based solely on criminal allegations resulting from credible and reliable sources.

### c) Whether the allegations concern acts that are legal or not under Union law is irrelevant

84. Contrary to the claims of the Applicants, the criminal charges against Mr Sadr are relevant for assessing his integrity even if certain alleged acts are not regarded as illegal under Union law. The Guidelines mention that any conviction or prosecution of a criminal offence should be taken into account by competent authorities when assessing the integrity of a proposed acquirer[33].

85. The relevance of information casting doubt on the integrity of a person is assessed by competent authorities on a case-by-case basis taking into account all relevant circumstances. The Guidelines nevertheless mention as having particular relevance any conviction or prosecution of certain criminal offences, such as fraud or financial crime, including money laundering[34].

86. According to the indictment, Mr Sadr is charged with one count of conspiracy to defraud the United States, one count of conspiracy to violate the International Emergency Economic Powers Act (IEEPA), one count of bank fraud, one count of conspiracy to commit bank fraud, one count of money laundering, and one count of conspiracy to commit money laundering. Most of these offences are subject to severe sanctions under the applicable law (e.g. up to 20 years of imprisonment for conspiracy to violate IEEPA, money laundering and conspiracy to commit money laundering and 30 years of imprisonment for bank

---

deposits requested for withdrawal further increased to EUR 53.9 million at the end of April 2018, representing 42.6% of the total amount of deposits on the balance sheet of Pilatus Bank at 28 May 2018.

33   See paragraph 10.13(a) of the Guidelines.

34   See paragraph 10.13 of the Guidelines.

fraud and conspiracy to commit bank fraud), as is also confirmed by the strict bail terms.

87. All these criminal allegations cast serious doubt on the reliability and suitability of Mr Sadr. Even if certain of the allegations relate to acts that are technically not illegal under Union law they were still of relevance from a prudential perspective for the assessment of the integrity of a person. The purpose of assessing the person's integrity is to ensure the sound and prudent management of a credit institution. Since credit institutions are dependent on the trust and confidence of the general public in the way they run their business, charges under a foreign law also need to be considered insofar as they have an impact on the reputation of the relevant person, whether or not the alleged actions are technically illegal under the law applicable to the credit institution concerned. The relevant fact is that these allegations may, and in fact did, result in the loss of trust and confidence amongst the counterparties of Pilatus Bank.

### d) The Guidelines are also relevant in cases of a withdrawal of authorisation

88. Finally, Mr Sadr is the sole ultimate shareholder of Pilatus Bank and therefore the allegations affecting his suitability are related to Pilatus Bank and its authorisation.

89. This follows from the fact that, pursuant to Article 18(c) of the CRD IV, competent authorities may withdraw the authorisation where a credit institution no longer fulfils the conditions under which an authorisation was granted. Pursuant to Article 14(2) of the CRD IV, one of the conditions for granting an authorisation is that the shareholders are 'suitable', in particular meeting the relevant criteria established in Article 23(1) of the CRD IV for the purpose of assessing acquisitions of qualifying holdings[35].

90. Consequently, the Guidelines, aimed, inter alia, at clarifying the assessment criteria of Article 23(1) of the CRD IV, are relevant in the present case where the withdrawal of the authorisation was based on the fact that a shareholder no longer satisfies the assessment criterion set out in Article 23(1)(a) of the CRD IV, as implemented in national law.

91. The Applicants' argument that the consequences of a non-approval of an acquisition of a qualifying holding are more limited than those of the withdrawal of an authorisation is not relevant. In both cases, prudential regulation aims to achieve the sound and prudent management of a credit institution. If a competent authority cannot authorise a credit institution because the qualifying

---

35    See Article 18(c) in conjunction with Article 14(2) of the CRD IV.

shareholder is not suitable then the competent authority should be also in a position to withdraw the authorisation of a credit institution for the same reason.

92.  Consequently, the ECB submits that also the Applicants' second plea must be rejected.

## 6.  Third plea: The Applicants failed to demonstrate that the ECB did not exercise its discretion appropriately

93.  By their third plea, the Applicants allege that 'the Contested Decision fails to take into account entirely the discretionary nature of a license withdrawal'.

94.  However, the Applicants fail to substantiate and prove their allegation.

95.  The Applicants claim that the Contested Decision was taken 'based on the point of view of a person who merely asks whether the license withdrawal <u>may</u> be justified and who wishes to withdraw the license' (emphasis added). In this context, use of the word 'may' (underlined by the ECB) shows that the Applicants admit that the Contested Decision was based on the ECB's assessment exercising its discretion. Further, while the Applicants allege that the Contested Decision was based on the point of view of a person who 'wishes' to withdraw the licence, the Applicants do not provide any arguments to support this contention.

96.  Further, the Applicants contend that '[e]ven a proportionate license withdrawal based on a valid ground for such license withdrawal does not have to be effected'. However, this remains a general statement of the Applicants without any substantiation and without any link to the Contested Decision as they do not explain to what extent they consider that the exercise of ECB's discretion in adopting the Contested Decision is flawed.

97.  In this respect, the ECB submits that it had to withdraw the authorisation of Pilatus Bank since Pilatus Bank breached applicable legal requirements, which aim to ensure sound and prudent management of a credit institution, and thereby endangered the protection of the interests of depositors, investors and the public.[36] In fact, there were no alternatives measures to a withdrawal of the authorisation feasible to restore the compliance of Pilatus Bank with the applicable legal requirements. Therefore, withdrawing the authorisation was the only possible measure for the ECB to exercise its discretion free from error.

98.  The ECB exercised its discretion fully in line with the applicable law and principles, as evidenced by the detailed grounds on which the Contested Decision is based, which followed an assessment of the relevant facts against the relevant legal framework and principles, including the principle of

---

36   See Contested Decision, Section 3.3.

proportionality and the fact that the Contested Decision was adopted fully in line with the procedural requirements.

99. Therefore, the third plea must be rejected.

**7. Fourth plea: The ECB assessed the relevant facts impartially and objectively**

100. By their fourth plea, the Applicants argue that the ECB failed to assess the relevant facts impartially and objectively. The Applicants support their plea with the following arguments:

- the Contested Decision is based on conclusions of the MFSA which in turn are based on merely preliminary and highly tentative conclusions by the US law enforcement authorities;

- the ECB failed to assess the actual reputational effect on Pilatus Bank of the indictment of Mr Sadr and to distinguish this effect from the impact of the MFSA's measures which were implemented immediately following Mr Sadr's indictment as well as the impact of the ECB's own public statements and leaks to the media.

101. The Applicants' fourth plea is entirely unfounded. The ECB submits that none of the arguments advanced by the Applicants can call into question the fact that the ECB conducted an assessment and did so impartially and objectively.

102. First of all, the Contested Decision is not based on the 'conclusions' of the MFSA. Rather the ECB adopted the Contested Decision following its own assessment and conclusion, based on the MFSA's proposal to withdraw the authorisation. This is fully in line with the legal framework. According to Article 15(5) of the SSM Regulation, where an NCA considers that the authorisation must be withdrawn and submits a proposal to the ECB to that end, the ECB is obliged to ('shall') take a decision on the proposed withdrawal taking full account of the justification for withdrawal put forward by the NCA.

103. Second, as explained in the context of the second plea above, for the purposes of the Contested Decision, the assessment of the suitability of Mr Sadr may be based on criminal allegations.

104. Finally, while the impact of the allegations concerning Mr Sadr on the reputation of Pilatus Bank was considered a relevant element, it was not a condition for the withdrawal of authorisation. Further, contrary to the claim of the Applicants, the ECB considered the reputational damage incurred by Pilatus Bank when assessing the necessity of the withdrawal of the authorisation. In particular, the ECB took into account the requests to withdraw significant amounts submitted

by depositors of Pilatus Bank subsequent to the initiation of criminal proceedings against Mr Sadr[37] and the fact that the majority of Pilatus Bank's correspondent banks terminated their relationships forcing Pilatus Bank to transfer the funds held with those banks to the Central Bank of Malta[38].

105. To assess which of the negative effects on Pilatus Bank stem from the indictment of Mr Sadr and which from the measures taken by the MFSA or alleged unspecified ECB leaks to the public, is not relevant for the assessment whether to withdraw the authorisation of Pilatus Bank. In fact, all of the supervisory measures taken by the MFSA were in response to the indictment of Mr Sadr and with the objective of preventing further negative effects on Pilatus Bank as a result of this indictment.

106. Consequently, the ECB submits that it assessed the relevant facts impartially and objectively and, hence, the fourth plea must be rejected.

**8.    Fifth plea: the ECB did not violate the principle of proportionality**

107. By their fifth plea, the Applicants argue that the ECB breached the principle of proportionality. The Applicants support their plea with the following arguments:

-    The proportionality assessment contains references to the problematic financial condition of Pilatus Bank which were unsubstantiated and unsupported by evidence. The Applicants allege that Pilatus Bank not only fulfilled all regulatory requirements but far exceeded the performance of any other bank in Malta and that it was financially viable;

-    None of the less intrusive measures were considered in an appropriate manner. First, the Applicants allege that the statement in the Contested Decision that Pilatus Bank could not be sold because it had no material franchise was untrue. The Applicants claim that the independent valuations of Pilatus Bank demonstrated substantial value and there was interest in the acquisition of the bank. Second, the alleged objective of restoring legality is so abstract as to be devoid of any meaning. According to the Applicants, it is necessary that the concrete legitimate prudential objectives are weighed against the adverse effects of the proposed decision. Third, the ECB could have publicly stated that the allegations against Mr Sadr are based on US sanctions against Iran, which are not recognised in Europe, and that they merely constitute allegations.

---

37    Specifically, during the week of 20 March 2018 when Mr Sadr was indicted, Pilatus Bank received withdrawal requests for EUR 51.4 million worth of deposits. The amount of deposits requested for withdrawal further increased to EUR 53.9 million at the end of April 2018, representing 42.6% of the total amount of deposits on the balance sheet of Pilatus Bank at 28 May 2018.

38    See the Contested Decision, p. 11.

108. The Applicants further claim that there is a curious discrepancy between the Contested Decision and the manner in which the ECB deals with misconduct within the ECB. In this respect, the Applicants refer to the case concerning Mr Ilmārs Rimšēvičs, Governor of the Latvian central bank.

109. According to the settled case-law of the Court of Justice, the principle of proportionality requires that acts of the EU institutions be appropriate for attaining the legitimate objectives pursued by the legislation at issue and do not go beyond what is necessary in order to achieve those objectives[39]. The ECB submits that the Contested Decision meets these requirements.

110. First, the ECB contests the allegations made by the Applicants, for which the Applicants have not provided any evidence.

111. The Contested Decision was, contrary to the Applicants' contention, proportionate because the withdrawal of the authorisation was suitable, necessary and reasonable.

- The withdrawal of the authorisation was a suitable measure to meet the objective of the law, as explained in the Contested Decision[40].

- The ECB also considered the necessity of the withdrawal and whether there were other less onerous measures which could be the same effective at restoring the legality and ensuring the sound and prudent management of the credit institution. In the light of the circumstances of Pilatus Bank, the ECB identified the sale to a third party or a group of third parties as the main alternative to the withdrawal of an authorisation. However, given the reputational damage done and after careful analysis the ECB concluded that that alternative did not have a realistic chance of success[41].

- The ECB also considered the reasonableness of the withdrawal taking into account the rights of Pilatus Bank, its owners and management to offer financial services and conduct business. In addition, rights and expectations of depositors, investors and of the public to a stable, reliable, transparent and efficient financial sector where their rights and financial resources are well-protected were considered. In light of these considerations, the ECB decided that the public interest in restoring legality outweighed Pilatus Bank's private interest in maintaining its authorisation as a credit institution[42].

---

39   See e.g. judgment of 16 June 2015, *Gauweiler*, C-62/14, ECLI:EU:C:2015:400, paragraph 67 and case-law cited.

40   See the Contested Decision, p. 9.

41   See the Contested Decision, pp. 9-12.

42   See the Contested Decision, pp. 12-13.

112. It follows from the above that the Contested Decision is fully in line with the principle of proportionality.

113. Further, the Applicants have not submitted any evidence to support their allegation that Pilatus Bank not only fulfilled all regulatory requirements but far exceeded the performance of any other bank in Malta and that it was financially viable.

114. The Applicants have not provided any evidence in support of their allegation that the statement in the Contested Decision that Pilatus Bank could not be sold because it had no material franchise was untrue. The Applicants' allegations that the independent valuations of Pilatus bank demonstrated substantial value and there was interest in the acquisition of a bank are also without any evidential support.

115. Second, the Applicants argue that a proportionality analysis requires that 'concrete legitimate prudential objectives' are weighed against the adverse effects of the decision and criticise the reference in the Contested Decision to the 'objective of restoring legality', which they allege to be so abstract as to be devoid of any meaning.

116. In this context, the Applicants' arguments are misleading because the ECB did consider the concrete legitimate prudential objectives of the measure and weighed them against the affected interests. The Contested Decision considers concretely the protection of the interests of depositors, investors and the public in a stable, reliable, transparent and efficient financial sector[43]. It further considers the damage done to the public confidence in the Maltese and Union markets by the presence of a credit institution which no longer fulfils the conditions for authorisation. The wording 'the public interest in restoring legality' is used in the concluding sentence summarising the aforementioned concrete elements and therefore needs to be read in that context. Therefore, this wording is not abstract as to be devoid of any meaning, contrary to the claim of the Applicants.

117. Third, there is no basis for the Applicants' argument that a less intrusive measure than the Contested Decision could have been a public statement of the ECB saying that the allegations against Mr Sadr based on US sanctions against Iran are not recognised in Europe and that, at any rate, they constitute mere allegations.

118. As explained in relation to the second plea, the charges against Mr Sadr are relevant and raise serious doubt with respect to Mr Sadr's integrity in his capacity as the sole ultimate shareholder of Pilatus Bank even if the alleged actions are not regarded as illegal under Union law. Therefore, no public

---

43    See the Contested Decision, pp. 12-13.

statement could have been made. Further, it does not fall within the ECB's competence and there is no legal basis for the ECB to assess and make public statements whether certain criminal allegations against Mr Sadr are regarded as illegal under Union law. The Applicants have not proven otherwise in support of their claim.

119. Finally, although the Applicants claim that there is a discrepancy between the Contested Decision and the manner in which the ECB deals with misconduct within the ECB, the Applicants have not demonstrated why the alleged discrepancy is relevant for the proportionality assessment in the present case. The case in relation to Mr Rimšēvičs, Governor of the Latvian central bank, is based on different factual circumstances and is, in particular, subject to an entirely different legal framework (i.e. the Statute of the European System of Central Banks and of the European Central Bank) to that applicable in the present case. Therefore, no conclusions from the case referred to by the Applicants may be drawn for the present case. The Applicants' claim is completely unsubstantiated and, hence, the fifth plea must also be rejected.

## 9. Sixth plea: the ECB did not violate the principle of nemo auditor

120. By their sixth plea, the Applicants allege a violation of the nemo auditor principle. In particular, the Applicants argue that the main difficulties of Pilatus Bank are due to the actions of the MFSA as well as the failure of the ECB to intervene despite its dominant role in prudential supervision pursuant to the SSM Regulation. They claim that the reputational issues are mainly due to the public statements and leaks from within the MFSA and the ECB. Accordingly, the Applicants claim that the ECB cannot rely on the consequences of its own misconduct and failure to perform its role properly as a basis for the Contested Decision.

121. The Applicants' sixth plea is unfounded.

122. First, as was demonstrated in relation to the first plea, there was no legal basis for the ECB to assume direct supervision of Pilatus Bank since the conditions for the use of this power were not met. The MFSA's measures do not amount to a *de facto* withdrawal of an authorisation and the MFSA was competent to adopt supervisory decisions addressed to Pilatus Bank.

123. Second, the Applicants do not submit any evidence in support of their claim that Pilatus Bank's reputation was damaged as a result of alleged public statements and leaks from within the MFSA and the ECB.

124. Third, Pilatus Bank's reputation was negatively affected by the fact that the sole ultimate shareholder Mr Sadr was arrested in the United States on a six-count indictment. The indictment was subject to intense national and international media attention resulting in press reports on Pilatus bank having negative effect on its reputation, in particular taking into account the allegations of the US

prosecutor with respect to the illicit origin of (part of) the funds invested in the capital of Pilatus Bank. The MFSA intervened and took measures on 21 and 22 March 2018 to mitigate the negative effects on Pilatus bank. The actions taken by the MFSA aimed to ensure the safety and soundness of the bank. Therefore, the difficulties of Pilatus Bank were a result of Mr Sadr's indictment and not the actions of the MFSA or inaction on the part of the ECB.

125. Consequently, the ECB submits that it did not violate the nemo auditor principle and, hence the sixth plea must be rejected.

**10.   Seventh plea: the Contested Decision is compatible with the presumption of innocence during criminal proceedings**

126. By their seventh plea, the Applicants argue that the Contested Decision is based on erroneous considerations as to the presumption of innocence. The Applicants base their plea on the following arguments.

- The ECB fails to take into account that 'presumption of innocence' is commonly used in a criminal law context to describe the allocation of the burden of proof and that this allocation is, in principle, the same in an administrative law context. In this context, the ECB did not consider any concrete facts (let alone evidence) and merely referred to the existence of charges in abstract.

- The presumption of innocence applies in the context of the charges the ECB relied on as the basis for the Contested Decision. The ECB cannot base its decision on certain elements of the US criminal law system, namely allegations, but disregard another extremely important element of the US criminal law system, namely the presumption of innocence.

127. The Applicants' seventh plea is unfounded.

128. As was already set out in relation to the second plea, the ECB's assessment for the purposes of the Contested Decision is in line with the principle of the presumption of innocence in criminal proceedings. In particular, the ECB's assessment aimed not to determine whether Mr Sadr is guilty of a criminal offence. Rather, the ECB's assessment sought to determine whether there were any circumstances which cast serious doubt on the reliability and suitability of a shareholder relevant for prudential supervision. Therefore, the ECB did not consider those facts and items of evidence that are relevant for the criminal investigation authorities but focused on those facts that are relevant for the prudential supervision of Pilatus Bank.

129. Therefore, this seventh plea must be rejected.

**11.   Eighth plea: the ECB did not violate the principle of equal treatment and non-discrimination**

130. By their eighth plea, the Applicants claim that the Contested Decision violates the principle of equal treatment and is discriminatory. They allege that no bank owned by a Maltese citizen (or any bank owned by a citizen of the same country) would have been treated in this manner. In this context, the Applicants assert merely that a 'superficial review of media reports' would confirm such claim, but do not provide any (concrete) evidence in this regard. Nor do they provide any arguments to explain why the Contested Decision leads to the violation of the principle of equal treatment and discrimination. The Applicants' claim is completely unsubstantiated.

131. Therefore, this eighth plea must be rejected.

**12.   Ninth plea: the ECB did not violate Article 19 of the SSM Regulation and did not misuse its powers**

132. By their ninth plea, the ECB understands the Applicants to argue that the ECB did not act independently when adopting the Contested Decision and misused its powers. In support of their plea, the Applicants refer to the allegedly quick adoption of supervisory measures by the MFSA and other suspicions in relation to the MFSA and the consultancy firm Promontory. In particular, the Applicants claim that certain alleged political motivations and the desire to create a lucrative assignment for Promontory may have been the main actual motivating factors for the MFSA's measures and therefore also for the Contested Decision, which, according to the Applicants, merely constitutes a confirmation of the MFSA's de facto licence withdrawal.

133. The Applicants' ninth plea is unfounded.

134. As a preliminary remark, for the reasons set out in relation to the first plea, the ECB rejects the Applicants' view that the Contested Decision was a mere 'confirmation' while the actual licence withdrawal was imposed by the MFSA (in the words of the Applicants: the 'de facto license withdrawal').

135. Further, the Applicants make allegations about the MFSA and Promontory but do not offer any proof in support of their allegations.

136. The suspicions held by the Applicants do not call into question the independence of the ECB in adopting the Contested Decision nor the proper use of its powers. Since the Applicants do not submit any evidence to substantiate their claim, the ninth plea must be rejected as unfounded.

### 13.   Tenth plea: the ECB did not violate the Applicants' rights of defence and to be heard

137.  The Applicants claim that Pilatus Bank's rights of defence and to be heard have been violated because Pilatus Bank was systematically deprived of its legal representation before the ECB changed its position in this regard in Case T-687/18 R[44], which was only after the adoption of the Contested Decision.

138.  The Applicants merely argue that the procedure leading to the Contested Decision did not involve any appropriate representation of Pilatus Bank because the Competent Person was treated as the sole representative of the bank.

139.  As a preliminary remark, the ECB would like to clarify that, although initially the Competent Person was considered the sole representative of Pilatus Bank, in the context of Case T-687/18 R, the ECB recognised that the representation power of the Competent Person was limited to the particular circumstances referred to in national law in the light of a national court decision which confirmed that the directors of a bank can have residual powers to represent a bank alongside an appointed competent person.

140.  However, the Applicants do not substantiate their claim further to demonstrate how exactly their rights have been violated in the context of the supervisory procedure leading to the adoption of the Contested Decision.

141.  As a matter of fact, Pilatus Bank and its directors, represented by legal counsel, were granted the right to be heard in respect of the Contested Decision, as evidenced by the request of the ECB to Pilatus Bank and its legal counsel by letter of 31 August 2018 and the reply submitted by the counsel to the ECB on 21 September 2018. In fact, the hearing period lasted three weeks and not three working days, which is the (minimum) hearing period established for draft withdrawal decisions under Article 31 of Regulation (EU) No 468/2014 of the European Central Bank (ECB/2014/17)[45] (the SSM Framework Regulation). Thus, the Applicants had much more time available to devise their hearing submission and exercise their right to be heard. However, ultimately, Pilatus Bank only reconfirmed and stated 'for the record the management's and shareholder's opposition to the draft [Contested Decision]'.

142.  The allegation of the Applicants that it was not possible to put in place an effective representation of the bank due to the MFSA's interference is not

---

44  Order of 21 January 2019, *Pilatus Bank* v *ECB*, T-687/18 R, ECLI:EU:T:2019, annexed hereto as Annex **B.7**.

45  Regulation (EU) No 468/2014 of the European Central Bank of 16 April 2014 establishing the framework for cooperation within the Single Supervisory Mechanism between the European Central Bank and national competent authorities and with national designated authorities (SSM Framework Regulation) (ECB/2014/17) (OJ L 141, 14.5.2014, p. 1).

related to the procedure leading to the Contested Decision. It is also not clear how the allegation that the directors were unable and continue to be unable to finance the legal representation of Pilatus Bank is relevant.

143. Therefore, this tenth plea must be rejected.

**14.    Eleventh plea: the ECB did not fail to provide an adequately reasoned decision**

144. By their eleventh plea, the Applicants argue that the ECB did not adequately reason the Contested Decision, contending that it is extremely superficial and vague. In particular, the Applicants allege that it is not possible to assess the seriousness of the alleged misconduct and that it is not clear whether the relevant conduct is 'misconduct' from the European law point of view.

145. The Applicants' eleventh plea is unfounded.

146. The ECB submits that the Contested Decision is adequately reasoned. In particular, the Contested Decision contains the material facts and legal reasons on which it is based. Further, the ECB has considered the nature and gravity of the indictment to assess Mr Sadr's suitability as the sole shareholder of Pilatus Bank. However, there was no obligation for the ECB to assess generally the seriousness of the alleged misconduct which gave rise to the indictment of Mr Sadr in the US.

147. As set out in relation to the second plea, the criminal charges against Mr Sadr are relevant for assessing his integrity even if certain of the alleged acts are not regarded as illegal under Union law. Therefore, the question whether certain activities that Mr Sadr is charged with are illegal under Union law is not relevant for the purpose of the Contested Decision.

148. Therefore, this eleventh plea must be rejected.

**VI.    ORDERS SOUGHT**

149. In the light of the foregoing, the ECB respectfully requests the Court to:

**1.    dismiss the application of Applicant 2 as inadmissible and, in the alternative, as unfounded;**

**2.    dismiss the application of Applicant 1 as unfounded; and**

**3.    order the Applicants to bear the costs.**

_____          _____          _____

Alexander Karpf                     Emilie Yoo                       Markas Puidokas

ECB Agents

**TABLE OF ANNEXES**

| Annex | Document description | First reference in the defence | Lang. | Pages |
|---|---|---|---|---|
| Annex B.1 | The "Contested Decision", 2018-11-02 Pilatus Bank – WHD-2018-0014 – ECB-SSM-2018-MT-4 | Page 5, paragraph 2. | English | 1 to 15. |
| Annex B.2 | Directive of the MFSA of 21 March 2018 as regards removal and suspension of voting rights | Page 12, paragraph 32. | English | 16 to18. |
| Annex B.3 | Directive of the MFSA of 22 March 2018 as regards the moratorium | Page 12, paragraph 33. | English | 19 to 21 |
| Annex B.4 | Directive of the MFSA dated 22 March 2018 as regards the appointment of the competent person | Page 12, paragraph 33. | English | 22 to 27. |
| Annex B.5 | Letter of the EBA Chairperson of 24 September 2018 to the Members of the European Parliament | Page 13, paragraph 40. | English | 28 to 32. |
| Annex B.6 | Court of Appeal (Inferior Judgment), Appeal number 6/2017, Heikki Niemelä, Mika Lehto both in their capacity as directors of Nemea Bank plc; Nemea Plc (C 45025); Nevestor SA (890.311.134); and Nemea Bank plc (C 45026) (appellees) versus The Malta Financial Services Authority (appellant) (unofficial translation) | Page 15, paragraph 48. | English | 33 to 48. |
| Annex B.7 | Order of 21 January 2019, Pilatus Bank v ECB, T-687/18 R, ECLI:EU:T:2019 | Page 32, paragraph 137. | English | 49 to 56. |

Date of acceptance      :          02/04/2019



| | | |
|---|---|---|
| Published ID | : | T-27/19 |
| Document number | : | 11 |
| Register number | : | 882907 |
| Date of lodgment | : | 28/03/2019 |
| Date of entry in the register | : | 29/03/2019 |
| Type of document | : | Defence |

| | | |
|---|---|---|
| | : | Annexes Part 1 |
| e-Curia lodgment reference | : | DT105699 |
| File number | : | 2 |
| Person lodging document | : | Puidokas Markas (R351121) |
| | | BCE |

## Annex B.1

**[The "Contested Decision", 2018-11-02 Pilatus Bank – WHD-2018-0014 – ECB-SSM-2018-MT-4]**



**EUROPEAN CENTRAL BANK**

BANKING SUPERVISION

**ECB-CONFIDENTIAL**

Pilatus Bank plc

Whitehall Mansions, Level 2

Ta' Xbiex Wharf

Ta' Xbiex

MALTA


(hereinafter the 'Supervised Entity')


cc:      Malta Financial Services Authority (MFSA)

          Central Bank of Malta


ECB-SSM-2018-MT-4

WHD-2018-0014

Frankfurt am Main, 2 November 2018


**Decision pursuant to Articles 4(1)(a) and 14(5) of Council Regulation (EU) No 1024/2013[1] (hereinafter the 'SSM Regulation'), Article 83 of Regulation (EU) No 468/2014 of the European Central Bank (ECB/2014/17)[2] (hereinafter the 'SSM Framework Regulation') and Article 9(2) of the Banking Act, Chapter 371 of the Laws of Malta[3] (hereinafter the 'Banking Act') implementing Directive 2013/36/EU of the European Parliament and of the Council[4] (hereinafter the 'CRD IV')**


**1.      Decision**

I am writing to notify you that the Governing Council of the European Central Bank (ECB) has decided to hereby withdraw the authorisation of the Supervised Entity as a credit institution with effect from the date of notification of this Decision to the Supervised Entity.

---

1   Council Regulation (EU) No 1024/2013 of 15 October 2013 conferring specific tasks on the European Central Bank concerning policies relating to the prudential supervision of credit institutions (OJ L 287, 29.10.2013, p. 63).

2   Regulation (EU) No 468/2014 of the European Central Bank of 16 April 2014 establishing the framework for cooperation within the Single Supervisory Mechanism between the European Central Bank and national competent authorities and with national designated authorities (SSM Framework Regulation) (OJ L 141, 14.5.2014, p. 1).

3   http://www.justiceservices.gov.mt/DownloadDocument.aspx?app=lom&itemid=8840.

4   Directive 2013/36/EU of the European Parliament and of the Council of 26 June 2013 on access to the activity of credit institutions and the prudential supervision of credit institutions and investment firms, amending Directive 2002/87/EC and repealing Directives 2006/48/EC and 2006/49/EC (OJ L 176, 27.6.2013, p. 338).

## 2.      Legal basis of the Decision

### 2.1     Applicable Union law

Pursuant to Articles 4(1)(a) and 14(5) of the SSM Regulation and to Article 83 of the SSM Framework Regulation, the ECB is competent to decide on the withdrawal of the authorisation of credit institutions. Pursuant to Article 4(3) of the SSM Regulation, the ECB shall apply all relevant Union law, and where this Union law is composed of Directives, the national legislation transposing those Directives.

Article 18 of the CRD IV provides that the competent authorities may only withdraw the authorisation granted to a credit institution in certain situations as provided therein.

In accordance with Article 18(c) of the CRD IV, the competent authorities may withdraw the authorisation granted to a credit institution where such a credit institution no longer fulfils the conditions under which authorisation was granted.

### 2.2     Requirements set out in national law

The requirements for the withdrawal of an authorisation are set out in Article 9(2) of the Banking Act transposing, *inter alia*, the provisions of Article 18 of the CRD IV.

Article 9(2)(c) of the Banking Act (transposing Article 18(c) of the CRD IV) provides for a withdrawal of an authorisation in a situation where an institution no longer fulfils the conditions under which authorisation was granted.

## 3.      Grounds on which the Decision is based

### 3.1     Procedure

(a)    On 29 June 2018, the ECB received a proposal from the MFSA to withdraw the authorisation of the Supervised Entity, in accordance with Article 80 of the SSM Framework Regulation.

On 2 August 2018, taking into account updated information received by the MFSA from the Supervised Entity on 18 July 2018, the MFSA has submitted to the ECB a revised proposal under Article 80 of the SSM Framework Regulation.

The ECB has assessed the revised proposal for the withdrawal of the authorisation of the Supervised Entity submitted by the MFSA and considered that initiating the withdrawal of the authorisation was justified.

In accordance with Article 31 of the SSM Framework Regulation, before the ECB may adopt an ECB supervisory decision addressed to a party which would adversely affect the rights of such party, the party must be given the opportunity of commenting in writing to the ECB on the decision and the relevant factual and legal grounds for the decision. This Decision constitutes a withdrawal within the meaning of Article 14(5) of the SSM Regulation and, according to the third subparagraph of Article 31(3) of the SSM Framework Regulation, the time limit for the hearing may in such case be shortened from the standard two weeks to three working days. However, in the present case the ECB decided to exercise its discretion to only shorten the time limit to five working days in order to

ensure that the Supervised Entity has sufficient time to provide comments to the envisaged decision.

(b)   Pursuant to Article 14(6) of the SSM Regulation and Article 80(2) of the SSM Framework Regulation, the national competent authority (NCA) shall coordinate with the national resolution authority (NRA) with regard to any draft withdrawal decision that is relevant to the NRA. Pursuant to Article 7B of the Malta Financial Services Authority Act, Chapter 330 of the laws of Malta, the Board of Governors of the MFSA also acts as the NRA. The NRA must appoint a Resolution Committee which shall have all the powers of the NRA as provided by the the national legal provisions transposing Directive 2014/59/EU of the European Parliament and of the Council[5] (hereinafter the 'BRRD'). On 3 May 2018, the Resolution Committee adopted a decision according to which no public interest according to national law provisions transposing Article 32(1)(c) and Article 32(5) of the BRRD exists to implement resolution tools or powers.

(c)   By letter of 31 August 2018, the ECB invited the Supervised Entity to provide comments on the draft decision within five working days from the day of receipt of that letter. Taking into account the request of the Supervised Entity for extension of the hearing period and access to file, the hearing period was extended initially until 17 September 2018 and subsequently until 21 September 2018. On 21 September 2018, the ECB was informed by the legal counsel submitting comments on behalf of the Supervised Entity that, in light of the already extensive prior correspondence and communications on this matter, it reconfirms and states for the record the management's and shareholder's opposition to the proposed withdrawal of authorisation. Therefore, the ECB considers that no material new facts have emerged since the Supervised Entity was notified of the draft decision and it maintains its assessment that the Supervised Entity's authorisation as a credit institution should be withdrawn.

### 3.2   Factual grounds on which the Decision is based

The initiative to withdraw the authorisation of the Supervised Entity is related to the Supervised Entity's failure to meet the conditions for authorisation. This issue has not been and can no longer be appropriately addressed by the Supervised Entity within a reasonable time due to the irreversible damage to its reputation and its business model.

The withdrawal of the authorisation is thus considered to be the last resort measure taking into account the circumstances of the case, in particular the financial situation of the Supervised Entity and the lack of prospects for restoring its capital position and viability within a reasonable period of time if the moratorium were to be lifted.

---

5   Directive 2014/59/EU of the European Parliament and of the Council of 15 May 2014 establishing a framework for the recovery and resolution of credit institutions and investment firms and amending Council Directive 82/891/EEC, and Directives 2001/24/EC, 2002/47/EC, 2004/25/EC, 2005/56/EC, 2007/36/EC, 2011/35/EU, 2012/30/EU and 2013/36/EU, and Regulations (EU) No 1093/2010 and (EU) No 648/2012, of the European Parliament and of the Council (OJ L 173, 12.6.2014, p. 190).

## 3.3   Assessment

According to Article 4(1)(a) and Article 14(5) of the SSM Regulation and Article 83 of the SSM Framework Regulation, the ECB is exclusively competent to decide on the withdrawal of an authorisation of credit institutions.

### 3.3.1  Breaches of legal requirements

Pursuant to Article 7(1)(d) of the Banking Act, transposing the provisions of Article 14(2) of the CRD IV, a licence cannot be granted unless the competent authority is satisfied that the shareholders or members whether direct or indirect, that have qualifying holdings, controllers and all individuals who will effectively direct the business of the credit institution are 'suitable persons to ensure its sound and prudent management'.

The criteria based on which the suitability of shareholders of a qualifying holding is assessed are set out in Article 13A(9) of the Banking Act, which transposes the provisions of Article 23(1) of the CRD IV and to which reference is made in Article 7(1)(d) of the Banking Act and Article 14(2) of the CRD IV. These include, *inter alia*, the reputation of the person holding a qualifying holding within the meaning of the legal framework[6] (Article 13A(9)(a) of the Banking Act transposing Article 23(1)(a) of the CRD IV). These provisions can be read and interpreted in the light of guidelines adopted by the European Banking Authority on the basis of Regulation (EU) No 1093/2010 of the European Parliament and of the Council[7].

Specifically, the Guidelines of the European Banking Authority[8] specify that the reputation criterion covers two elements, the integrity and the professional competence. A person is considered of good repute if there is no reliable evidence to suggest otherwise and no reasonable ground to doubt his or her reputation. There is, consequently, a rebuttable presumption of good repute. As regards the integrity, this may be called into question by the existence of, among other, any prosecution of a criminal offence, in particular any offences of dishonesty, fraud or financial crime, including money laundering and terrorist financing, or any other information from credible and reliable sources that is relevant in this context.

Even though the suitability of shareholders is primarily ensured by means of the qualifying holding regime under Articles 22 et seq. of the CRD IV (transposed in Malta by means of Articles 13 et seq. of the Banking Act), which provides for a point-in-time assessment of a proposed acquirer at the time of the acquisition, this is not the only context in which the reputation of a shareholder or prospective shareholder becomes of relevance from a supervisory perspective. Article 14(2) of the CRD IV (transposed in Malta by means of Article 7(1)(d) of the Banking Act) refers to the suitability criteria defined by Article 23(1) of the CRD IV (transposed in Malta by means of Article 13A(9) of the Banking Act) and defines them as criteria

---

6   Pursuant to Article 2(1) of the Banking Act a "qualifying holding" shall have the same meaning as that assigned to it in point (36) of Article 4(1) of Regulation (EU) No 575/2013, i.e. a direct or indirect holding in an undertaking which represents 10% or more of the capital or of the voting rights or which makes it possible to exercise a significant influence over the management of that undertaking.

7   Regulation (EU) No 1093/2010 of the European Parliament and of the Council of 24 November 2010 establishing a European Supervisory Authority (European Banking Authority), amending Decision No 716/2009/EC and repealing Commission Decision 2009/78/EC (OJ L 331, 15.12.2010, p. 12).

8   Joint Guidelines on the prudential assessment of acquisitions and increases of qualifying holdings in the financial sector, JC/GL/2016/01, paragraph 10.1.

which must be met for the granting of an authorisation as a credit institution. Article 18(c) of the CRD IV (transposed in Malta by means of Article 9(2)(c) of the Banking Act), in turn, provides that a ground for withdrawal is present where the credit institution no longer fulfils the conditions under which authorisation was granted. It follows that non-compliance of a qualifying shareholder with the suitability criteria set out in Article 23(1) of the CRD IV (transposed in Malta by means of Article 13A(9) of the Banking Act), including the reputation criterion, constitutes a ground for withdrawal even if this becomes apparent only after the initial granting of the authorisation and outside the context of a qualifying holding assessment within the meaning of Article 22 of the CRD IV. This regime is part of a system whose objective is clarified by the CRD IV: "to ensure the sound and prudent management of the credit institution in which an acquisition is proposed"[9]. The legislator seeks to ensure that only persons meeting specific requirements can hold significant shares of capital and/or voting rights in a bank, both at the time when the initial authorisation as credit institution is granted (for which the assessment of qualifying holdings is a crucial prerequisite) and as a continuous requirement to conduct the business of a credit institution. And this is also, by express provision of the CRD IV, the criterion for interpretation informing the assessment carried out by the competent authority.

As far as the shareholding structure of the Supervised Entity is concerned, the ultimate shareholder is Mr Ali Sadr Hashemi Nejad (hereinafter 'Mr Ali Sadr' or the 'Shareholder') who holds indirectly 100% of the capital and voting rights in the Supervised Entity[10]. Mr Ali Sadr is, therefore, not only holder of a qualifying holding, but also represents the controller of the Supervised Entity within the meaning of Article 14(11) of the Banking Act, which defines 'control' as "the power to determine in any manner the financial and operating policies of a body corporate, the power to appoint or remove the majority of the members of the board of directors or equivalent governing body or the power to cast the majority of votes at meetings of the board of directors or equivalent governing body".

According to a press release published by the U.S. Department of Justice[11], on 19 March 2018 Mr Ali Sadr was arrested in the United States on a six-count indictment for his alleged participation in a scheme in which more than USD 115 million in payments for a Venezuelan housing complex were illegally funnelled through the U.S. financial system for the benefit of Iranian individuals and entities. In May 2018, he was granted bail subject to very strict terms (e.g. electronic monitoring, surrender of all passports or any other travel documents etc.).

The indictment was subject to intense national and international media attention resulting in negative press reports on the Supervised Entity, severely tarnishing its reputation, in particular taking into account the allegations of the U.S. prosecutor with respect to the illicit origin of (part of) the funds invested in the

---

9   Article 23(1) of the CRD IV.

10  Mr Ali Sadr is the sole owner of Alpene Ltd (Hong Kong), which in turn owns 99.99% of Pilatus Holding Ltd (the remaining 0.01% owned directly by Mr Ali Sadr). Pilatus Holding Ltd is the majority direct shareholder of the Supervised Entity, holding 9,999,999 ordinary "A" shares representing 99.99% of the capital and 100% of the voting rights in the Supervised Entity, while Alpene Ltd holds 1 ordinary class B share representing 0.01% of the capital in the Supervised Entity.

11  https://www.justice.gov/usao-sdny/pr/iranian-national-arrested-scheme-evade-us-economic-sanctions-illicitly-sending-more-115.

capital of the Supervised Entity[12]. To mitigate the negative effects on the Supervised Entity stemming from the indictment concerning Mr Ali Sadr, the MFSA intervened immediately by, *inter alia*, ordering his removal, with immediate effect, from the position of director of the Supervised Entity and any executive roles held therein, pursuant to Article 14(10) of the Banking Act, as well as by directing the suspension of his voting rights and refraining from the legal and judicial representation of the bank, pursuant to Article 4B(1) of the Banking Act[13]. Furthermore, on 21 and 22 March 2018 respectively the MFSA imposed a full moratorium on the Supervised Entity pursuant to Article 4B of the Banking Act and appointed a competent person ('Competent Person') under Article 29(1)(c) and (d) of the Banking Act to take charge of the assets of the Supervised Entity for the purpose of safeguarding the interests of depositors and respectively to assume control of its business.

Notwithstanding the actions of the MFSA which were meant to address the situation of Mr Ali Sadr in his capacity as non-executive director, further assessment is needed with regard to the impact of the indictment on the Shareholder's suitability as a continuous requirement for the conduct of business as a credit institution by the Supervised Entity. The Guidelines of the European Banking Authority[14] expressly specify that the integrity requirements apply regardless of the involvement in the management or the influence exercised on the credit institution concerned.

Moreover, the suspension of his voting rights imposed by the MFSA is a temporary measure aimed at temporarily freezing the situation of the Supervised Entity, and is without prejudice to the assessment of Mr Ali Sadr's suitability as a qualifying holder in line with the legal requirements under Article 7(1)(d) corroborated with Article 13A(9) of the Banking Act.

The ECB has assessed Mr Ali Sadr's suitability, thereby taking into account the presumption of innocence during criminal proceedings, as well as the impact it has on the Supervised Entity. While the charges against Mr Ali Sadr in the United States are merely allegations, as long as he has not been proved guilty by a court, the indictment is nevertheless assessed as relevant and raising serious doubt with respect to Mr Ali Sadr's integrity in his capacity as shareholder of the Supervised Entity for the reasons provided herein.

According to the Guidelines of the European Banking Authority[15], the integrity is not called into question only in the case of final convictions; any information from credible and reliable sources should be taken into account. Pending criminal proceedings may thus have an impact on the reputation of the person concerned (and consequently on the supervised entity). Notwithstanding the fact that the relevant

---

12  According to the allegations of the United States Attorney Southern District of New York quoted by numerous local and international press reports, Mr Ali Sadr's equity in the Supervised Entity "constitutes criminal proceeds directly linked to the Venezuela project — [Mr Ali Sadr] used money from the project (CHF 1 million and EUR 8 million) to establish and capitalize [the Supervised Entity] in 2013. See Case 1:18-cr-00224-ALC Document 29 Filed 05/24/18 accessible at: http://www.independent.com.mt/file.aspx?f=168992.

13  MFSA letter to Mr Ali Sadr dated 21 March 2018.

14  Joint Guidelines on the prudential assessment of acquisitions and increases of qualifying holdings in the financial sector, JC/GL/2016/01, paragraph 10.2.

15  Joint Guidelines on the prudential assessment of acquisitions and increases of qualifying holdings in the financial sector, JC/GL/2016/01, paragraph 10.13(d).

competent authorities conduct these proceedings, the very fact that an individual is – or has been – subject to proceedings is relevant to the assessment of suitability.

The relevance of information casting doubt on the integrity of a person is assessed by competent supervisory authorities on a case-by-case basis taking into account all relevant circumstances. The Guidelines nevertheless mention as of particular relevance any conviction or prosecution of certain criminal offences, such as fraud or financial crime, including money laundering[16].

In the current case, the nature and gravity of the indictment are thus considered relevant elements. According to the indictment[17], Mr Ali Sadr is charged with one count of conspiracy to defraud the United States, one count of conspiracy to violate the International Emergency Economic Powers Act (IEEPA), one count of bank fraud, one count of conspiracy to commit bank fraud, one count of money laundering, and one count of conspiracy to commit money laundering. Most of these alleged crimes are subject to severe sanctions under the applicable law (e.g. up to 20 years of imprisonment for Conspiracy to violate IEEPA, money laundering and respectively conspiracy to commit money laundering or 30 years of imprisonment for bank fraud and conspiracy to commit bank fraud)[18], as also confirmed by the strict bailing terms (see above).

Moreover, in the current case, the shareholding structure of the Supervised Entity is also relevant. Specifically, Mr Ali Sadr in his capacity as the sole ultimate shareholder exercised control over the Supervised Entity and was thus ultimately responsible for the adoption of material decisions for the sound and prudent operation of the Supervised Entity (e.g. appointment of management bodies, increase of the share capital of the Supervised Entity). This cannot be permanently remediated by means of the appointment of a competent person taking control of the Supervised Entity, since such a measure is by its nature intended to be temporary. Furthermore, as explained in detail in Section 3.3.2 of this Decision, the sale of the Supervised Entity is considered unlikely and would thus not constitute a remedy either.

Against this background, Mr Ali Sadr no longer satisfies the reputation requirements as provided under the applicable legal framework. In accordance with Article 18(c) of CRD IV, competent authorities may withdraw the authorisation granted to a credit institution where such a credit institution no longer fulfils the conditions under which authorisation was granted. This provision was transposed into Maltese law by Article 9(2)(c) of the Banking Act which refers to the underlying conditions which formed the basis for the issuance of a licence under Article 7, including where applicable any additional, specific conditions that may have been set at the moment of the licensing.

Therefore, taking into account the fact that Mr Ali Sadr, in his capacity as holder of a qualifying holding and controller of the Supervised Entity, is no longer suitable within the meaning of Article 14(2) of the CRD IV, as transposed by Article 7(1)(d) of the Banking Act, corroborated with Article 23(1)(a) of the CRD IV, as transposed by Article 13A(9)(a) of the Banking Act, there are grounds to consider that the

---

16  Joint Guidelines on the prudential assessment of acquisitions and increases of qualifying holdings in the financial sector, JC/GL/2016/01, paragraph 10.13(a)(ii).

17  Published by the U.S. Department of Justice, U.S. Attorney's Office for the Southern District of New York, and available at https://www.justice.gov/usao-sdny/press-release/file/1044926/download.

18  https://www.justice.gov/usao-sdny/pr/iranian-national-arrested-scheme-evade-us-economic-sanctions-illicitly-sending-more-115.

Supervised Entity no longer fulfils the conditions under which authorisation was granted pursuant to Article 18(c) of CRD IV, as transposed by Article 9(2) of the Banking Act into the Maltese legal framework.

This conclusion is compatible with the principle of presumption of innocence during criminal proceedings, which is protected and recognised under Maltese as well as Union law[19]. This follows from the different purposes pursued by prudential supervision as opposed to criminal law. Prudential supervision is not concerned with imposing punishments on natural persons, but rather with ensuring the stability and soundness of credit institutions. It takes a forward-looking perspective in order to manage and mitigate risks arising from financial activities, as opposed to penalising past behaviour, as is the objective of criminal law. In providing for the legal framework, the co-legislators were aware that financial markets are, to a larger degree than other sectors, dependent on the trust and confidence of the general public in the way financial market actors run their business, since a loss of such confidence can rapidly lead to a loss of funding and thereby result in the failure of such an actor. Consequently, they were not primarily concerned with whether a qualifying shareholder of a credit institution has, objectively and by the standards of criminal law, committed a criminal offence, but they were rather concerned with the public perception of the shareholder. This is evidenced by the use of the word "reputation" in Article 23(1)(a) of the CRD IV, as opposed to a different wording which aims directly at criminal law standards[20]. As a consequence, circumstances which cast serious doubt on the reliability and suitability of a shareholder can be of relevance from a prudential supervision perspective even if they still fall short of a criminal conviction; this is true in particular if, as is presently the case, these circumstances had an impact on the reputation of the Supervised Entity to such an extent that they have led to detrimental market sentiment about the Supervised Entity. This detrimental market sentiment is, in the present case, evidenced not only by significant withdrawal requests submitted by the depositors of the Supervised Entity subsequent to the initiation of criminal proceedings against Mr Ali Sadr[21], but also in the termination of correspondent banking relationships. In addition, the criminal proceedings against Mr Ali Sadr even constitute one of the factors contributing to the downgrade of the Maltese banking sector as a whole[22].

These differences between the objectives of financial supervision as opposed to criminal law mean that it is compatible with the presumption of innocence for the ECB to draw proportionate supervisory conclusions from the criminal proceedings against Mr Ali Sadr, and from the effect these proceedings have had on the prudential situation of the Supervised Entity; this does not entail a claim or

---

19  Cf. Article 48 of the Charter of Fundamental Rights.

20  Other language versions of the CRD IV confirm this interpretation by also using words which focus on the public perception of the shareholder, as opposed to standards of criminal law; see, for instance, German *Leumund*, French *honorabilité*, Italian *onorabilità*, Spanish *reputación*.

21  Specifically, during the week of 20 March 2018 when the Shareholder was indicted, the Supervised Entity received withdrawal requests for EUR 51.4 million worth of deposits. The amount of deposits requested for withdrawal further increased to EUR 53.9 million at the end of April 2018, representing 42.6% of the total amount of deposits on the balance sheet of the Supervised Entity at 28 May 2018.

22  On 1 August 2018, S&P Global Ratings announced that they revised their industry risk score for the Maltese banking sector from 4 to 6 (on a scale of 1-10, with 1 being the lowest risk), the reason for this being that the reputational and operational risks for the Maltese banking sector generally have increased. In this context S&P Global Ratings made explicit reference, among others, to the criminal proceedings against Mr Ali Sadr in the United States.

pronouncement by the ECB that Mr Ali Sadr is guilty of a criminal offence, or a prejudgment of the assessment of the case by the competent criminal authorities[23].

### 3.3.2   Proportionality

The ECB is of the opinion that the withdrawal of the authorisation of the Supervised Entity is suitable, necessary and reasonable to end the non-compliance with the legal requirements and to protect the interests of depositors, as well as the stability of the national banking sector as a whole.

#### a)  Suitability of the withdrawal

The objective of the withdrawal of the Supervised Entity's authorisation as a credit institution is to put an end to the non-compliance with the applicable law by the Supervised Entity and to prevent damages to the depositors and other creditors of the Supervised Entity and the national banking sector as a whole.

As explained above, the Supervised Entity no longer has a suitable shareholder exercising control over its business and thus no longer meets the conditions for authorisation, which constitutes a ground for the withdrawal of the authorisation pursuant to Article 18(c) of the CRD IV, as transposed into national law.

#### b)  Necessity of the withdrawal

The supervisory measure is necessary if the stated aim cannot be achieved by a less onerous measure, which would be at least as effective at achieving the same objective of restoring legality. In the analysis of necessity in this sense, the ECB has considered not only the severity of the Supervised Entity's non-compliance with the requirements for authorisation, but also whether there are any prospects for the Supervised Entity to remedy this shortcoming through other, less onerous means than a withdrawal of the authorisation.

Given the circumstances of the Supervised Entity, its sale to a third party or group of third parties has been identified as the main alternative to the withdrawal of the authorisation in this context. However, the ECB concludes that this measure does not have a realistic chance of succeeding based on the assessment of the Supervised Entity's viability.

More specifically, the composition of the Supervised Entity's balance sheet in conjunction with the reputational damage incurred strongly suggest there is no material franchise value to the enterprise and it is therefore unrealistic to assume third party interest in its acquisition.  This conclusion is based on the following considerations:

Taking into account the deteriorating capital and liquidity position of the Supervised Entity due to the significant damage to its reputation in light of the extensive negative media coverage, the MFSA requested the Supervised Entity to assess its financial situation and to propose the necessary measures to restore its position and compliance with the relevant prudential requirements at the moment the

---

23  See, in this regard, the judgment of the General Court of 27 February 2014 in Case T-256/11 Ahmed Abdelaziz Ezz and Others v Commission, ECLI:EU:T:2014:93, at para. 83, and the judgment of the European Court of Human Rights of 23 January 2018 in Application no. 15374/11 Güç v. Turkey, ECLI:CE:ECHR:2018:0123JUD001537411, at para. 41 (emphasising the consideration to preserve public confidence in the system as an objective of the administrative, as opposed to criminal, procedure).

moratorium is lifted.  More specifically, on 23 April 2018, the MFSA sent a letter to the Competent Person asking for: (i) 12-months balance sheet projections of the Supervised Entity assuming no restrictions on deposit withdrawals; (ii) an action plan to restore the Supervised Entity's liquidity position by the end of April; (iii) an action plan the Supervised Entity intends to follow to restore its viability, and (iv) plans which the Supervised Entity has in place to restore the capital position should it fall below the minimum statutory threshold of EUR 5 million.

On 25 April 2018, as a response to the MFSA's request, the Competent Person informed the MFSA of the following:

- the Supervised Entity's capital situation has declined significantly since the previous year and will continue to do so beyond what cost cutting may offer until falling below the minimum statutory threshold, given the deteriorating quality of its assets, the related loan impairment provisions and the recent and further expected operating expenses, including the external auditors' view that the Supervised Entity is gone concern for accounting purposes;

- the viability of the Supervised Entity which mainly conducts private banking business is unrealistic in light of the significant damage to its reputation and the loss of trust by its client base. Furthermore, the Supervised Entity has no franchise value. In this context, should the full moratorium established by the MFSA be lifted, there can be no credible action plan to restore neither the Supervised Entity's position from the liquidity and capital perspective, or its viability.

The ECB has assessed this information provided by the Competent Person in conjunction with information on subsequent developments, most importantly a signed written notification by the largest borrower of the Supervised Entity from 24 June 2018, in which the latter requested the early termination of its loan, offsetting it against the deposit and the proceeds from US Treasury Bills pledged with the Supervised Entity.

The ECB concludes that the viability of the Supervised Entity in the medium term is highly doubtful based on several factors:

- The loan that is to be terminated upon lifting of the moratorium represents 90% of the Supervised Entity's loan book. The latter constitutes its main source of income, meaning the early termination of said loan drastically reduces the Supervised Entity's income generating capacity. This is further exacerbated by the fact that the remaining 10% of the loan book consist of five loans, three of which are delinquent as the borrowers have not honoured interest and/or principal payments (the relevant impairments have been booked by the Competent Person). Finally, the borrowers of the remaining two loans have requested their early termination (to be allowed only after extensive due diligence checks on the source and provenance of funds to be used for repayment and, for one of the loans, a verification process concerning the original transaction, as per MFSA instructions to the Competent Person).

- The Supervised Entity's ability to secure new sources of income appears extremely limited against the background of the following developments:

- o The observed decline of its loan book from EUR 159 million in March 2017 to EUR 66 million in March 2018, with maturing loans not being replaced by new business;

- o The damage to the Supervised Entity's reputation given the extensive negative media exposure following the indictment of the Shareholder in the United States for allegations concerning, *inter alia*, bank fraud and money-laundering, highly mediatised also by the international press.

- o The damage to the Supervised Entity's reputation given the enquiries by the EBA[24] into possible breaches of Union law committed by the Maltese authorities in the supervision of the Supervised Entity which triggered further negative media coverage.

- o The termination of the majority of the Supervised Entity's correspondent bank relationships forcing it to transfer the funds held with these banks into accounts with the Central Bank of Malta.

- The Supervised Entity's lack of current sources of income, its inability to secure new sources of income, and its ongoing operating expenses (rents, administrative expenses, staff costs, etc.) imply a trajectory of ongoing operating losses. This is reflected in the latest income statement projections submitted by the Competent Person on 25 July 2018, showing a net monthly loss of EUR 178 thousand for August 2018 followed by net monthly losses around EUR 80 thousand for each of the following months until the end of the forecasting horizon in December 2018.  Those losses would further deteriorate the Supervised Entity's capital position and, ceteris paribus, reduce it to a level close to the minimum initial capital of EUR 5 million required under the legal framework by September 2018.

- As regards the Supervised Entity's liquidity situation, it is noted that the early termination of the largest loan increases the stock of liquid assets the Supervised Entity could use to fulfil its obligations towards its creditors if the moratorium was lifted, and thereby reduces the risk of a liquidity shortfall in the short run. However, there is a very high likelihood that the vast bulk of the Supervised Entity's stock of liquid assets would need to be used to satisfy deposit withdrawals upon lifting of the moratorium, implying that its liquidity situation with a view to continuing operations in the medium term would remain precarious given that the Entity does not possess

---

24 At the request of the European Commission's Director General for Justice and Consumers, the EBA initiated two investigations of the Maltese authorities: (i) a preliminary enquiry into a possible breach or non-application of Union law by the MFSA, and (ii) a formal Breach of Union Law Investigation under Article 17(3) of Regulation (EU) No 1093/2010 of the Maltese FIAU in relation to its supervision of alleged infringements of Malta's AML provisions by the Supervised Entity. The EBA decided to close the case without opening an investigation in relation to the MFSA on 24 September 2018, while in the case of the FIAU the conclusion was in the sense of a breach of Union law and the EBA issued a recommendation to the FIAU on 11 July 2018. See also https://www.eba.europa.eu/-/eba-notifies-the-european-commission-and-meps-on-the-outcome-of-its-enquiry-into-the-application-of-eu-law-on-aml-in-malta and https://www.eba.europa.eu/documents/10180/2101654/Letter+to+Tiina+Astola+on+the+request+to+investigate+a+possible+BUL+under+Article+17+of+Regulation+%28EU%29%20No+10932010+-+24092018.pdf; http://www.eba.europa.eu/documents/10180/2101654/Letter+to+MEPs+on+the+request+of+information+on+a+preliminary+inquiry+into+the+Maltese+bank+Pilatus+Bank+-+07062018.pdf and https://www.eba.europa.eu/documents/10180/2257858/Recommendation+to+the+FIAU+on+action+necessary+to+comply+with+the+AML+directive+%28EBA-Rec-2018-02%29.pdf.

material further assets that could be sold or pledged as collateral to generate liquidity, and liquidity injections from the Shareholder are not considered an option given the assessment in 3.3.1 above. Liquidity support from third parties is also considered unrealistic based on the reputational damage the Supervised Entity has suffered and the statement by the Competent Person in the letter dated 25 April 2018 that "outside support is non-existent".

- Finally, it is noted that the external auditor of the Supervised Entity requested the preparation of accounts on a gone concern basis, requiring the application of a write down of the Supervised Entity's assets by EUR 1.2 million. This reflects the external auditor's assessment that the probability of the Supervised Entity continuing in operational existence is highly remote.

In addition, Mr Ali Sadr's equity interest in the Supervised Entity is currently inalienable pursuant to a restraining order of the U.S. District Court, Southern District of New York, dated 7 June 2018[25].

In the assessment of the necessity of the proposal, the ECB has also taken into consideration the fact that a number of supervisory measures have already been imposed on the Supervised Entity by the MFSA with a view to prevent further deterioration to the financial situation of the Supervised Entity as a result of the damage to its reputation. In this context, it is to be noted that several of these measures have been challenged and are currently being litigated before the Maltese Financial Services Tribunal. However, in line with Maltese law (Article 21(17) of the Maltese Financial Services Authority Act, Chapter 330 of the Laws of Malta), this appeal does not suspend the operation of the challenged MFSA actions, which therefore remain fully effective and applicable. In spite of this effectiveness, these MFSA actions cannot remedy the situation and restore a state of affairs where the Supervised Entity can be considered viable going forward.

For the reasons described above, it is considered that no alternative measures to a withdrawal of the authorisation are feasible to restore the compliance of the Supervised Entity with the applicable legal requirements.

Furthermore, as the Supervised Entity is making monthly operating losses, postponing the decision would increase the risk for depositors. As such, the adoption of other equivalent supervisory measures within a reasonable timeframe has to be considered unrealistic.

Given the circumstances of the Supervised Entity and its Shareholder described in detail above, and the need to protect the depositors and other creditors of the Supervised Entity, there is a need to proceed with the withdrawal of the authorisation as a credit institution.

   *c)   Reasonableness of the withdrawal*

When assessing the reasonableness of the withdrawal of the authorisation, the rights of the Supervised Entity, its owners and management to offer financial services and conduct business have to be considered. In addition, the rights and expectations of depositors, investors and of the public for a stable,

---

25  Letter from Arnold & Porter, the legal counsel of Mr Ali Sadr in the U.S., to the Supervised Entity through the Competent Person dated 13 June 2018.

reliable, transparent and efficient financial sector where their rights and financial resources are well-protected must be considered.

In doing so, the ECB has taken into account the severity of the Supervised Entity's failure and the capacity of the Supervised Entity (or lack thereof) to restore its position. The ECB has, furthermore, considered the damage done to the public confidence in the Maltese and European financial markets – as also reflected by the increase of the industry risk score for the Maltese banking sector – by the presence of a credit institution which no longer fulfils the conditions for authorisation.

In the light of these considerations, the ECB considers that the public interest in restoring legality outweighs the Supervised Entity's private interest in maintaining its authorisation as a credit institution.

### 3.3.3  Protection of legitimate expectations

The ECB has also considered whether the withdrawal of the authorisation of the Supervised Entity would be compatible with the principle of protection of legitimate expectation. In this regard, the ECB considers that the Supervised Entity had been aware of the shortcomings identified for a long time through the measures taken by the MFSA in the course of ongoing supervision. Furthermore, there has been no communication or statement by the MFSA or the ECB stating or implying that the authorisation would not, or not for the time being, be withdrawn. The Supervised Entity can thus not claim that expectations had been created by the MFSA or the ECB according to which its authorisation could not be withdrawn. In addition, the ECB is of the view that unless special circumstances – which are not present in this case – dictate otherwise, the law does not protect the expectation to continue engaging in a business activity for which the respective entity does not meet the applicable legal requirements. Consequently, the ECB concludes that the withdrawal of the Supervised Entity's authorisation as a credit institution is not prevented by the principle of protection of legitimate expectations.

### 3.3.4  Summary of the ECB assessment

In conclusion, the ECB has concluded that the grounds for the withdrawal of the Supervised Entity's authorisation as a credit institution within the meaning of Article 18 of the CRD IV, as transposed into national law, are met. The ECB has further concluded that such a measure constitutes a proportionate (in the sense of suitable, necessary and reasonable) response to the situation and is in line with the principle of protection of legitimate expectations.

### 4.  Administrative and judicial review

A review of this Decision by the ECB's Administrative Board of Review may be requested under the conditions and within the time limits set out in Article 24 of the SSM Regulation and Decision 2014/360/EU of the European Central Bank[26]. A request for a review should be sent, preferably by electronic mail, to: ABoR@ecb.europa.eu or by post to:

---

26  Decision 2014/360/EU of the European Central Bank of 14 April 2014 concerning the establishment of an Administrative Board of Review and its Operating Rules (ECB/2014/16) (OJ L 175, 14.6.2014, p. 47).

The Secretary of the Administrative Board of Review

European Central Bank

Sonnemannstrasse 22

60314 Frankfurt am Main

Germany

Proceedings may be instituted against this Decision before the Court of Justice of the European Union under the conditions and within the time limits provided for in Article 263 of the Treaty on the Functioning of the European Union.


Yours sincerely,


The Secretary of the Governing Council

Pedro Gustavo TEIXEIRA

**Annex B.2**

**[Directive of the MFSA of 21 March 2018 as regards removal and suspension of voting rights]**

# MFSA

## MALTA FINANCIAL SERVICES AUTHORITY

21 March 2018

**Mr Ali Sadr Hasheminejad**
1015 33 RD ST NW NO.809
Washington DC,
United States of America

By email and mail – Ali.Sadr@pilatusbank.com

Dear Sir,

**Pilatus Bank Ltd, C-62995 ("the Bank")**

We write to you in your capacity as Ultimate Beneficial Owner of the Bank and Director and Chairman of the Credit Committee of the Bank which Bank is licensed as a credit institution under the Banking Act (Cap 371) and holds a licence under the Investment Services Act (Cap370).

Reference is made to the indictment of the United States District Court Southern District of New York, *United States of America v.* Ali Sadr Hasheminejad and your arrest in relation thereto.

The Banking Act (Cap 371) of the Laws of Malta, ("the Act") provides specific criteria that a person acting in the capacity of a controller or director of a credit institution has to meet. Reference is made to Article 14(2) of the Act which provides that Directors shall at all times be of sufficiently good repute. Additionally, Article 14(1) of the Act provides that *any person who is a controller or director of a credit institution shall be a suitable person to exercise such control.* Article 14(11) further specifies that "control" includes *the power to determine in any manner the financial and operating policies of a body corporate, and the power to appoint or remove the majority of the members of the board of directors*, powers that you presently hold.

The Authority notes that the above-mentioned pending criminal proceedings raise serious concern and reasonable doubt about your integrity, propriety and suitability to continue controlling and directing the bank.

After careful deliberation of the situation, the Authority has determined to take the following actions:

1. In terms of Article 14(10) of the Act the Authority is hereby issuing an order to remove you, with immediate effect, from the position of director of the Bank and any executive roles that you hold within the Bank.
2. In terms of Article 4B(1) of the Act, the Authority directs tha,t with immediate effect:
   a. You suspend the exercise of your voting rights as shareholder of the Bank.
   b. You refrain from exercising the legal and judicial representation of the Bank.

Page **1** of **2**

# MFSA

## MALTA FINANCIAL SERVICES AUTHORITY

The above measures are also being taken in terms of article 15(1) and (2)(c) of the Investment Services Act (Cap 370).

In terms of the powers granted by law, the Authority will be making public the aforesaid measures.

Any person aggrieved by a decision of the MFSA to impose a directive may, in terms of article 10 of the Banking Act, Article 19 of the Investment Services Act and Article 21 of the Malta Financial Services Centre Act appeal against this decision to the Financial Services Tribunal within thirty days from the date the decision in notified.

Yours sincerely,

**Marianne Scicluna**
**Director General**

**Copied**

**The Compliance Officer – Pilatus Bank**

**The Board of Directors**
**Pilatus Bank Ltd**
**Ta' Xbiex Wharf,**
**Ta' Xbiex, XBX 1026**

Notabile Road, Attard BKR 3000, MALTA.
Tel:(+356) 2144 1155 • Fax:(+356) 2144 1188 • Website: www.mfsa.com.mt

**Annex B.3**

**[Directive of the MFSA of 22 March 2018 as regards the moratorium]**



# MFSA

## MALTA FINANCIAL SERVICES AUTHORITY

21st March 2018

The Board of Directors

Pilatus Bank Ltd

Whitehall Mansions, Level 2

Ta' Xbiex Wharf,

Ta' Xbiex XBX1026

Dear Sirs

PILATUS BANK LTD ('THE BANK')

**DIRECTIVE TO THE BANK WITH IMMEDIATE EFFECT**

In terms of Article 4B of the Banking Act (Cap. 371), and until notified further, the MFSA hereby directs the Bank not to allow any banking transactions, including withdrawals or deposits held with the Bank by the shareholder, members of the Board of Directors and senior management officials of the Bank, or any connected persons or related persons thereto, whether direct or indirect.

The Bank is being further directed to obtain MFSA's prior written approval before effecting any movement of the Bank's assets.

These directives follow our telephone call with Dr Claude-Anne Sant Fournier earlier this morning.

Yours sincerely,

**MARIANNE SCICLUNA**

**DIRECTOR GENERAL**

# MFSA

## MALTA FINANCIAL SERVICES AUTHORITY

The Directors
Pilatus Bank Limited
Whitehall Mansions, Level 2,
Ta' Xbiex Wharf,
Ta' Xbiex MSD 1026

21 March 2018

Dear Sir/Madam,

**Clarification to Directive dated 21 March 2018 - Pilatus Bank Limited ('the bank')**

Reference is made to Directive to the bank issued by the MFSA on 21 March 2018.

In order to clarify the content of the aforementioned Directive as regards the relative scope,
the directive stipulates that the bank is not to transact any business whatsoever irrespective
of the client or the counter party.

More specifically, the Directive applies to all deposits and withdrawals and any disposal of
assets.

Please be informed that in terms of applicable law, the Directive issued earlier today shall be
made public.

Yours sincerely,

**Marianne Scicluna**
**Director General**
**Malta Financial Services Authority**

**Annex B.4**

**[Directive of the MFSA dated 22 March 2018 as regards the appointment of the competent person]**

# MFSA

## MALTA FINANCIAL SERVICES AUTHORITY

22 March 2018

The Board of Directors,
Pilatus Bank
Whitehall Mansions, Level 2,
Ta' Xbiex Wharf,
Ta' Xbiex, XBX 1026

Dear Sirs,

**Pilatus Bank**

We write to you in your capacity as Directors of the Bank, which is licensed as a credit institution under the Banking Act (Cap 371) ("the Act") and holds a licence under the Investment Services Act (Cap 370).

Reference is made to the letter dated 21 March 2018 whereby the Malta Financial Services Authority ("the Authority") ordered the immediate removal of Mr Ali Sadr Hasheminejad from the directorship and any executive roles within the Bank. The Authority also directed him to suspend his voting rights as a shareholder of the Bank and to refrain from exercising the legal and judicial representation of the Bank.

Further reference is made to the directive issued by the Authority on the 21 March 2018 under the Banking Act directing the Bank *inter alia* not to transact any business whatsoever irrespective of the client or the counterparty.

Reference is also made to the directive dated 22 March 2018 directing the Bank in terms of the Investment Services Act not to dispose, liquidate, transfer or otherwise deal with clients' assets and all monies held in its possession as agent, nominee or any other fiduciary capacity.

Reference is also made to the directive dated 25 April 2017, issued to the Bank directing the Bank to preserve all of its records and not to remove them from the registered office of the bank which Directive still stands.

One of the conditions necessary for a bank to be granted a licence is provided for in Article 7(1)(d) of the Act. In terms of this condition, the Authority must be satisfied that the shareholders or members, whether direct or indirect, that have qualifying holdings, the controllers and all individuals who will effectively direct the business of the Bank are suitable persons to ensure its sound and prudent management.

Page **1** of **5**

# MFSA

### MALTA FINANCIAL SERVICES AUTHORITY

Furthermore, in terms of Article 14(1) of the Act, any person who is a controller or director of a Bank shall be a suitable person to exercise such control. Also in terms of Article 14(2) of the Act, directors shall at all times be of sufficiently good repute.

Mr Ali Sadr Hasheminejad is the sole ultimate beneficial owner of the Bank and therefore has a qualifying shareholding in terms of the Act. He is also a controller of the Bank in terms of Article 14(11) of the Act. Mr Ali Sadr Hasheminejad has been a director of the Bank since its inception. Mr Ali Sadr Hasheminejad is therefore required at all times to satisfy the suitability criteria in terms of Articles 7(1)(d), 14(1) and 14(2) of the Act.

The Authority has taken note of the indictment of the United States District Court Southern District of New York, *United States of America v. Ali Sadr Hasheminejad*, and to the arrest of the same Mr Ali Sadr Hasheminejad for his alleged involvement in a scheme to evade U.S. economic sanctions against Iran, to defraud the United States, and to commit money laundering and bank fraud. Mr. Sadr was charged with participating in a scheme in which more than $115 million in payments for a Venezuelan housing complex were illegally funnelled through the U.S. financial system for the benefit of Iranian individuals and entities. Sadr was arrested on a six-count Indictment and presented in U.S. District Court for the Eastern District of Virginia.

The Authority has serious concern and is of the view that the criminal actions in the U.S. against Mr Ali Sadr Hasheminejad raise reasonable doubt about the integrity, propriety and suitability of Mr Ali Sadr Hasheminejad as are required in terms of the Act and therefore the Authority is no longer satisfied that the condition under Article 7(1)(d) is being fulfilled.

Having regard to the functions of the Authority as set out under the Malta Financial Services Authority Act (Cap. 330) and in particular the functions:

(a) to regulate, monitor and supervise financial services in Malta; and
(b) to ensure high standards of conduct and management throughout the financial system.

Having also considered the significance of the aforementioned circumstances, it appears to the Authority that the circumstances indicated under Article 9(2)(c) and (g) subsist and, by virtue of its power under Articles 29(1)(c)and 29(1)(d) of the Act, the Authority, after having consulted the Central Bank of Malta, has decided to appoint a competent person until further notice.

The Authority has also determined that to protect the rights and interests of investors serviced by Category 2 Investment Services licence held by the Bank, the Competent Person is also being appointed in terms of Article 15A(1)(b) and (c) of the Investment Services Act.

The Competent Person shall:

- take charge of all the assets of the Bank, and interests arising from advances, loans or credit facilities given, for the purpose and safeguarding the interests of depositors, investment services clients and creditors. In this case reference to assets also includes any assets relating to investment services business of the Bank; and

# MFSA

MALTA FINANCIAL SERVICES AUTHORITY

- assume control of the banking and the investment services business and to continue carrying on the business until such time as the Authority may direct.

The Competent Person is to continue with the aforesaid appointment until such time as the Authority may direct. This is without prejudice to any further regulatory action that the Authority may deem fit to take in the circumstances.

For this purpose, the Authority has appointed Mr Lawrence Connell (Holder of U.S. Passport No 517387849) as the Competent Person. In terms of Article 29(1)(g) of the Act and Article 15A(1)(d) of the Investment Services Act, the costs relating to the appointment of Mr Lawrence Connell as Competent Person shall be borne by the Bank. The Competent Person may be assisted by other individuals, known to the Authority, in the carrying out of his duties as Competent Persons who will form part of the Competent Person's team. Any rights, including rights of access to premises and documents, given to the Competent Person shall be equally given to the individuals forming part of his team who are identified by the Competent Person as such.

The Bank is required to co-operate and take all necessary actions to ensure that the Competent Person is able to carry out its responsibilities accordingly. To this effect, the Bank shall, in terms of Article 29(2)(b) and (c) of the Banking Act and Article 15A(2)(b) and (c) of the Investment Services Act, deliver to the Competent Person all the assets of the Bank and control of the banking and investment services business and shall act in accordance with its obligations under the said provisions.

The Bank is also directed to provide:

- access to the Competent Person to all the books and records of the Bank, as well as ancillary records whether in soft or hard format; all the records relating to the Bank including those kept on the Bank's network and any other documentation which relates in any way, whether directly or indirectly, to the business of the Bank;

- access to all the systems of the Bank.

In terms of his mandate, the Competent Person shall, inter alia:

- assume all the powers, functions and duties of the Bank in respect to all assets, whether exercisable by the Bank in general meeting or by the Board of Directors or by any other person, <u>including the legal and judicial representation of the Bank to the exclusion of the Bank and any other person</u>, in terms of Article 29(2)(b) and (c) of the Banking Act, and Article 15A(2)(b) and (c) of the Investment Services Act, to the exclusion of the Bank;

- in terms of Article 29(3)(b) of the Banking Act and in respect of any such property, partnerships, firms or other business forming part of the assets of the Bank and in which the Bank has an interest, whether directly or indirectly, including any interest arising from advances or loans made or credit facilities given or any liability undertaken by the Bank, assume such powers, functions and duties as directed by the Authority;

- in terms of Article 29(3)(c) of the Banking Act and Article 15A(2)(c) of the Investment Services Act, have the power to require any other person to provide it with such facilities

# MFSA

MALTA FINANCIAL SERVICES AUTHORITY

as the Competent Person may deem necessary to carry out any of the powers, functions and duties assigned to it in terms of its Appointment Letter; and

- assume any other powers in terms of Article 29 of the Banking Act and Article 15A of the Investment Services Act, as may be determined by the Authority.

The Competent Person shall also have the power to:

- undertake a detailed and comprehensive review of the current state of affairs of the Bank including all assets of the Bank (including the loan portfolio granted by the Bank);

- locate, secure and take charge of all the assets and liabilities, including off-balance sheet items, of the Bank and take all necessary steps to ensure the protection of the Bank's assets;

- take physical possession of all the books and records of the Bank, as well as ancillary records, whether in soft or hard format, all the records relating to the Bank including those on the Bank's network and any other documentation which relates in any way, whether directly or indirectly, to the business of the Bank, to enable the Competent Person to establish with reasonable accuracy amounts owed by and to the Bank;

- take physical possession of all accounting records of the Bank, both hard copies and electronic records;

- take all necessary steps to recover monies that are due to the Bank as the Competent Person deems necessary for the continued operations of the Bank;

- establish ways to how to preserve the assets of the Bank in the best interest of depositors and investment services clients;

- undertake any other action that is necessary and expedient for the management of the assets of the Bank, liaising as may be necessary with the Authority.

In the context of the above, the Bank is directed to co-operate fully with the Competent Person to ensure that he can exercise the terms of his appointment as specified earlier on and as provided by law.

The disclosure of any information and documentation provided by the Bank to the Competent Person in the terms of the Appointment, shall be limited exclusively to the Competent Person, who shall treat the aforementioned information in the strictest confidence and who shall not disclose any confidential information to any other person except as required by law.

The fees, exclusive of VAT, due to the Competent Person for the purposes of this appointment shall be calculated at an hourly rate of US $350, capped at a maximum monthly fee of US$50,000. The Competent Person will be using the services of additional staff.  Hourly rates of the additional staff will be communicated to the Bank.

# MFSA

### MALTA FINANCIAL SERVICES AUTHORITY

Furthermore, the Competent Person has undertaken that he will ensure that any additional costs and expenses that may be incurred for the proper running of the operations of the Bank are reasonable and are essential for the proper carrying on of the operations of the Bank.

The Competent Person will be submitting monthly invoices to the Bank, with the Authority in copy, setting out the details of the time spent on this appointment during the period covered by the invoice. Invoices should be settled within 15 days from date of invoice.

Kindly acknowledge receipt of this letter.

Yours sincerely,

**Marianne Scicluna**
**Director General**

## **Annex B.5**

**[Letter of the EBA Chairperson of 24 September 2018 to the Members of the European Parliament]**

THE CHAIRPERSON

EBA | EUROPEAN
BANKING
AUTHORITY

Floor 46, One Canada Square,
London E14 5AA UNITED KINGDOM

t: +44(0) 20 7382 1770
f: +44(0) 20 7382 1771

www.eba.europa.eu

+44(0)20 7382 1765 direct
andrea.enria@eba.europa.eu

Members of the European Parliament,
who participated in the ad-hoc Delegation to Malta
European Parliament
60, rue Wiertz
B-1047 Brussels
Belgium

**EBA-D-2018-2049**

24 September 2018

**Re: Request to investigate a possible breach of Union law under Article 17 of Regulation (EU) No 1093/2010**

Dear Members of the European Parliament,

I am writing you in relation to your letter of 14 February 20187 concerning the request to investigate a possible breach or non-application of Union law by the Maltese competent authorities in relation to Pilatus Bank.

As I communicated to you, the EBA opened a preliminary enquiry in relation to the Maltese Financial Intelligence Analysis Unit (FIAU) and another in relation to the Maltese Financial Services Authority (MFSA). I informed you of the outcome of the investigation into the FIAU by my letter of 11 July 2018.

Concerning the MFSA, the preliminary enquiry has focused on the authorisation process, the prudential supervision of Pilatus Bank, and the recent supervisory measures taken by the MSFA.

As regards the latter issue, on 30 June 2018 MFSA announced that it has formally filed with the European Central Bank (ECB) a recommendation for the withdrawal of Pilatus Bank's banking license, on the following grounds: Indictment of the Ultimate Beneficial Owner (UBO) and liquidity.

In our opinion, this is an appropriate step to take to comply with Article 14 (2) of Directive 2013/36/EU, of 26 June 2013, on access to the activity of credit institutions and the prudential supervision of credit institutions and investment firms ("CRD") given the current circumstances of the bank's ultimate beneficial owner.

The EBA's preliminary enquiries have raised significant concerns concerning the MFSA's authorisation and supervisory practices in relation to Pilatus Bank. However, in the light of the requirements set out in Union law for prudential supervisors which make it difficult to conclude that there have been breaches of clear and unconditional obligations established in Union law, and especially in light of the significant supervisory actions taken by the MFSA in relation to Pilatus Bank, I have decided to close the case without opening a breach of Union law investigation.



Notwithstanding the decision not to open an investigation, there are a number of areas where we believe the MFSA's practices should be improved. The MFSA has informed us of a number of measures which it is implementing to improve its authorisation and supervisory processes and the EBA intends to monitor this, including through an on-site visit which we currently propose to carry out in mid-2019.

In particular, as a result of our enquiries I have expressed concerns to the MFSA about its supervisory practices in four key areas:

- Engagement between the MFSA and the Financial Intelligence Analysis Unit during the authorisation process.

- Robustness of due diligence checks conducted as part of the authorisation process.

- Prudential supervisory response to concerns about effectiveness of AML/CFT systems and controls.

- Resources and risk prioritisation given to credit institutions pursuing a private banking business model with predominantly non-resident customers.

I have therefore asked the MFSA to update the EBA on a quarterly basis on the measures adopted to strengthen its supervision and the state of play of its implementation in these areas.

EBA staff will also carry out a further on-site visit to the MFSA which is currently scheduled for mid-2019 to assess progress in the implementation of these measures and the EBA will then review what, if any, further measures it considers need to be taken.

It will also        be important to tackle the deficiencies which we have identified in current Union law in order to help address perceived shortcomings in conduct and prudential supervision of AML/CFT issues which have be discuss and the high-level joint working group on AML/CFT recently convened by the Commission and in which we participated. I therefore hope that the joint working group will be able to consider how best the following issues which we have identified can be addressed.

**Authorisation of credit institutions**

The requirements for authorisation of credit institutions are laid down by Member States under Article 8(1) CRD. While CRD contains some specific requirements, these are limited in nature or require information to be provided without setting out how it is to be assessed. This leaves considerable discretion in the assessment of authorisation requirements. RTS and ITS submitted by the EBA to the Commission in June 2017 on information to be provided in authorisation applications and the procedures for providing that information will help ensure that authorisation is not given in the absence of information on AML/CFT systems and controls being provided. However, these RTS and ITS are still awaiting endorsement by the Commission and the EBA's empowerment does not extend to harmonising the assessment of the information.



While Articles 16 and 24 CRD impose the obligation to consult and to cooperate among competent authorities of different Member States during the authorisation process, CRD does not provide for specific engagement between different competent authorities within the Member State. Given that Union law has established a requirement for AML supervisors, it may be useful to ensure that AML supervisors are required to contribute their expertise to authorisation assessments.

**Assessment of qualifying holdings**

The assessment of qualifying holdings in credit institutions is more fully harmonised than some other areas of prudential supervision. However, there are still limits on the extent of harmonisation achieved. In particular, the extent to which competent authorities should verify the accuracy of information provided and actively investigate and challenge that information is not harmonized.

Joint ESA guidelines have sought to develop common standards in this area, in particular making clear the wide range of information that should be taken into account. Competent authorities making suitability assessments of individuals face significant difficulties under some national legal regimes because of constraints in taking into account negative elements other than definitive judicial and administrative findings in the assessment of the fitness and propriety of qualifying holders and managers.  The EBA sought to address this through guidelines but we consider that directly applicable Union law requirements are needed to address issues arising from different implementation in national legal systems, rather than from supervisory practices.

Competent authorities can also face difficulties in conducting in-depth investigations within the time limits for taking decisions on qualifying holdings and authorisations. Establishing evidence that will withstand judicial scrutiny in complex, multi-jurisdiction cases can take a significant amount of time. Establishing targeted measures that may be applied by competent authorities to limit the influence of qualifying holders where failings are, for justifiable reasons, identified after approval for an acquisition has been granted may be useful to deal with such situations.

Finally, there is a concern about the assessment criterion in Article 23(1)(e) CRD regarding how competent authorities establish reasonable grounds to suspect that an acquisition of a qualifying holding could increase the risk of AML/CFT. Without clear assessment criteria set out in Union law there is a risk that such a hypothetical assessment proves difficult to defend and so is not relied on by competent authorities.

**Prudential supervision of AML/CFT**

There is a need to integrate consideration of ML/TF risks as an essential part of the supervision of operational risk by the prudential authorities.

Article 74 CRD contains a broad requirement to have robust governance arrangements including adequate internal control mechanisms, and Article 85 CRD requires competent authorities to ensure that institutions implement policies and processes to evaluate and manage the exposure to operational risk. However, CRD does not specifically set out the risk of financial crime as a risk to



be assessed by institutions and by their prudential supervisors. Indeed, Article 67 CRD in setting out the administrative measures available to prudential supervisors refers to reliance on the existing findings of the AML/CFT supervisor, since paragraph 1 (o) make reference to "*an institution is found liable for a serious breach of the national provisions adopted pursuant to Directive 2005/60/EC*".

This is a minimum list of powers, and does not preclude Member States from providing wider powers, or competent authorities from using other supervisory tools to address risks. Article 104(1) CRD makes clear that prudential supervisors' supervisory powers should be available for the purpose of addressing risks identified in the supervisory review and evaluation process carried out under Article 97 CRD. While ML/TF risk forms part of operational risk in Article 85 CRD, the existence of separate AML/CFT supervisors and the provision in Article 67(1)(o) CRD may mean that it would be helpful to specifically include an article on ML/TF risk in Section II of Chapter 2 of Title VII of CRD to ensure clarity over the role of prudential supervisors.

The EBA could address this issue in part through further development of its SREP guidelines, but it would be useful to look at whether changes should also be made in CRD itself.

**Cooperation between supervisors**

The interaction between prudential and AML supervision is left to national implementation.  The level of cooperation and of information exchanged can therefore vary between Member States, and there are no specific triggers for such information exchange or particular forms of supervisory action. AMLD5 assists in removing barriers to information exchange, but it does not establish positive obligations regarding cooperation. While EBA or joint ESA guidelines could assist here, there are likely to be limits on what can be achieved without a more specific framework in Union legislation.

I would like to reiterate that the EBA continues to take ML/TF issues very seriously as I hope is shown by our enquiries into the MFSA's activities regarding Pilatus Bank and the measures we are taking. Besides the specific breach of Union law enquiries and investigations carried out this year we have developed a broader strategy to review the effectiveness of AML/CFT supervision in all Member States. We remain committed to working with you towards a more robust and effective European AML/CFT regime.

Yours sincerely,

[signed]

Andrea Enria

## Annex B.6

**[Court of Appeal (Inferior Judgment), Appeal number 6/2017, Heikki Niemelä, Mika Lehto both in their capacity as directors of Nemea Bank plc; Nemea Plc (C 45025); Nevestor SA (890.311.134); and Nemea Bank plc (C 45026) (appellees) versus The Malta Financial Services Authority (appellant)]**

Court of Appeal
(Inferior Jurisdiction)

Judge Anthony Ellul

Appeal number:

6/2017

**Heikki Niemelä, Mika Lehto**
**both in their capacity as directors of Nemea Bank plc;**
**Nemea Plc**
**(C 45025);**
**Nevestor SA (890.311.134);**
**and Nemea Bank plc (C 45026)** (appellees)

**V**

**The Malta Financial Services Authority**
**(appellant)**

5 November 2018.

1.  This judgment deals with an appeal filed by the Malta Financial Services
    Authority concerning part of a preliminary decision issued by the Financial
    Services Tribunal on 16 January 2017, whereby it decided that "*it is the
    opinion of the Tribunal that it was legally possible to file this appeal also in
    the name of the company Nemea Bank plc*".

2.  The most relevant <u>facts</u> of this judgment are:

    2.1.  By means of an appeal to the Financial Services Tribunal filed on 11
          May 2016, **Heikki Niemelä**, **Mika Lehto,** both in their personal
          capacity as directors of Nemea Bank plc; **Nemea Plc** (C 45025);
          **Nevestor SA** (890.311.134); and **Nemea Bank plc** (C 45026)
          requested the revocation of a number of decisions made by the Malta
          Financial Services Authority between 12 April 2016 and 26 April 2016.
          The following decisions concern Nemea Bank plc:

          "*(i)*     *The Directive of 12 April 2016 – issued in terms of **art. 4B of the**
                     **Banking Act and art. 16(2)(b) of the Malta Financial Services Act**
                     and inter alia imposing on the bank the obligation to inject fresh capital of
                     €3,000,000;*

          *(ii)*    *The Directive of **15 April 2016** – issued in terms of **art. 4B of the***

1

> *Banking Act and inter alia prohibiting withdrawals of any deposits held with the Bank by shareholders, members of the Board of Directors and senior Management officials;*
>
> (iii) *The Directive of **26 April 2016** – issued in terms of **art. 4B of the Banking Act** and inter alia prohibiting withdrawals by customers in excess of €250 per day;*
>
> (vi) *The Decision of **26 April 2016** – issued in terms of **art. 29(1)(c) and 29(1)(d) of the Banking Act and art. 15A(1)(b) and (c) of the Investment Services Act** by means of which inter alia a competent person was appointed to administer Nemea Bank plc".*

2.2.   The Malta Financial Services Authority replied that the appellants'[1] claims should be denied, both on the substantive issues as well as in view of the following preliminary pleas:

> (i)   "*the absence of any locus standi for the bank to bring this appeal since the appeal was not filed by the person vested with legal and judicial representation of the bank at the time of filing*";
>
> (ii)   "*Mr. Heikki Niemelä, Mr. Mika Lehto do not have the required locus standi to appeal the directives and the decision issued by the MFSA between 12 April 2016 and 26 April 2016*"; and
>
> (iii)   "*neither Nemea Plc, nor Nevestor SA, have the locus standi to appeal the directives and the decision issued by the MFSA between 12 April 2016 and 26 April 2016*".

2.3.   By virtue of a partial decision issued on 16 January 2017, the Tribunal rejected all the preliminary pleas raised by the respondent Authority and ordered that the substantive issues should be heard, with the expenses of the preliminary judgment to be borne by the Authority.

2.4.   In summary, the Tribunal's decision regarding the preliminary pleas, numbered above as (ii) and (iii), was based on the following consideration:

> "*That the tribunal has considered that the impugned Directives are not limited, in their effect and consequences, to the appellant Nemea Bank plc, but provide repercussions to the other Appellants as well. Repercussions which, in the tribunal's opinion, are sufficient to radicate these other Appellants' juridical interest ....*

---

[1] Translator's note: The Maltese text refers to "appellanti" (appellants). However, from the context it is clear that the Court is referring here to the appellees in this case (as defined in the opening text of this judgment). It seems that this confusion arises from the fact that the appellees in this case were the appellants in the previous instance (i.e. they appealed the original MFSA orders before the Financial Services Tribunal, whose decision is now being appealed by MFSA before the Court of Appeal). This confusion in nomenclature persists throughout the rest of the judgment.

> *That the tribunal therefore concludes that the Appellants Niemelä, Lehto, Nevestor SA and Nemea Plc have the juridical interest to institute and continue these proceedings".*

2.5.   With regard to the preliminary plea about the alleged lack of *locus standi* of the Bank itself since the appeal allegedly was not filed *by the person vested with the legal and judicial representation of the bank at the time of filing*, the Tribunal's considerations were the following:

> *"That different considerations apply to the Respondent's preliminary pleas in so far as Nemea Bank plc is concerned … the dispute lies with regard to whether the appeal filed by Nimea Bank plc was filed upon the direction, order or instruction of the person or persons having the judicial or legal representation of such company. The Respondent grounds its objection on the fact that, with effect from the 16th April 2016, a controller was appointed for Nimea Bank plc. which appointment excludes any control or power which the Appellants may have had on the said company.*

> *That Article 29(3)(a) and (b) of the Banking Act is of particular reference to the issue at hand:*

> *…*

> *That the provisions of Article 15A for the Investment Services Act are substantially identical to those of Article 29 of the Banking Act.*

> *That it also noteworthy to add that, in terms of Article 21(7) of the Malta Financial Services Act 'An appeal made under this article shall not suspend the operation of any decision or directive from which the appeal is made.'*

> *That by operation of the above cited provisions of the law, it transpires that at the moment of the institution of this appeal, all powers over Nemea Bank plc were vested in the person appointed by the Respondent in virtue of its Directive of the 26th April 2016.*

> *That it is the Respondent's submission that an appeal against its Directives could only be instituted by the person appointed by the said Respondent by virtue of its Directive of the 26th April 2016.*

> *The tribunal disagrees with this submission, and grounds its disagreement on two reasons.*

> *Firstly, this tribunal is duly listed in the First Schedule of the Administrative Justice Act (Chapter 490 of the laws of Malta), and is consequently bound by the principles arising from the said Act, with special reference to Article 3. The said Article 3 in fact obliges this tribunal to apply principles of good administrative behaviour. In terms*

*of the cited legislation, this would involve respecting the parties' right to a fair hearing ...*

*...*

*However, it is the opinion of this tribunal that it was legally possible to file this appeal also in the name of the company Nimea Bank plc. The effect of paragraphs (a) and (b) of Article 29(3) of the Banking Act, above cited, have application in regard to paragraph (a), '... relating to any assets or business of which the person appointed under either of the paragraphs aforesaid is placed in charge or control', and in regard to paragraph (b), 'in respect of such property, partnerships, firms or other business as the competent authority may specify and in which the credit institution has an interest.'. It is clear that judicial proceedings are not specifically included within the ambit of these provisions. The provisions found in Article 29(1) further support this Tribunal's conclusion, in that the powers therein awarded to the appointed person refer to the conduct of the business of the credit institution, and not to any and all matters concerning that institution.*

*Since the law clearly grants a right of appeal to any aggrieved person, and since Nimea Bank plc is clearly such an aggrieved person, it follows that this company has a right of appeal which can, in no conceivable manner, be limited or controlled by the Respondent. The appointment of the Competent Persons, executed by the Directive dated 26th April 2016, does not include within its effect the expulsion or ejection of the directors from office. So much so that the said Directive contains various orders, aimed at the same directors, to ensure their cooperation with the Competent Person.*

*It follows that those powers not conferred upon the Competent Persons shall constitute residual powers which remain vested in accordance with the Memorandum and Articles of Association. In this case, in the Co-Chairmen who were entitled to proceed with this appeal on behalf of Nimea Bank plc.*

*Additionally, the tribunal is of the view that it would be unreasonable and anomalous to expect that the Respondent-appointed competent person would consider opening proceedings against its own appointer, to whom such person reports, for the purpose of contesting and undermining such person's own appointment".*

3. The Malta Financial Services Authority's appeal of this decision was <u>limited</u> to the part where the Tribunal decided that "*it is the opinion of the tribunal that it was legally possible to file this appeal also in the name of the company Nemea Bank plc*". It says that this part of the Tribunal's decision is based on an incorrect interpretation and application of a point of law.

4. The appellees rebutted the ground of appeal raised by the appellant Authority and argued that the appealed decision is fair and merits confirmation.

**Considerations**.

5.      In its ground for appeal, the Authority contends that the considerations that led to the Tribunal's conclusion, namely that "*it was legally possible to file this appeal also in the name of the company Nemea Bank plc*" are based on an incorrect interpretation and application of the law, with reference to:

    5.1.  Articles 29(3)(a) and (b) of Section 371; and

    5.2.  the principles of good administrative behaviour including the right to a fair hearing.

6.      The Authority firstly refers to that part of the appealed decision where the Tribunal referred to indents 29(1) and (3) of Section 371. However, with reference to (2)(b) and (c), as well as sub-articles (5) and (6) of the same article, it contends that it is obvious from these provisions that the legal and judicial representation in all *ex lege* matters is vested in the competent person appointed by the Authority.

7.      On their part, the appellees say that a reading of this article clearly and unequivocally shows that <u>neither in Article 29(1)(c) and (d)</u>, under the provisions of which the competent person has been appointed, <u>nor in Article 29(3)(a) and (b)</u> is it stated that the legal and judicial representation of the appellee Bank is vested, for all matters, with the competent person appointed by the appellant Authority.

8.      The said Article 29 of Section 371 of the Laws of Malta provides for the power of the competent authority to take control of credit institutions. In the circumstances, it is appropriate that the article be reproduced *verbatim* in its entirety, with emphasis added to those parts to which reference is made by the Tribunal or by the parties:

> "*29. (1) If, whether from any report made under Article 20 or Article 22 or otherwise, it appears to the competent authority that any of the circumstances indicated in Article 9(2) apply, the competent authority, after consulting with the Central Bank, may, without prejudice to the provisions of Article 9(2) –*
>
>     *(a)    require the credit institution forthwith to take such steps as the competent authority may consider necessary to remedy or rectify the matter;*
>
>     *(b)    appoint a competent person to advise the credit institution in the proper conduct of its business;*
>
>     **(c)    appoint a competent person to take charge of the assets of the credit institution or any portion of them for the purpose of safeguarding the interests of depositors;**
>
>     **(d)    appoint a competent person to assume control of the business of the credit institution and either to carry on that business or to carry out such other function or**

*functions in respect of such business, or part thereof, as the competent authority may direct;*

(e) require the credit institution to wind up its business or to wind up its business in Malta;

(f) appoint a competent person to act as liquidator for the purpose of winding up the affairs of the credit institution;

(g) fix the remuneration to be paid by the credit institution to any competent person appointed under this sub-article.

(2) *Where a competent person is appointed by a competent authority –*

(a) under sub-article (1)(b), the credit institution shall act in accordance with the advice given by such person unless and until the competent authority directs otherwise;

(b) *under sub-article (1)(c), the credit institution shall deliver to such person all the assets of which he is placed in charge, and all the powers, functions and duties of the credit institution in respect of those assets, whether exercisable by the company in general meeting or by the board of directors or by any other person, <u>including the legal and judicial representation of the credit institution, shall be exercisable by and vest in him to the exclusion of the credit institution</u>;*

(c) *under sub-article (1)(d), the credit institution shall submit its business to the control of such person and shall provide him with such facilities as he may require in order to carry on that business or to carry out the functions assigned to him under that paragraph, <u>and all the powers, functions and duties of the credit institution, whether exercisable by the company in general meeting or by the board of directors or by any other person, including the legal and judicial representation of the credit institution in all matters, shall be exercisable by and vest in him to the exclusion of any other person</u>.*

(3) *Where a person is appointed under sub-article (1)(c) or (d) –*

(a) *any function, power or duty exercisable by any other person, including the curator of a bankrupt or any other person appointed by or under any other law, and relating to any assets or business of which the person appointed under either of the paragraphs aforesaid is placed in charge or in control, shall, unless or until the competent authority directs otherwise or an express provision of law specifically provides otherwise, cease to be so exercisable;*

(b) *the person appointed under either of the paragraphs aforesaid shall, in respect of such property, partnerships, firms or other business as the competent authority may specify and in which the credit institution has an interest, whether directly or indirectly, including any interest arising from advances or loans made or credit facilities given or any liability undertaken, have*

7

*such powers, functions and duties, including legal and judicial representation, as the competent authority may direct, and any such power, function or duty shall be exercisable by and vest in such person to the exclusion of any other person:*
Provided that:

(i)   the competent authority shall have the power to direct that all or any of the powers, functions or duties aforesaid should be exercisable by any other person, and in any such case, with effect from such date or dates as the competent authority may specify and unless and until the competent authority directs otherwise; the powers, functions and duties to which the direction of the competent authority applies shall be exercisable by and vest in such other person appointed for the purpose to the exclusion of all others;

(ii)   where the competent authority is of the opinion that the credit institution has ceased to have any interest as aforesaid, it shall direct that any powers, functions and duties exercisable under this paragraph shall cease to be so exercisable, but any such direction shall not affect anything done or omitted to be done by virtue or by reason of any of the aforesaid powers, functions or duties;

(c)   the person appointed under either of the paragraphs aforesaid shall have the power to require any other person to provide him with such facilities as he may deem necessary to carry out any of the powers, functions or duties under this article;

(d)   the provision of law relating to bankruptcy and in particular Part III of the Commercial Code shall cease to apply to, and shall cease to operate in respect of, any property, partnership, firm or other business specified by the competent authority under paragraph (b), unless and until, or except to the extent that, the competent authority directs otherwise; and in any such case the person appointed as aforesaid shall, subject to any directions of the competent authority given in the interest of the creditors, act as if those provisions did not exist and as if any declaration of bankruptcy had not been made;

(e)   any person appointed by the competent authority under any of the provisions of this article shall submit six-monthly reports of his activities and annual accounts of all transactions carried out by him in the performance of his functions audited by an independent auditor to the Minister who will provide such reports and accounts to the House of Representatives within fifteen days.

*(4) Where a person is appointed under sub-article (1)(f), such person shall be the liquidator of the company for all purposes of law to the exclusion of any other person.*

*(5)* **The provisions of this article shall have effect notwithstanding any other provision of any enactment, and notwithstanding any deed, contract, instrument or other document whatsoever.**

*(6)* **The foregoing provisions of this article vesting exclusive powers of representation in a person appointed by the competent authority thereunder shall apply also to any act** **or proceedings** **commenced or instituted before such representation vested as aforesaid, and in respect of any such act or proceedings any other person acting or purporting to act, or in respect of whom action is taken, in that capacity shall cease to be a party to, and shall be excluded from, any such act or proceedings.**

*(7) No person shall in any way obstruct a person appointed under sub-article (1) in the performance of any of his functions, powers or duties under this article.*

*(8)   In respect of a credit institution operating in Malta and elsewhere, the offices and branches in Malta of that credit institution shall, if the competent authority so directs and to the extent it so directs, be deemed to constitute a separate credit institution.*

*(9) Upon receipt of a report as is mentioned in sub-article (1), the competent authority shall inform the Central Bank on whether it intends to take any action pursuant to such report and of any action it intends to take thereon."*

9.     It transpires that by virtue of the decision issued by the appellant Authority concerning Nemea Bank plc on 26 April 2016, attached to the application initiating proceedings as "*Document 4*", the firm *PricewaterhouseCoopers* was appointed as competent person in terms of Articles 29(1)(c) and 29(1)(d) of the Banking Act and in terms of Article 15A(1)(b) and (c) of the Investment Services Act. The said decision states the following:

"*The Competent Person shall:*

- *take charge of all the assets of Nemea Bank, including any assets relating directly to its investments services business and interests arising from advances, loans or credit facilities given, for the purpose of safeguarding the interests of depositors, investment services clients and creditors; and*
- *assume control of the banking and investment services business and to continue carrying on that business until such time as the MFSA may direct.*

...

*The Bank is required to co-operate and take all necessary actions to ensure that the Competent Person is able to carry out its responsibilities accordingly. To this effect, the Bank shall, in terms of Article 29(2)(b) and (c) of the Banking Act and Article 15A(2)(b) and (c) of the Investment Services Act, deliver to the Competent Person all the assets of the Bank and control of the banking and investment services business and shall act in accordance with its obligations under the said provisions.*

...

*In terms of its mandate, the Competent Person shall, inter alia,*

- *assume all the powers, functions and duties of the Bank in respect to all assets, whether exercisable by the Bank in general meeting or by the Board of Directors or by any other person, including the legal and judicial representation of the Bank, in terms of Article 29(2)(b) and (c) of the Banking Act and Article 15A(2)(b) and (c) of the Investment Services Act, to the exclusion of the Bank;*

- *...*

- *assume any other powers conferred by the MFSA in terms of Article 29 of the Banking Act and Article 15A of the Investment Services Act ...".*

10.    This Court therefore believes that it is clear that the directors of the appellee Bank <u>have not</u> been completely divested of all their powers and that the same powers were transferred *in toto* to the person chosen by the Authority, as claimed by the appellants. Both the law itself, as well as the decision, state that the legal and judicial representation that is due to the competent person in the present case is **<u>limited</u>** to the particular circumstances referred to in subparagraphs (b) and (c) of Article 29(2) of Section 371.

11.    Article 29(2)(b) of Section 371 requires that when the Authority appoints a competent person to take charge of the assets of the credit institution or any part thereof in order to safeguard the interests of the depositors, the credit institution's legal and judicial representation is exercised by the competent person appointed by the same Authority <u>only with respect to matters concerning those assets that have been placed under the charge of this person</u>.

12.    Article 29(2)(c) of Section 371 deals with the appointment of a competent person to assume control of the credit institution's business. This Court opines that it is <u>only for this reason</u> that the legal and judicial representation of the credit institution in all matters should be exercised by and vested in such person, to the exclusion of anyone else.

13. If this were not so, and the legal and judicial representation were vested in the competent person in all matters as insisted on by the Authority, there would be no need for the legislator to repeat what was already stated under headings (b) and (c) and neither would the legislator need to refer specifically to the particular appointment of the competent person according to sub-articles (1)(c) and (1)(d), respectively.

14. As has already been stated, the appellants[2] appealed before the Tribunal different decisions issued by the Malta Financial Services Authority between 12 April 2016 and 26 April 2016 against Nemea Bank plc. These decisions were adopted because the appellant concluded that Nemea Bank plc. had acted wrongly. Therefore, for example, in one of the MFSA's orders dated 26 April 2016, restrictions were imposed on the bank, *"On the basis of the present uncertainty on the financial soundness of the Bank and the serious shortcomings identified in the joint inspection report drawn up by the ECB and the MFSA"*. That same day, the appellant issued another order whereby it appointed Pricewaterhouse as the competent person in order to carry out the tasks mentioned therein. The appellee justified the order on the basis that *"serious regulatory shortcomings by the Bank have been identified as outlined in Section 2 of the On-Site Inspection report, including a serious lack of provisioning by the Bank"*.

15. The decisions bind the appellee Bank irrespective of who is in charge of the assets or exercises control of its business. Therefore, despite the fact that the first three decisions listed above undoubtedly affect both the appellee Bank's assets as well as the business that might be exercised, **as such, the option to appeal these decisions goes well beyond the exercise of the appellee Bank's business which was entrusted to the competent person**. *Multo magis*, the Authority's decision as such, issued on 26 April 2016, concerns the appointment of that competent person.

16. It therefore follows that, contrary to what is claimed by the appellants[3], the faculty to appeal these decisions exceeds the legal and judicial representation due to the competent person in matters of business regarding the assets and the business of the Bank in question.

17. Subparagraph (6) of Article 29 of Section 371, to which the Authority referred, mentions *"the foregoing provisions of this article"*. Therefore, it should be read in the context of the above-quoted provisions. On its own, it does not give the absolute right of legal and judicial representation to the person appointed by the appellant Authority as it claims.

---

[2] Translator's note: See footnote 1.
[3] Translator's note: See footnote 1.

18.   Moreover, it would not be correct to state that Article 29 was not given effect in the appealed decision due to some other provision of law or to some other provision in any act, deed, writ or other document. Therefore, not even the reference to Article 29(5) of Section 371 upholds the appellant Authority's argument as it claims.

19.   The appellant Authority further disputes that part of the appealed decision where reference was made to the principles of good administrative behaviour including the right to a fair hearing.

20.   In effect, the appellant does not contest the applicability of these principles, but contends that, if anything, the decision in the case *Amadeo Barletta et v The Malta Financial Services Authority* justifies the appeal made by the Bank's shareholders on their own behalf, but not the Bank's appeal. In this context, the appellant once again refers to its interpretation of Article 29 of Section 371 and reiterates that there can be no residual powers that remain vested in the Bank's directors as decided by the Tribunal since all the powers that, prior to the appointment of the competent person, were exercised by the directors/shareholders are exercised by the competent person after the latter's appointment. It also contends that the competent person does not only have the right but also the duty to appeal even against their own appointment if such appointment is not in the interest of the entity which they are appointed to represent. In any case, the Authority contends that it is not in the Tribunal's discretion to try to interpret the law in such a way as to lead to a result that, in the Tribunal's opinion, is reasonable.

21.   With regard to the partial decision in the case *Amadeo Barletta et v The Malta Financial Services Authority*, issued by the First Hall of the Civil Court dated 23 April 2013,[1] it is true that that case was initiated by the shareholders of the company in question on their own behalf. However, that part of the Tribunal's decision was upheld not only by the said decision, but reference was also made to various decisions by the European Court of Human Rights, and specifically *Credit and Industrial Bank v The Czech Republic* (App. No. 29010/95) and *Capital Bank AD v Bulgaria* (App. No. 49429/99).

22.   The appellant makes no reference to those decisions in its appeal, but argues that the competent person has the duty to appeal against their own

---

[1] The final decision is deferred to 15 November 2018

appointment in the case where their appointment is not in the interest of the entity with regard to which they have been appointed. Apart from the fact that this hypothesis is altogether implausible, since in fact the competent person did not appeal any of the decisions referred to above, this argument totally ignores the case-law referred to in the appealed decision.

23.   In the case *Credit and Industrial Bank v The Czech Republic,* the European Court of Human Rights decided that:

> *"69. … As from that date, the powers and functions of the statutory organ of management of the bank were suspended and transferred to the compulsory administrator, who alone was authorised to represent the bank and to appoint a legal representative to conduct proceedings on the bank's behalf. The Court observes that, in its judgment of 30 November 2000, the Supreme Court held that, until the date of entry in the Register, the applicant bank's own statutory body remained empowered to act on the bank's behalf (see paragraph 35 above). However, the Court notes that the entry was in fact made on the day after publication of the CNB's original decision in the Commercial Bulletin. In these circumstances, even assuming that the decision of the CNB was liable to be judicially reviewed and that in any such proceedings the civil courts would have had jurisdiction to review the grounds on which the compulsory administration had been imposed, the Court finds that the applicant bank had no practical possibility of bringing or pursuing such review proceedings through its statutory management body.*
>
> *…*
>
> *72. … The Court, like the Commission, finds that, even assuming the scope of review in such an appeal would have been wide enough to satisfy the requirements of Article 6 of the Convention, the applicant bank had no effective access to court to obtain such a review".*

24.   In the case *Capital Bank AD v Bulgaria*, the European Court reiterated the same concept:

> *"117. Concerning the second limb of the complaint, the Court notes that in the proceedings on the BNB's petition the applicant bank was represented by persons who were dependent, to varying degrees, on the other party to those proceedings – the Central Bank. Before the Sofia City Court the applicant bank was represented by the BNB-appointed special administrators (see paragraph 25 above). Since the Sofia City Court's judgment was immediately enforceable (see paragraphs 28 and 64 above), in the ensuing stages of the proceedings the applicant bank was represented by the liquidators appointed by the insolvency court from a panel of qualified persons selected by the BNB (see paragraph 63 above). The liquidators could be struck off the list kept by the BNB and that would automatically result in their discharge by the insolvency*

> *court (ibid.). In view of the resulting dependence of the liquidators on the BNB, it is not surprising that they did not lodge any appeal against the Sofia City Court's judgment or petition for review of the judgment of the Supreme Court of Cassation's three-member panel, and that they acted in concert with the BNB throughout the proceedings (see paragraphs 29 and 30 above). If the prosecutor's office had not acted in support of the applicant bank and had not lodged an appeal and a petition itself, the bank would have been deprived of access to an appellate jurisdiction (see, mutatis mutandis, Credit and Industrial Bank, cited above, § 72).*

> *118. The rights of access to a court and of adversarial proceedings, enshrined by Article 6, imply, among other things, the possibility for the parties to a civil or criminal trial to be able to effectively participate in the proceedings (see Airey v. Ireland, judgment of 9 October 1979, Series A no. 32, p. 13, § 24; and Stanford v. the United Kingdom, judgment of 23 February 1994, Series A no. 282-A, pp. 10-11, § 26) and adduce evidence and arguments with a view to influencing the court's decision. The litigants' confidence in the workings of justice is based on, inter alia, the knowledge that they have had the opportunity to express their views (see Pellegrini v. Italy, no. 30882/96, § 45, ECHR 2001-VIII). As it was represented by persons dependent on the other party to the proceedings, the applicant bank was unable, especially when the case was being examined by the Supreme Court of Cassation, to properly state its case and protect its interests. It is true that the prosecutor's office came to its aid, but that cannot remedy the fact that it was denied the opportunity to present its case before the courts (see, mutatis mutandis, Philis v. Greece (no. 1), judgment of 27 August 1991, Series A no. 209, pp. 20-23, §§ 58-65). The Court notes in this connection that in July 1999 the Supreme Court of Cassation held that the debtor itself, not the liquidator, had standing to appeal against the winding-up order, for reasons similar to those set out above (see paragraph 62 above). However, that did not happen in the instant case."*

25.     Having applied these principles to the present case, the Tribunal could do nothing but arrive at the conclusion that the fact that the competent person was appointed by the appellant Authority creates a dependency of the said competent person on the same Authority that precludes the appellee Bank from submitting its case against the same Authority through the competent person in an effective manner and in compliance with the legal requirements for a fair hearing.

26.     Nemea Bank plc has more than an interest in contesting the decision that it committed wrongdoing and is therefore an aggrieved person. Certainly, that appeal would not be filed by the competent person appointed by the MFSA, and who was surely not appointed to contest the orders of the MFSA but to carry out what was ordered by the MFSA in its order dated 26 April 2016. In the circumstances, neither can it be said that the competent person is the person who possesses the *locus standi* to contest the appellant's orders in the interest of the Bank.

**For these reasons the Court denies the appeal of the Malta Financial Services Authority, which is to bear all expenses.**

**The Registrar is to send the case file to the Tribunal so that the hearing of the case can continue.**

Anthony Ellul.

**Annex B.7**
**[Order of 21 January 2019, Pilatus Bank v ECB, T-687/18 R,**
**ECLI:EU:T:2019]**

50

Date de réception      :           21/01/2019



ОБЩ СЪД НА ЕВРОПЕЙСКИЯ СЪЮЗ
TRIBUNAL GENERAL DE LA UNIÓN EUROPEA
TRIBUNÁL EVROPSKÉ UNIE
DEN EUROPÆISKE UNIONS RET
GERICHT DER EUROPÄISCHEN UNION
EUROOPA LIIDU ÜLDKOHUS
ΓΕΝΙΚΟ ΔΙΚΑΣΤΗΡΙΟ ΤΗΣ ΕΥΡΩΠΑΪΚΗΣ ΕΝΩΣΗΣ
GENERAL COURT OF THE EUROPEAN UNION
TRIBUNAL DE L'UNION EUROPÉENNE
CÚIRT GHINEARÁLTA AN AONTAIS EORPAIGH
OPĆI SUD EUROPSKE UNIJE
TRIBUNALE DELL'UNIONE EUROPEA

EIROPAS SAVIENĪBAS VISPĀRĒJĀ TIESA
EUROPOS SĄJUNGOS BENDRASIS TEISMAS
AZ EURÓPAI UNIÓ TÖRVÉNYSZÉKE
IL-QORTI ĠENERALI TAL-UNJONI EWROPEA
GERECHT VAN DE EUROPESE UNIE
SĄD UNII EUROPEJSKIEJ
TRIBUNAL GERAL DA UNIÃO EUROPEIA
TRIBUNALUL UNIUNII EUROPENE
VŠEOBECNÝ SÚD EURÓPSKEJ ÚNIE
SPLOŠNO SODIŠČE EVROPSKE UNIJE
EUROOPAN UNIONIN YLEINEN TUOMIOISTUIN
EUROPEISKA UNIONENS TRIBUNAL

LUXEMBOURG

## ORDER OF THE PRESIDENT OF THE GENERAL COURT

### 21 January 2019 *

(Application for interim measures — Economic and monetary policy — Prudential supervision of credit institutions — Application for suspension of operation — No urgency)

— 872 473 —

In Case T-687/18 R,

**Pilatus Bank plc,** established in Ta'Xbiex (Malta), represented by O.H. Behrends, M. Kirchner and L. Feddern, lawyers,

applicant,

v

**European Central Bank (ECB),** represented by E. Yoo, M. Puidokas and A. Karpf, acting as Agents,

defendant,

APPLICATION based on Articles 278 and 279 TFEU seeking suspension of the operation of an act of the European Central Bank contained in an email of 10 September 2018 by which the ECB required that any communication to it by the applicant be made either through the person appointed by the Malta Financial Services Authority or with the approval of that person,

THE PRESIDENT OF THE GENERAL COURT

makes the following

### Order

* Language of the case: English.



EN

**Background to the dispute, procedure and forms of order sought by the parties**

1    The applicant, Pilatus Bank plc, used to be a less significant credit institution within the meaning of Article 6(4) of Council Regulation (EU) No 1024/2013 of 15 October 2013 conferring specific tasks on the European Central Bank concerning policies relating to the prudential supervision of credit institutions (OJ 2013 L 287, p. 63) and, as such, subject to direct prudential supervision by the Malta Financial Services Authority (the 'MFSA').

2    On 21 March 2018, the MFSA ordered the applicant to terminate its operations.

3    On 22 March 2018, the MFSA appointed Mr Lawrence Connell as the so-called Competent Person in order to 'take control of the Bank' (the 'Competent Person').

4    In the context of an exchange with the applicant's legal counsel, the ECB took in its email of 10 September 2018 the following stance (the 'contested act'):

'Finally, taking into consideration that, as you are aware, the [MFSA] has appointed a Competent Person to represent [the applicant] we would like to ask you to direct your comments/future communications with the ECB in respect of [the applicant] via this Person or to attach to any future submission the Competent Person's approval.'

5    On 2 November 2018, the ECB withdrew the applicant's authorisation as a credit institution.

6    By application lodged at the Registry of the General Court on 20 November 2018, the applicant requested that the Court annul the contested act.

7    On 7 December 2018, the applicant, by a separate document, lodged at the Court Registry an application for interim measures pursuant to Articles 278 and 279 TFEU in which it claims that the President of the Court should:

–    suspend the operation of the contested act;

–    order the ECB to pay the costs.

8    In its observations on the application for interim measures, lodged at the Court Registry on 20 December 2018, the ECB contends that the President of the Court should:

–    dismiss the application for interim measures;

–    order the applicant to pay the costs.

2

**Law**

9     It is apparent from a reading of Articles 278 and 279 TFEU, together with Article 256(1) TFEU, that the judge hearing an application for interim measures may, if he considers that the circumstances so require, order that the operation of a measure challenged before the General Court be suspended or prescribe any necessary interim measures, pursuant to Article 156 of the Rules of Procedure of the General Court. Nevertheless, Article 278 TFEU establishes the principle that actions do not have suspensory effect, since acts adopted by the institutions of the European Union are presumed to be lawful. It is therefore only exceptionally that the judge hearing an application for interim measures may order suspension of the operation of an act contested before the General Court or prescribe interim measures (order of 19 July 2016, *Belgium* v *Commission*, T-131/16 R, EU:T:2016:427, paragraph 12).

10     The first sentence of Article 156(4) of the Rules of Procedure requires applications for interim measures to state 'the subject matter of the proceedings, the circumstances giving rise to urgency and the pleas of fact and law establishing a prima facie case for the interim measure applied for'.

11     Accordingly, the judge hearing an application for interim relief may order suspension of operation of an act, or other interim measures, if it is established that such an order is justified, prima facie, in fact and in law, and that it is urgent in so far as, in order to avoid serious and irreparable harm to the applicant's interests, it must be made and produce its effects before a decision is reached in the main action. Those conditions are cumulative, and consequently an application for interim measures must be dismissed if any one of them is not satisfied. The judge hearing an application for interim relief is also required to undertake, when necessary, a weighing of the competing interests (see order of 2 March 2016, *Evonik Degussa* v *Commission*, C-162/15 P-R, EU:C:2016:142, paragraph 21 and the case-law cited).

12     In the context of that overall examination, the judge hearing the application for interim measures enjoys a broad discretion and is free to determine, having regard to the particular circumstances of the case, the manner and order in which those various conditions are to be examined, there being no rule of law imposing a pre-established scheme of analysis within which the need to order interim measures must be assessed (see order of 19 July 2012, *Akhras* v *Council*, C-110/12 P(R), not published, EU:C:2012:507, paragraph 23 and the case-law cited).

13     Having regard to the material in the case file, the judge hearing the application for interim measures considers that he has all the information needed to rule on the present application for interim measures, without there being any need first to hear oral argument from the parties.

14     In the circumstances of the present case, it is appropriate to examine first whether the condition relating to urgency is satisfied.

15    In order to determine whether the interim measures sought are urgent, it should be noted that the purpose of the procedure for interim relief is to guarantee the full effectiveness of the future final decision, in order to prevent a lacuna in the legal protection afforded by the EU Courts. To attain that objective, urgency must usually be assessed in the light of the need for an interlocutory order in order to avoid serious and irreparable damage to the party requesting the interim measure. That party must demonstrate that it cannot await the outcome of the main proceedings without suffering serious and irreparable damage (see order of 14 January 2016, *AGC Glass Europe and Others* v *Commission*, C-517/15 P-R, EU:C:2016:21, paragraph 27 and the case-law cited).

16    Furthermore, according to settled case-law, there is urgency only if the serious and irreparable harm feared by the party requesting the interim measures is so imminent that its occurrence can be foreseen with a sufficient degree of probability. That party remains, in any event, under an obligation to prove the facts that form the basis of its claim that such harm is likely, it being clear that purely hypothetical harm, based on future and uncertain events, cannot justify the granting of interim measures (see order of 16 February 2017, *Gollnisch* v *Parliament*, T-624/16 R, not published, EU:T:2017:94, paragraph 25 and the case-law cited).

17    Following settled case-law, damage of a pecuniary nature cannot, otherwise than in exceptional circumstances, be regarded as irreparable since, as a general rule, pecuniary compensation is capable of restoring the aggrieved person to the situation that prevailed before he suffered the damage. Any such damage could be remedied by the applicant's bringing an action for compensation on the basis of Articles 268 and 340 TFEU (see order of 23 April 2015, *Commission* v *Vanbreda Risk & Benefits*, C-35/15 P(R), EU:C:2015:275, paragraph 24 and the case-law cited).

18    Furthermore, under the second sentence of Article 156(4) of the Rules of Procedure, an application for interim measures must 'contain all the evidence and offers of evidence available to justify the grant of interim measures'.

19    Thus, an application for interim measures must, of itself, enable the defendant to prepare its observations and the judge hearing the application to rule on it, if necessary without any other supporting information, since the essential elements of fact and law on which the application is based must be found in the actual text of that application (see order of 6 September 2016, *Inclusion Alliance for Europe* v *Commission*, C-378/16 P-R, not published, EU:C:2016:668, paragraph 17 and the case-law cited).

20    It is also established case-law that, in order to be able to determine whether the conditions set out in paragraph 16 above are met, the judge hearing the application for interim measures must have hard and precise information, supported by detailed and certified documents showing the situation of the party seeking interim relief and making it possible to examine the actual consequences which

would be likely to result if the measures sought were not granted. It follows that that party, especially where it alleges harm of a financial nature, must, in principle, provide, with supporting documentation, an accurate and comprehensive picture of its financial situation (see order of 29 February 2016, *ICA Laboratories and Others* v *Commission*, T-732/15 R, not published, EU:T:2016:129, paragraph 39 and the case-law cited).

21   Lastly, while the application for interim measures may be supplemented on specific points by references to documents annexed to that application, those documents cannot compensate for the failure to set out the essential elements in that application. It is not the task of the judge hearing the application for interim measures to seek, in place of the party concerned, the information that may be found in the annexes to the application for interim measures, in the main application or in the annexes to that application, which is liable to substantiate the application for interim measures. To impose such an obligation on the judge hearing the application for interim measures would also be likely to deprive of all effect Article 156(5) of the Rules of Procedure, under which the application for interim measures must be made by separate document (see order of 20 June 2014, *Wilders* v *Parliament and Council*, T-410/14 R, not published, EU:T:2014:564, paragraph 16 and the case-law cited).

22   The applicant claims, in order to prove that the condition relating to urgency is satisfied, that the contested act results in a situation in which the applicant cannot, due to the unavailability of the Competent Person, communicate with the ECB. Accordingly, the applicant is not in a position to be compliant with regulatory requirements, to defend its legal position and to assert its rights vis-à-vis the ECB. Furthermore, the applicant fears that the ECB will not be properly informed about its 'true situation'.

23   These arguments cannot prove that the condition relating to urgency is met.

24   Notwithstanding the question whether an action against the contested act is admissible, it must be held that, in any event, the alleged harm is not imminent within the meaning of the case-law cited in paragraph 16 above.

25   It must be stressed that, at the present time, the alleged risk appears to be merely hypothetical.

26   In fact, the applicant does not provide evidence to support its contention that the ECB had refused to communicate with it if such communication was not channelled through the Competent Person or communicated without the approval of the latter and there is no reason to believe that the ECB would in fact refuse to accept such communication from the applicant.

27   That is even more unlikely since the ECB has expressly acknowledged in its written observations that, in view of a judgment by the Court of Appeal of Malta of 5 November 2018, it will no longer request the applicant 'to coordinate' with the Competent Person its communication with the ECB.

28    It follows from the foregoing that the application for interim measures must be dismissed for lack of urgency, without it being necessary to examine the condition relating to a prima facie case or the need to weigh up the interests involved.

29    Pursuant to Article 158(5) of the Rules of Procedure, it is appropriate to reserve the costs.

On those grounds,

### THE PRESIDENT OF THE GENERAL COURT

hereby orders:

1.    **The application for interim measures is dismissed.**

2.    **The costs are reserved.**

Luxembourg, 21 January 2019 .

E. Coulon                                                                  M. Jaeger

Registrar                                                                  President

6

**Annex 4**

**Report for the Hearing by the Judge-Rapporteur received**

**15 October 2020**

Date of acceptance          :                    15/10/2020



ОБЩ СЪД НА ЕВРОПЕЙСКИЯ СЪЮЗ
TRIBUNAL GENERAL DE LA UNIÓN EUROPEA
TRIBUNÁL EVROPSKÉ UNIE
DEN EUROPÆISKE UNIONS RET
GERICHT DER EUROPÄISCHEN UNION
EUROOPA LIIDU ÜLDKOHUS
ΓΕΝΙΚΟ ΔΙΚΑΣΤΗΡΙΟ ΤΗΣ ΕΥΡΩΠΑΪΚΗΣ ΕΝΩΣΗΣ
GENERAL COURT OF THE EUROPEAN UNION
TRIBUNAL DE L'UNION EUROPÉENNE
CÚIRT GHINEARÁLTA AN AONTAIS EORPAIGH
OPĆI SUD EUROPSKE UNIJE
TRIBUNALE DELL'UNIONE EUROPEA

EIROPAS SAVIENĪBAS VISPĀRĒJĀ TIESA
EUROPOS SĄJUNGOS BENDRASIS TEISMAS
AZ EURÓPAI UNIÓ TÖRVÉNYSZÉKE
IL-QORTI ĠENERALI TAL-UNJONI EWROPEA
GERECHT VAN DE EUROPESE UNIE
SĄD UNII EUROPEJSKIEJ
TRIBUNAL GERAL DA UNIÃO EUROPEIA
TRIBUNALUL UNIUNII EUROPENE
VŠEOBECNÝ SÚD EURÓPSKEJ ÚNIE
SPLOŠNO SODIŠČE EVROPSKE UNIJE
EUROOPAN UNIONIN YLEINEN TUOMIOISTUIN
EUROPEISKA UNIONENS TRIBUNAL

**E-CURIA**
- 966991 -

Luxembourg, 09/10/2020
T-27/19-89

Mr Okko Hendrik Behrends
DLA Piper UK LLP
Westhafenplatz 1
60327 Frankfurt am Main
DEUTSCHLAND

**Case T-27/19**

**Pilatus Bank plc and Pilatus Holding ltd.**
v
**European Central Bank**
**European Commission, intervener**

The Registrar of the General Court hereby informs you that the Court has decided to open the oral part of the procedure. The date of the hearing has been set as

**11/12/2020 - 09:30.**

The hearing will be held in one of the courtrooms of the General Court (Kirchberg, Luxembourg).

The Registrar encloses a copy of the following document(s):

| Document(s) | Author(s) | Register number(s) |
|---|---|---|
| Report for the hearing | – | 966940 |

Your attention is drawn to Title V of the **Practice Rules for the Implementation of the Rules of Procedure of the General Court** relating to the oral part of the procedure, and to the **Aide-mémoire: Hearing of oral argument**. The texts governing procedure may be consulted on the Curia website (https://curia.europa.eu).

The lawyers and agents for the parties are requested to limit the length of their oral submissions to 15 minutes (10 minutes for each intervener, if any). If circumstances so require, a request for a derogation from the normal period, stating reasons and the speaking time judged necessary, may be sent to the Registry at least two weeks before the date of the hearing.

- 2 -

In order to facilitate interpretation, parties' representatives are requested to send any text or written notes for their submissions to the Interpretation Directorate in advance by e-mail to Interpretation@curia.europa.eu. Notes for submissions will not be placed on the case-file.

Should you intend not to attend the hearing personally but to have the party represented by a different representative, you are requested to inform the Registrar and to ensure that an authority signed by you and, if necessary, your replacement's certificate of authorisation to practise are submitted before the hearing.



C. Kristensen
Head of unit

- 3 -



Registry of the
General Court

**Practical information regarding the conduct of hearings with effect from 25 May 2020**
**-**

The particular context in which hearings will be organised requires special measures to be taken. The parties' representatives are asked to read carefully the following information:

- In view of the circumstances, the institution cannot make robes available for representatives that would otherwise be without them.

- If it is not possible for a representative to bring a robe for the purpose of the hearing, the court will allow him or her to plead without a robe, in derogation from point 155 of the Practice rules for the implementation of the Rules of Procedure of the General Court.

- Representatives wishing to lodge a written text or file of their pleading to meet the needs of the interpretation services are asked to send them, so far as possible, <u>before noon (local time of the Grand Duchy of Luxembourg) on the working day preceding the date of the hearing to the address</u> <u>Interpretation@curia.europa.eu.</u>

- By derogation from what is indicated in the 'Aide-mémoire: Hearing of oral argument' of the General Court, the judges will not meet with the parties' representatives 5 to 10 minutes before the hearing begins.

The parties' representatives are furthermore asked to consult regularly the website of the Court of Justice of the European Union which contains important messages for the parties regarding the current situation: https://curia.europa.eu/jcms/jcms/p1_3012067/en/

Date of acceptance          :              15/10/2020



| | |
|---|---|
| ОБЩ СЪД НА ЕВРОПЕЙСКИЯ СЪЮЗ | EIROPAS SAVIENĪBAS VISPĀRĒJĀ TIESA |
| TRIBUNAL GENERAL DE LA UNIÓN EUROPEA | EUROPOS SĄJUNGOS BENDRASIS TEISMAS |
| TRIBUNÁL EVROPSKÉ UNIE | AZ EURÓPAI UNIÓ TÖRVÉNYSZÉKE |
| DEN EUROPÆISKE UNIONS RET | IL-QORTI ĠENERALI TAL-UNJONI EWROPEA |
| GERICHT DER EUROPÄISCHEN UNION | GERECHT VAN DE EUROPESE UNIE |
| EUROOPA LIIDU ÜLDKOHUS | SĄD UNII EUROPEJSKIEJ |
| ΓΕΝΙΚΟ ΔΙΚΑΣΤΗΡΙΟ ΤΗΣ ΕΥΡΩΠΑΪΚΗΣ ΕΝΩΣΗΣ | TRIBUNAL GERAL DA UNIÃO EUROPEIA |
| GENERAL COURT OF THE EUROPEAN UNION | TRIBUNALUL UNIUNII EUROPENE |
| TRIBUNAL DE L'UNION EUROPÉENNE | VŠEOBECNÝ SÚD EURÓPSKEJ ÚNIE |
| CÚIRT GHINEARÁLTA AN AONTAIS EORPAIGH | SPLOŠNO SODIŠČE EVROPSKE UNIJE |
| OPĆI SUD EUROPSKE UNIJE | EUROOPAN UNIONIN YLEINEN TUOMIOISTUIN |
| TRIBUNALE DELL'UNIONE EUROPEA | EUROPEISKA UNIONENS TRIBUNAL |

- 88 -

REPORT FOR THE HEARING *

(Economic and monetary policy — Prudential supervision of credit institutions — Specific supervisory tasks conferred on the ECB — Decision to withdraw the authorisation of the credit institution Pilatus Bank Plc — Criterion of reputation — Error of assessment — Proportionality — Presumption of innocence — Rights of defence)

- 966940 -

In Case T-27/19,

**Pilatus Bank plc,** established in Ta'Xbiex (Malta),

**Pilatus Holding Ltd.,** established in Ta'Xbiex,

represented by O.H. Behrends, lawyer,

applicants,

v

**European Central Bank (ECB),** represented by E. Yoo, M. Puidokas and A. Karpf, acting as Agents,

defendant,

supported by

**European Commission,** represented by D. Triantafyllou, A. Nijenhuis and A. Steiblytė, acting as Agents,

intervener,

APPLICATION based on Article 263 TFEU seeking annulment of the decision of the European Central Bank (ECB) of 2 November 2018, ECB-SSM-2018-MT-4, WHD-2018-0014 ('the contested decision'), adopted under Article 4(1)(a) and Article 14(5) of Council Regulation (EU) No 1024/2013 of 15 October 2013

---

* Language of the case: English.



EN

conferring specific tasks on the European Central Bank concerning policies relating to the prudential supervision of credit institutions (OJ 2013 L 287, p. 63) by which it withdrew the authorisation of Pilatus Bank plc to take up the business of a credit institution.

## I.   Background to the dispute

1   Pilatus Bank plc ('Pilatus Bank' or 'the bank'), the first applicant, is a less significant credit institution established in Malta which is subject to direct prudential supervision by the Malta Financial Services Authority ('the MFSA').

2   Pilatus Holding Ltd., the second applicant, is the direct majority shareholder of Pilatus Bank (together, 'the applicants').

3   According to a press release published by the United States Department of Justice (United States) on 19 March 2018, Mr Sadr, the shareholder of Pilatus Bank who indirectly holds 100% of its capital and voting rights, was arrested in the United States on six charges relating to his alleged participation in a scheme in which approximately USD 115 million in payments to finance a housing complex in Venezuela was embezzled for the benefit of Iranian individuals and undertakings.

4   According to the indictment adopted by the United States Attorney for the Southern District of New York (United States), some of the funds used to establish and capitalise Pilatus Bank in 2013 have an illegal origin linked to the Venezuelan project.

5   Following the investigation into Mr Sadr, Pilatus Bank received withdrawal requests totalling EUR 51.4 million worth of deposits, thus approximately 40% of the deposits on its balance sheet.

6   On 21 March 2018, the MFSA adopted a directive with regard to the removal or suspension of voting rights by which it ordered, inter alia, that Mr Sadr be removed from his post as director of Pilatus Bank with immediate effect and from all other decision-making roles within the bank, that he suspend the exercise of his voting rights and refrain from any legal or judicial representation of Pilatus Bank.

7   On the same day, the MFSA adopted the directive with regard to the moratorium, by which it ordered the applicant not to authorise any banking transactions, in particular withdrawals and deposits by shareholders and members of the bank's Board of Directors.

8   On 22 March 2018, the MFSA adopted the directive regarding the appointment of the competent person in accordance with Maltese law, in order to entrust that competent person, in essence, with the exercise of the main powers normally conferred on the bank's governing bodies in respect of its specific activities and its assets.

9    On 29 June 2018, the European Central Bank (ECB) received a proposal from the MFSA to withdraw the applicant's authorisation to take up the business of a credit institution, in accordance with Article 14(5) of Council Regulation (EU) No 1024/2013 of 15 October 2013 conferring specific tasks on the ECB concerning policies relating to the prudential supervision of credit institutions (OJ 2013 L 287, p. 63).

10   On 2 August 2018, the MFSA submitted to the ECB a revised proposal to withdraw the applicant's authorisation to take up the business of a credit institution.

11   The present action seeks the annulment of the decision of the ECB of 2 November 2018, ECB-SSM-2018-MT-4, WHD-2018-0014, adopted under Article 4(1)(a) and Article 14(5) of Regulation No 1024/2013, by which it withdrew the authorisation of Pilatus Bank to take up the business of a credit institution.

## II.   Procedure and forms of order sought

12   On 15 January 2019, the applicants brought an action for the annulment of the contested decision.

13   The ECB lodged its defence on 28 March 2019.

14   By decisions of 20 May 2019, the President of the Second Chamber of the General Court granted the Commission leave to intervene in support of the form of order sought by the ECB.

15   The Commission lodged its statement in intervention within the period prescribed.

16   The applicants lodged their observations on the statement in intervention on 2 August 2019.

17   The applicants lodged the reply on 28 June 2019 and the ECB lodged the rejoinder on 21 August 2019.

18   Following a change in the composition of the Chambers of the General Court, pursuant to Article 27(5) of the Rules of Procedure, the Judge-Rapporteur was assigned to the Ninth Chamber, to which this case was consequently allocated.

19   The applicants claim that the Court should:

      –    annul the contested decision;

      –    order the ECB to pay the costs.

20   The ECB, supported by the Commission, contends that the Court should:

      –    dismiss the action;

–   order the applicants to pay the costs.

## III.   Arguments of the parties

### A.   Admissibility

21   In the first place, the applicants state that the bank's action against the contested decision, of which it is the addressee, is admissible and note that the power of attorney that its directors signed with its legal counsel is valid under Maltese law.

22   In that regard, they state that the ability of the directors of the bank to authorise a lawyer to represent the bank in circumstances such as those in the present case has been recognised by the Maltese case-law, the case-law of the European Court of Human Rights and by the ECB.

23   In the second place, the applicants submit that the action by the bank's shareholder, Pilatus Holding, is also admissible.

24   In that regard, the *ECB*, supported by the *Commission*, submits, in essence, that the action is inadmissible in so far as it was lodged for and on behalf of the second applicant since that applicant has not demonstrated that it has a personal and separate interest in the annulment of the contested decision and is individually concerned by the contested decision.

### B.   Substance

25   In support of their action for annulment, the applicants put forward eleven pleas in law.

### 1.   *The first plea in law, alleging infringement of Article 14(5) of Regulation No 1024/2013 and the right to good administration*

26   In the context of that plea, the *applicants* submit that the ECB did not assume its responsibilities under Article 14(5) of Regulation No 1024/2013 and it infringed the applicants' rights to have their affairs handled impartially, fairly and within a reasonable time by allowing the MFSA to implement a de facto withdrawal of authorisation without any due process by adopting the directives of 21 and 22 March 2018.

27   The contested decision is said to be flawed since, in essence, it is merely a confirmation of a fait accompli created by the MFSA and not a genuine decision by the ECB.

28   The ECB is responsible for the MFSA's actions in that regard since a withdrawal of authorisation falls under its exclusive powers and those powers cannot be delegated to the competent national authority.

29  First of all, the applicants claim, in essence, that the fact that the measure taken by the MFSA has a separate and independent legal basis or that it is a signal cannot justify the adoption by that authority of a measure that has the same effect as a withdrawal of authorisation, regardless of how that measure is described.

30  Similarly, the MFSA's measures cannot be described as a moratorium since they consisted in imposing on the applicant the 'competent person' in accordance with Maltese law to replace all of the bank's statutory representatives and prohibiting the bank from conducting banking business, which is equivalent to a withdrawal of authorisation. The MFSA's measures therefore went beyond a withdrawal of authorisation since they also included the replacement of the bank's statutory representatives by a person who is controlled by the MFSA and acts in accordance with its instructions.

31  Moreover, the applicants submit that it is clear from the letter dated 21 March 2019 from the MFSA to the applicant, entitled 'Clarification to Directive dated 21 March 2018 as regards the moratorium', that the MFSA prohibited the applicant from conducting any business, in particular any regulated business, which goes beyond a withdrawal of authorisation.

32  Furthermore, the MRSA's measures cannot be regarded as temporary solely because they could be withdrawn or annulled.

33  In that context, the applicants take the view that the ECB should have intervened under Article 6(5)(c) of Regulation No 1024/2013 and in accordance with its obligation to ensure high standards of supervision, in essence, in order to ensure compliance with the relevant prudential requirements, the division of powers in respect of decisions to withdraw authorisation and fundamental rules of procedure, inter alia the need for any bank to be truly represented by its own representatives vis-à-vis the regulatory authority rather than being 'represented' by a person who is controlled by that authority.

34  The applicants also state that the first plea in law does not depend on the ECB's obligation to intervene and concerns the flaws in the contested decision which, in essence, stem from the fact that it is merely a confirmation of a fait accompli created by the MFSA and not a genuine decision by the ECB. This is clearly the case since the applicant has been prevented by the MFSA from conducting any banking business for a very long period of time.

35  Lastly, the applicants note that, at the time when the contested decision was adopted, the competent person had, on the MFSA's instructions, discontinued all of the applicant's banking activities for over eight months, and therefore, in reality, the contested decision was not a withdrawal of authorisation but the confirmation of that withdrawal as decided by the MFSA eight months earlier.

36  The *ECB*, supported by the *Commission*, states that it did not fail to fulfil its responsibilities under Article 14(5) of Regulation No 1024/2013 by allowing the

MFSA to implement a de facto withdrawal of authorisation, as the applicants claim.

37    In the first place, it submits that the MFSA's directives of 21 and 22 March 2018 do not constitute a withdrawal of authorisation, but are supervisory measures which are different from such a withdrawal and temporary and which were adopted on a separate and independent legal basis. It notes in that regard that the withdrawal of authorisation falls under its exclusive powers and is permanent in nature, whereas a moratorium, which is a signal of financial difficulties faced by a credit institution, may be lifted and the institution may be authorised to continue carrying out its business. It infers from this that the contested decision cannot be regarded as a confirmatory act and the breaches that occurred in the procedure before the MFSA cannot render the contested decision unlawful.

38    In the second place, the ECB submits, in essence, that, with regard to a less significant credit institution, the MFSA was the competent authority to take the measures contained in the directives at issue and it could not have assumed the direct prudential supervision of the applicant itself as the conditions for carrying out that supervision were not met.

39    The ECB also states that, in respect of that category of institution, it is responsible for supervising the system and may decide to exercise itself all the relevant powers when this is necessary to ensure consistent application of high supervisory standards.

40    Nevertheless, the ECB notes, first, that it was not necessary to ensure the consistent application of high supervisory standards since the MFSA had carried out appropriate supervision of the applicant and, secondly, that the decision to carry out itself the direct supervision of a less significant credit institution falls under a discretionary power which, as such, does not entail any obligation on its part.

41    It infers from this, in essence, that neither Article 6(5)(c) of Regulation No 1024/2013, nor the applicants' right to good administration, the alleged infringement of which is not substantiated by any reasoning, have been infringed.

### 2.    The second plea in law, alleging errors of assessment as to the existence of a ground for the withdrawal of authorisation

42    In support of that plea, the *applicants* submit, in essence, that the contested decision is vitiated by errors of assessment in that it finds that a ground for the withdrawal of authorisation lies in the indictment of Mr Sadr in the United States.

43    In that regard, the applicants submit, in the first place, that the ECB was not able to rely solely on a press release issued by the US authorities, in particular since that press release states that every fact contained in it must be regarded as an allegation.

44  In the second place, the ECB did not examine the facts described in the indictment, nor did it note their general nature. In particular, the applicant claims that the ECB did not take account of the fact that it concerns charges for the infringement of rules relating to US sanctions against Iran, whereas the conduct complained of is not illegal from the perspective of EU law.

45  On that point, the applicants state that the alleged infringements of sanctions concern points of detail and that, at a hearing, a transcript of which has been submitted, a US magistrate expressed doubts as to whether the conduct complained of involved an infringement of sanction rules.

46  The only US aspect is connected to the technical role of a correspondent bank as regards a payment made in US dollars. The charges are based on the idea that even such a secondary support service, which has a minimal financial value equalling a fraction of the fees associated with the payment, may be regarded as 'services from the United States' in accordance with the law of that third State, as was confirmed by a US Government agent at the abovementioned hearing.

47  Moreover, all of the charges, inter alia those for bank fraud and money laundering, are based on the alleged infringement of sanction rules in respect of Iran, which itself is based on the theory that a payment in US dollars from one European bank to another European bank constitutes an export of services from the United States to Iran, since a correspondent bank in the United States was involved in that transaction.

48  Furthermore, the charges against Mr Sadr have no connection with the applicant and the relevant facts predate its existence. It cannot therefore be considered that the mere indirect effect of those accusations on the applicant's reputation prevent it from continuing to exist and such an approach based on references to reputational issues is dangerous and contrary to fundamental rules of procedure.

49  In the fourth place, the ECB is also said to have committed an error by referring to the guidelines of the European Banking Authority (EBA) on the prudential assessment of acquisitions and increases of holdings in the financial sector (JC/GL/2016/01, 'the EBA Guidelines') since they apply only to the acquisition of qualifying holdings which have more limited consequences than a withdrawal of authorisation.

50  In the fifth place, the applicants complain that the ECB, first, did not take into consideration the fact that the key criterion to be assessed in that regard is the sound and prudent management of the credit institution in question.

51  The assessment criteria in Article 23 of Directive 2013/63/EU of the European Parliament and of the Council of 26 June 2013 on access to the activity of credit institutions and the prudential supervision of credit institutions and investment firms, amending Directive 2002/87/EC and repealing Directives 2006/48/EC and 2006/49/EC (OJ 2013 L 176, p. 338), in particular the criterion of reputation in

Article 23(1)(a), should be examined only in the light of that objective and the likely influence of the proposed acquirer on the credit institution.

52    In that regard, the applicants complain that the ECB, in essence, failed to take account of the fact that Mr Sadr's influence on the applicant had already been eliminated long before the contested decision on account of the measures taken by the MFSA, which makes his reputation irrelevant.

53    Secondly, the applicants submit, in essence, that the ECB committed an error by not showing how the allegedly bad reputation of Mr Sadr constituted a potential risk in respect of the sound and prudent management of the applicant.

54    In the sixth place, the applicants complain that the ECB, in essence, did not precisely establish the facts, used the mere existence of allegations as a basis without examining the conduct complained of and the true facts, and incorrectly relied on the general public's perception of the shareholder in question and an allegedly credible and reliable source without verifying whether the criticism of that person was justified and whether that person was able to exercise over the applicant an influence which is incompatible with sound and prudent management.

55    In the seventh place, in essence, the ECB is said to wrongly rely on how the shareholder is perceived by others and not on an objective assessment of that shareholder by referring to withdrawals of deposits.

56    Moreover, the reference to withdrawals of deposits is irrelevant since the withdrawal of authorisation was based on the status of the bank's indirect shareholder and not on a lack of liquidity or it having insufficient funds. In that regard, the applicants note that the withdrawals of deposits were extremely limited and were the result of the MFSA's actions and not the indictment.

57    In the eighth place, the applicants, in essence, highlight the essential difference between the authorisation of an acquisition of a qualifying holding in a credit institution or the granting of an authorisation and the assessment of subsequent developments for the purposes of a potential withdrawal of authorisation, the consequences of which are more serious and the criteria for which must be more strict, in particular the necessary verifications and the time limit for making a decision, than for the authorisation of an acquisition of qualifying holdings.

58    By analogy, the applicants note in that regard that the time that elapsed between the indictment and the contested decision exceeded the 60 days available to the ECB to make a decision on the acquisition of qualifying holdings, that the ECB did not arrange any dialogue with the applicant and that it did not examine all of the assessment criteria or the existence of reasonable grounds, as it is obliged to do so in the context of the procedure for authorising the acquisition of qualifying holdings.

59    The *ECB* submits that the second plea in law is unfounded.

8

60  In the first place, it states that the contested decision is based on a breach of legal requirements, which justifies the withdrawal of a banking authorisation.

61  In that regard, the ECB and the Commission note that grounds for the withdrawal of a banking authorisation exist where where the credit institution no longer fulfils the conditions under which an authorisation was granted and an authorisation cannot be granted unless the competent authority considers that the shareholders or members, whether direct or indirect, that have qualifying holdings, controllers and all individuals who will effectively direct the business of the credit institution are suitable persons to ensure its sound and prudent management.

62  Moreover, the ECB states that the non-compliance with the reputation criterion by a shareholder with a qualifying holding constitutes a ground for the withdrawal of authorisation.

63  According to the ECB, since it concluded in the contested decision that the sole ultimate shareholder, Mr Sadr, was no longer suitable and that, therefore, Pilatus Bank no longer fulfilled the conditions under which its authorisation was granted, the withdrawal of authorisation contained in the contested decision was justified.

64  In the second place, the ECB submits that the assessment of a shareholder's reputation may be based solely on criminal allegations resulting from credible and reliable sources and not necessarily on final convictions.

65  First of all, it states that it assessed Mr Sadr's suitability, taking into account the presumption of innocence and the impact his suitability had on Pilatus Bank and notes that the investigation raised serious doubts as to his integrity even though the charges against him are allegations.

66  Moreover, the ECB and the Commission submit that, according to the EBA Guidelines, integrity is not called into question only in the case of final convictions and any information from credible and reliable sources should be taken into account. The mere fact that an individual is or has been subject to such proceedings is relevant when assessing suitability, in particular where allegations of criminal conduct persist.

67  This follows from the different purposes pursued by prudential supervision as opposed to criminal law. Prudential supervision does not seek to sanction natural persons or to decide whether they are guilty from a criminal law perspective, but to ensure the stability and soundness of credit institutions. That objective therefore requires a forward-looking approach which takes account of the general public's perception of the shareholder's reputation, since a loss of such confidence can rapidly lead to a loss of funding and result in the failure of the operator in question. Furthermore, the negative effects of Mr Sadr's lack of reputation on the sound and prudent management of Pilatus Bank have been clearly demonstrated in the contested decision.

68    Lastly, the ECB submits that circumstances which cast serious doubt on the reliability and suitability of a shareholder can be of relevance from a prudential perspective even if they do not amount to a criminal conviction. This is true in particular where, as in the present case, those circumstances had an impact on the reputation of Pilatus Bank to such an extent that they led to detrimental market sentiment, as evidenced by the significant number of withdrawal requests, representing approximately 42.6% of the total amount of deposits on the balance sheet of Pilatus Bank on 28 May 2018, made by depositors following the initiation of criminal proceedings against Mr Sadr, but also the termination of the majority of relationships with its correspondent banks.

69    In the third place, relying on the EBA Guidelines, the ECB considers that all convictions or prosecutions for a criminal offence are relevant when assessing the integrity of a shareholder even if certain alleged acts are not regarded as illegal under EU law.

70    In that regard, it states that the EBA Guidelines mention as having particular relevance any conviction or prosecution of certain criminal offences, such as fraud or financial crime, including money laundering.

71    Moreover, it notes that, according to the indictment, Mr Sadr was charged with conspiracy to defraud the United States, conspiracy to violate the International Emergency Economic Powers Act, bank fraud, conspiracy to commit bank fraud, money laundering and conspiracy to commit money laundering, the majority of which are subject to severe sanctions.

72    It considers, with the Commission, that all of those allegations cast serious doubt on the reliability and suitability of Mr Sadr and takes the view that, even if some of those allegations relate to acts that are technically not illegal under EU law, they are still relevant from a prudential perspective in order to assess the integrity of a person.

73    In the light of the objective of assessing a person's integrity, which is to ensure the sound and prudent management of a credit institution, and since credit institutions are dependent on the trust of the general public in the way their run their business, the ECB adds, in essence, that charges brought under a foreign law must also be taken into account since they have an impact on the reputation of the relevant person, whether or not the alleged offences are illegal under the law applicable to the credit institution concerned. The relevant fact is that those allegations may, and in fact did, result in the loss of trust and confidence amongst the counterparties of Pilatus Bank.

74    In the fourth place, the ECB explains that the EBA Guidelines also apply in cases of the withdrawal of authorisation from a credit institution. Since one of the conditions for granting an authorisation is that the shareholders are suitable, based on certain criteria, and the EBA Guidelines specify the same criteria in respect of the suitability of persons wishing to acquire qualifying holdings and become

10

shareholders of a credit institution, they are relevant in order to assess the suitability of a current shareholder in a credit institution. In addition, the ECB observes that, in both cases, the objective of the prudential assessment is to ensure the sound and prudent management of a credit institution.

75    In the fifth place, in the rejoinder, the ECB states that it took note of the suspension of Mr Sadr's voting rights and the appointment of a competent person when it adopted the contested decision. The contested decision specifies that the appointment of a competent person to take control of Pilatus Bank cannot be a permanent remedial solution since, by its nature, such a measure is intended to be temporary.

76    It also notes that it is not required to follow the procedures set out in Article 22 of Directive 2013/36, regarding the authorisation of qualifying holdings, in the context of a withdrawal of authorisation.

### 3.    The third plea in law, alleging that the ECB did not exercise its discretion appropriately and failed to exercise that discretion

77    In support of that plea, the *applicants* submit that the contested decision does not take full account of the discretion associated with a withdrawal of authorisation, and the possibility to exercise discretion, which must be exercised even if such a measure may be justified.

78    They consider, in essence, that it is for the ECB to demonstrate that it exercised its discretion in its decision and not for the applicant to prove that it did not do so.

79    Moreover, the applicants submit that the ECB considered that it had to withdraw the authorisation, which shows that it took the view that it had no discretion, and it decided to confirm the fait accompli that the MFSA had created after having initially concluded that a withdrawal of authorisation was not justified, as stated in reports in the media.

80    The *ECB* submits, in essence, that the applicants have not demonstrated that it did not exercise its discretion appropriately and notes that it had to withdraw the bank's authorisation since the bank infringed applicable legal requirements which aim to ensure the sound and prudent management of a credit institution, thus compromising the protection of the interests of depositors, investors and the public.

### 4.    The fourth plea in law, alleging a failure to examine the relevant facts and to assess those facts impartially and objectively

81    In the context of that plea, the *applicants* state that the ECB did not examine the relevant facts impartially and objectively since the contested decision is based on the conclusions by the MFSA which, in turn, are based on allegations by US law enforcement authorities which are merely preliminary and highly tentative. They

11

add that the ECB also did not assess the actual effect of Mr Sadr's indictment on the reputation of the bank, nor did it distinguish that effect from the impact of the MFSA's measures which were implemented immediately following that indictment as well as the impact of the ECB's own public statements and media revelations.

82    The *ECB* considers that none of the arguments put forward by the applicants are capable of calling into question the fact that it did conduct an impartial and objective assessment.

83    First, it states that the contested decision is not based on the conclusions of the MFSA, but on the ECB's evaluations and assessments based on the MFSA's proposal to withdraw the authorisation.

84    Secondly, while the impact on the reputation of Pilatus Bank of the allegations made against Mr Sadr were considered to be relevant, this was not a prerequisite for the withdrawal of authorisation, since the ECB also took into account the requests to withdraw significant amounts made by depositors following the initiation of the criminal proceedings against Mr Sadr and the fact that the majority of Pilatus Bank's correspondent banks terminated their relationships with it, forcing it to transfer the funds held with those banks to the Bank Centrali ta' Malta (Central Bank of Malta, Malta).

85    Moreover, it was not relevant to identify which negative effects on Pilatus Bank stem from the investigation into Mr Sadr and which stem from the measures taken by the MFSA since all of the measures of prudential supervision taken by the MFSA were in response to the investigation into Mr Sadr and had the objective of preventing Pilatus Bank from suffering further negative effects as a result of that investigation.

86    Furthermore, the ECB wishes to highlight that it took account of the gravity and the nature of the allegations against Mr Sadr, contrary to the applicants' claims.

### 5. *The fifth plea in law, alleging infringement of the principle of proportionality*

87    In order to demonstrate infringement of the principle of proportionality, the *applicants* submit that, in the contested decision, the considerations regarding proportionality lack any logical connection with the ground for the withdrawal of authorisation, namely the indictment of Mr Sadr in the United States.

88    According to the applicants, the arguments relating to proportionality contain numerous references to the applicant's allegedly problematic financial position which are entirely unsubstantiated and unsupported by evidence in respect of the ground relied on for the withdrawal. The applicant states in that regard that not only has it satisfied all of the financial regulatory criteria, its figures from the

perspective of those criteria far exceeded those of any other bank in Malta and even the large majority of European competitors.

89    In that context, the applicants complain that the ECB, first, did not give appropriate consideration to other, less restrictive solutions than a withdrawal of authorisation, and disputes the finding that the applicant could not be sold on the ground that it had no significant franchise value, relying on independent valuations which demonstrate that it had a substantial value and interest had been shown in its acquisition.

90    Moreover, the applicants consider that the objective of restoring legality is so abstract that it is devoid of any meaning and that the ECB did not weigh up concrete legitimate prudential objectives with the adverse effects of the proposed decision. According to the applicants, the contested decision should be annulled since it does not examine the main aspect of proportionality, namely whether a withdrawal of authorisation is proportionate where a bank is found to have an indirect shareholder who is allegedly no longer suitable because he has been indicted in the United States.

91    Furthermore, the applicants claim that the ECB did not take into account the simple alternative that it could have adopted, namely publicly announcing that the allegations against Mr Sadr are based on US sanctions against Iran which are not recognised in Europe and which, in any event, are merely allegations.

92    Lastly, according to the applicants, there is a contradiction between the contested decision and the manner in which the ECB responds to misconduct within the ECB, since it submitted in the case concerning the governor of the Latvian central bank brought before the Court that formal indictment for corruption did not justify his removal from his position and insisted that concrete evidence be submitted to the Court despite the existence of sound recordings which prove that bribes were intentionally sought from banks in Latvia.

93    In the reply, the applicants add that the withdrawal of authorisation is disproportionate in the light of the objective to ensure that shareholders are suitable since the examination of that suitability must take account of the influence of those shareholders on the management of the credit institution and be based on the assessment of whether there is a risk that such influence may be inconsistent with the sound and proper management of that institution. Where it has not been demonstrated that the shareholder in question could have a potentially damaging influence, the question as to whether reputational issues with respect to an indirect shareholder may be of general relevance to that institution is irrelevant.

94    They also submit that the contested decision is not proportionate for the additional reason that the indirect shareholder had already been deprived of having any influence on the management of the applicant on account of the MFSA's measures, and therefore a withdrawal of authorisation was no longer necessary.

95   The *ECB* considers, first of all, that the contested decision satisfies the requirements of the principle of proportionality since it is an appropriate measure for attaining the objective of restoring legality and ensuring the sound and prudent management of the bank.

96   The sale of the credit institution to a third party or a group of third parties was proposed but had no chance of success in the light of the reputational damage suffered.

97   Moreover, the ECB notes that it took account of the rights of all stakeholders and the general interest in restoring legality outweighed the bank's individual interest.

98   Furthermore, it notes that the applicants provide no evidence to support their claims that the bank satisfied all of the regulatory requirements, was viable and its performance exceeded all of the other Maltese banks, or to substantiate the estimate of the bank's value.

99   Lastly, the ECB refutes that a public statement by it with the aim, in essence, of adopting a position on the US measures could have been an adequate alternative measure since the integrity of Mr Sadr was in serious doubt and there were risks for the bank.

100   In the rejoinder, the ECB adds that not being of good repute in accordance with Article 23 of Directive 2013/36 presupposes that the sound and prudent management of the credit institution concerned cannot be ensured and, in that context, it took the view that the MFSA's measures could not remedy the situation in a manner that would restore compliance and ensure the bank's future viability.

### 6.   The sixth plea in law, alleging infringement of the nemo auditor principle

101   According to the *applicants*, in essence, since the bank's main difficulties stemmed in the main part from the MFSA's actions, inter alia its inappropriate reaction to the indictment of Mr Sadr in the United States, and the lack of intervention by the ECB despite its dominant role in respect of prudential supervision, to support the contested decision, the ECB cannot rely on the consequences of its own misconduct on account of the fact that it did not perform its role correctly.

102   The *ECB* submits that it was not required to ensure the direct prudential supervision of the bank and the measures taken by the MFSA do not constitute a de facto withdrawal of authorisation.

103   It adds, in essence, that the applicant has not adduced evidence that the statements by the ECB and the MFSA damaged the applicant's reputation and notes that that reputation was negatively affected by the investigation into its shareholder, which led to the publication of very negative articles stating inter alia that the origin of some of the funds invested in its capital was unlawful.

14

### 7.    The seventh plea in law, alleging infringement of the right to the presumption of innocence

104   In support of that plea, the *applicants* claim that the ECB has infringed their right to the presumption of innocence by merely invoking, in an abstract manner, the existence of charges and by misinterpreting the indictment, despite the warning by the US authorities in the press release, without having examined the facts relating to those charges.

105   The *ECB* and the Commission reply, in essence, that the analysis by the ECB did not seek to determine whether Mr Sadr was guilty of having committed a criminal offence, but to determine whether there are circumstances which cast serious doubt on the reliability and suitability of a shareholder concerned by the prudential supervision. This is why it did not examine the facts and evidence that were relevant for the purposes of the criminal investigation, but focused on the facts that were relevant for the purposes of the prudential supervision of Pilatus Bank.

### 8.    The eighth plea in law, alleging infringement of the principles of equal treatment and non-discrimination

106   The *applicants* invoke discrimination arising from the fact that no other bank owned by a Maltese citizen, whose shareholders or management had been formally indicted, had been treated in that manner and the fact that the contested decision contains no comparative analysis in that regard.

107   The *ECB* submits in reply that the applicants do not provide any evidence that other individuals in the same situation have been treated differently, but merely make a vague reference to a cursory examination of press articles. Nor do they substantiate their argument that the contested decision is contrary to the principle of non-discrimination.

### 9.    The ninth plea in law, alleging infringement of Article 19 and recital 75 of Regulation No 1024/2013 and a misuse of powers

108   According to the *applicants*, the initial de facto withdrawal of authorisation by the MFSA, which the ECB reluctantly confirmed, after a long delay, by adopting the contested decision and the appointment by the MFSA, through the consultancy firm 'Promontory', of a US citizen as a competent person progressed so quickly that it was not possible for the MFSA to have properly examined the indictment of Mr Sadr in the United States or the indirect consequences of that indictment on the applicant's reputation.

109   Moreover, there are indications that the closure of the applicant was based on political reasons deriving from a political scandal in Malta and therefore an illegitimate reason may be inferred from the circumstances and the lack of plausible justification in the contested decision. Following the MFSA's measures

but prior to the contested decision, the opposition party in Malta and some of the media tried to make false allegations concerning the applicant inter alia in order to gain political advantage.

110   The public criticism of the Maltese authorities, in particular the MFSA (including criticism by the EBA), mentioned in the contested decision give reason to believe that that public criticism and the desire to be regarded as an effective regulatory authority, and the intention to create a lucrative assignment for Promontory, were the real reasons underlying the MFSA's measures and therefore the contested decision.

111   In addition, a Maltese court decided that the competent person will have to testify about the suspicious circumstances of his appointment.

112   In that regard, the *ECB* recalls that it rejects the applicants' claim that the contested decision is a confirmation of the MFSA's measures and submits with the *Commission*, in essence, that the applicants have not adduced any evidence to support their claims.

### 10.   The tenth plea in law, alleging infringement of the applicants' rights of defence and their right to be heard

113   The applicants claim that their rights of defence and their right to be heard have been infringed since they were systematically deprived of their legal representation and effective representation, the MFSA having prevented this by insisting that it control any appointment of an external lawyer and all of the instructions given to that lawyer. The competent person was regarded as the applicant's sole representative, as the ECB confirmed in its observations in the case which gave rise to the order of 21 January 2019, *Pilatus Bank* v *ECB* (T-687/18 R, not published, EU:T:2019:28) and in the defence. Moreover, the directors of the applicant were not recognised by the ECB as legal representatives. It is irrelevant in that regard that the ECB changed its position on this point after the contested decision was adopted.

114   Furthermore, the directors do not have access to information held by the bank, including documents and IT systems, or to its financial resources, which prevents the lawyer from substantiating his claims regarding the value of the bank and its compliance with statutory requirements. Nor have the directors been able, and they continue to be unable, to finance the bank's legal representation. The applicants also submit in that regard that they will have to supplement and expand their application once effective representation of the bank has been ensured.

115   The applicants infer from this that their right to be heard has not been respected as it was granted to the competent person whereas it should have been granted to the bank's directors.

16

116 The *ECB* states, first of all, that it took account of the residual powers of representation accorded to the directors of the bank by national law after the contested decision was adopted, but submits that the applicants do not substantiate their plea and do not adduce evidence to demonstrate exactly how their rights of defence were infringed during the procedure which gave rise to the adoption of the contested decision.

117 Next, it states that their rights were respected and notes that it obtained the applicants' observations from their legal counsel who was appointed by the bank's governing bodies by a letter sent on 31 August 2018 in the context of the procedure.

118 Lastly, it submits that the applicants' claim that the MFSA's interference prevented the bank from organising effective representation does not concern the procedure which resulted in the adoption of the contested decision and states that it is difficult to assess the relevance of the claim that the directors were and continue to be unable to meet the costs of their legal representation.

## 11. *The eleventh plea in law, alleging infringement of the obligation to state reasons*

119 The *applicants* allege infringement of the obligation to state reasons stemming from the superficial and vague reasoning in the contested decision, which does not make it possible to determine whether it was justified, to assess the severity of the alleged misconduct which gave rise to the indictment of Mr Sadr in the United States and to verify that that conduct was reprehensible from the perspective of EU law.

120 The *ECB* submits that the contested decision contains the facts and legal reasons on which it is based and states that it took account of the nature and gravity of the investigation in order to assess the suitability of Mr Sadr as the sole shareholder of the bank.

121 It also considers that the question whether some of the activities in respect of which Mr Sadr has been investigated are illegal under EU law is irrelevant.

B. Berke
Judge-Rapporteur